Ex. 1

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 20 0212 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

**PLAINTIFF(S):** Heleni Thayre
**ADDRESS:** 12 Euston St. #3 Brookline, MA 02446

**COUNTY** Norfolk

**DEFENDANT(S):** Town of Brookline, et alia

**ATTORNEY:**
**ADDRESS:**

**BBO:**

**ADDRESS:**

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| CO2 | Zoning Appeal | F | ☑ YES ☐ NO |

**\*If "Other" please describe:**

**Is there a claim under G.L. c. 93A?** ☐ YES ☑ NO

**Is this a class action under Mass. R. Civ. P. 23?** ☐ YES ☑ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
  1. Total hospital expenses .................................................................. $
  2. Total doctor expenses .................................................................. $
  3. Total chiropractic expenses .................................................................. $
  4. Total physical therapy expenses .................................................................. $
  5. Total other expenses (describe below) .................................................................. $
    Subtotal (A): $

B. Documented lost wages and compensation to date .................................................................. $
C. Documented property damages to date .................................................................. $
D. Reasonably anticipated future medical and hospital expenses .................................................................. $
E. Reasonably anticipated lost wages .................................................................. $
F. Other documented items of damages (describe below) .................................................................. $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $

**Signature of Attorney/ Unrepresented Plaintiff:** X Heleni Thayre      **Date:** 2/25/20

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record:** X      **Date:**

# COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.

**SUPERIOR COURT
CIVIL ACTION**

NO.   20   02 2

*Heleni Thayre*, Plaintiff(s)

v.

*Town of Brookline, et al.*, Defendant(s)

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK
2020 FEB 25 P 2:13

## SUMMONS

To the above-named Defendant: *Town of Brookline*

You are hereby summoned and required to serve upon *Heleni Thayre*
plaintiff's attorney, whose address is *12 Euston St. #3, Brookline, MA 02446*
an answer to the complaint which is herewith served upon you, within 20 days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken
against you for the relief demanded in the complaint. You are also required to file your answer to the
complaint in the office of the Clerk of this court at Dedham either before service upon the plaintiff's
attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim
which you may have against the plaintiff which arises out of the transaction or occurrence that is the
subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other
action.

WITNESS, **JUDITH FABRICANT, Esquire** ), at *Dedham* the *25*
day of *February*, in the year of our Lord two thousand and *2020*

*Walter F. Dimitry*, Clerk.

NOTES:
1. This summons is issued pursuant to Rules 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption.
   If a separate summons is used for each such defendant, each should be addressed to the particular defendant.

F-33

RECEIVED & FILED

2020 FEB 25 AM 9: 37

CLERK OF THE COURTS
NORFOLK COUNTY

**COMMONWEALTH OF MASSACHUSETTS**

**NORFOLK, ss.**          **SUPERIOR COURT DEPARTMENT**

**Case No.:**      20    0213

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2020 FEB 25 P 2:13

| | |
|---|---|
| HELENI THAYRE | ) |
|     **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **TOWN OF BROOKLINE** and | ) |
| **JESSE GELLER, JOHANNA SCHNEIDER** | ) |
| **MARK ZUROFF, KATE POVERMAN,** | ) |
| **LARK PALERMO,** and **RANDOLPH** | ) |
| **MEIKLEJOHN,** as they are | ) |
| members of the **BROOKLINE ZONING** | ) |
| **BOARD OF APPEALS,** | ) |
| **DANIEL BENNETT** as | ) |
| Building Commissioner for the **TOWN OF** | ) |
| **BROOKLINE, JOSEPH BRAGA** as | ) |
| Deputy Building Commissioner, | ) |
| and **ROBERT DOUGAN** | ) |
| as Building Inspector | ) |
|     **Defendants.** | ) |

## INTRODUCTION

"We ought never to import into a statute words which are not to be found there, unless from a careful consideration of the entire statute it be ascertained that to import such words is necessary to give effect to the obvious and plain intention and meaning of the legislature."

-    Whipple v. Howser, 291 Or 475, 480, 632 P.2d 782 (1981)

1. Plaintiff Heleni Thayre, proceeding *pro se*, files this lawsuit and pursuant to G.L. c. 40A, § 17, hereby appeals the decision (hereinafter referred to as the "Decision") of Defendant Town of Brookline Zoning Board of Appeals and its Members (collectively referred to as the "Board"), dated and filed with the Town Clerk on February 5, 2020 (see Exhibit A). The Decision denies the administrative appeal of the Plaintiff, from a Notice of Violation issued by Defendant Daniel Bennett, as Building Commissioner for the Town of Brookline (hereinafter referred to as the "Commissioner"). This case presents matters of legal interpretation. The first question presented here is one in which the Court must decide whether a zoning board should be allowed to arbitrarily impose a ban on short-term rentals — in direct contravention of the plain wording of an ordinance and the established rules of statutory construction. The second question presented here is whether the Building Commissioner, who has exercised his authority in a manner flagrantly inconsistent with his mandate, has gone beyond what the legislature has authorized him to do.

2. Based on their flawed interpretation of the zoning ordinance, the Board has decided to suppress a property right that Brookline residents have enjoyed since at least the mid-nineteenth century: the leasing of rooms in private homes on a short-term basis (see Exhibit B for comprehensive historical overview). The Board's Decision is arbitrary and capricious for a number of reasons. To start with, the Board's interpretation of Use 51 runs contrary to the plain language of that provision. Use 51 permits the renting of not more than two rooms in a person's home to not more than two lodgers; and in no event can more than four unrelated persons dwell at one time in a unit.[1] Yet nothing whatsoever

---

[1] Use 51 states: "Within a dwelling unit, the renting of not more than two rooms as a lodging without separate cooking facilities and for not more than two lodgers; in the case of a dwelling

in the ordinance prohibits the renting of rooms based on time restrictions. It is irrelevant whether the occupying lodgers stay for one year or ten days. The only aspect of the situation that is regulated by Use 51 is the number of rooms and lodgers permitted. To construe Use 51 as limiting the right to rent property to no fewer than thirty days would be reading into that ordinance a provision which is nowhere to be found. We must look at the language of the ordinance, which is about the use of the property — not the *duration* of that use.

3. It is disturbing how the Commissioner (with the Board's approval) is imposing unlawful restrictions on property rights that the legislature has not sanctioned. He wants to have the power to abridge or enlarge the zoning ordinance at will. And he has effectively rewritten the ordinance to suit his own agenda. But it is not the Commissioner's or the Board's place to change, modify, or attempt to rewrite any portion of a statute by "putting into the body of the statute a limitation which [the legislature] did not think it necessary to prescribe." *Morrill v. Jones*, 106 U.S. 466 (1883). Nor may they add words to a statute or read into it something which is not there. Whenever the language of a statute is plain and conveys a clear and definite meaning, a municipal agency has no right to impose a *contrary* meaning. A law's meaning cannot be changed until those with the authority to change it do so. And in our system of government, that change must come via the legislative process. For short-term rentals to be prohibited then, the ordinance themselves must be democratically amended. It is undisputed that the amendment procedures set forth in G. L. ch. 40A, §5 — which, among other things, requires public notice,

---

unit occupied by unrelated persons, the sum of lodgers and other unrelated persons shall not exceed the limits defined for a family in §2.06, paragraph 1."

minimum public involvement, and two-thirds vote of all the members of the town council — was not followed here.

4. The Board's Decision is nothing more than an attempt to rewrite the provisions of Brookline's zoning ordinance, in excess of its authority and without observance of the amendment procedures mandated by law. It also constitutes a deprivation of property without due process of law, in violation of the Fourteenth Amendment of the United States Constitution and of rights of due process available under applicable law in the Commonwealth of Massachusetts.

5. Furthermore, Defendant Johanna Scneider (hereinafter referred to as "Board Chair Schneider") made several biased statements during the proceedings, which demonstrated a strong antipathy to Airbnbs and those who operate them in Brookline. Her comments impugned the character of the Plaintiff and indicated a predisposition to review the Plaintiff's appeal not on the legal merits thereof, but rather based on her own personal bias. Her lack of impartiality is a violation of the Fourteenth Amendment of the United States Constitution and Article 29 of the Massachusetts Declaration of Rights.

6. Furthermore, the Commissioner's ban against short-term rentals unconstitutionally infringes upon the First Amendment rights of intimate association of Airbnb hosts and guests. Citizens should be able to keep the right to live with and interact at home with whom they choose. To make short-term rentals illegal is to remove an avenue of significant personal and social satisfaction for many of the homeowners hosting Airbnbs.

## JURISDICTION AND VENUE

7. This Superior Court has original and concurrent jurisdiction over claims arising under the Zoning Act, i.e. G.L. c. 40A, per G.L. c. 185, §1(p).

8. Venue is proper in Norfolk County, where Plaintiff's property is located and where the Board operates and where it issued the Decision that is the subject matter thereof.

## PARTIES

9. Plaintiff Heleni Thayre (hereinafter referred to as "Ms. Thayre") is an individual who owns and resides at 12 Euston Street, Unit #3, Brookline, Norfolk County, Massachusetts. (the "Property"). Ms. Thayre was also the petitioner/appellant seeking to overturn the Violation Notice, which the Defendant denied in the enclosed Decision (Exhibit A). Pursuant to M.G.L. c. 40A, § 17, Ms. Thayre has standing to appeal the Board's Decision.

10. Defendant Town of Brookline is a Massachusetts municipality with the Town Clerk's office located at Town Hall, 333 Washington Street, Brookline, MA 02445.

11. Defendant Dan Bennett (The Building Commissioner), Defendant Joseph Braga (Deputy Building Commissioner), and Defendant Robert Dougan (Building Inspector) are public officials for the Town of Brookline, with a principal office at 333 Washington St. Third Floor, Brookline, MA 02445.

12. The Brookline Zoning Board of Appeal is a duly-appointed and duly-organized municipal agency of the Town of Brookline, with its principal office at 333 Washington St, First Floor, Brookline, MA 02445

13. Defendants Jesse Geller, Johanna Schneider, Mark Zuroff, Kate Poverman, Lark Palermo, and Randolph Meiklejohn are duly appointed members of the Board and are named in their capacities as members of the Board. They reside at the following addresses:

a.  Jesse Geller, 1514 Beacon Street, #1, Brookline, MA 02446

b.  Mark Zuroff, 136 Wolcott Road, Chestnut Hill, MA 02467

c.  Johanna Schnedier, 125 Westbourne Terrace #1, Brookline, MA 02446

d.  Kate Poverman, 39 Adams Street, Brookline, MA 02446

e.  Lark Palermo, 828 Hammond Street, Chestnut Hill, MA 02467

f.  Randolph Meiklejohn, 161 Cypress Street, Brookline, MA 02445

## FACTS

14. Plaintiff Ms. Thayre is a 76-year-old retired person on a fixed income who owns and
    resides in a condominium located at 12 Euston Street #3 in Brookline.

15. Ms Thayre has resided in this property since 1976.  When she first moved to 12 Euston
    St,  she rented from and shared this apartment with Ellen Jayne Abromson, whose father
    owned the seven apartment buildings #2 Euston through #24 Euston St.  On or about
    1980, Mr. Abromson sold all seven buildings to a developer, who converted the single
    heating system to individual systems for each building and began to sell the buildings to
    various entities.  All three units at 12 Euston St. were rental units at that time.  The
    renters, including Ms. Thayre, united and negotiated with the developer to convert 12
    Euston into a condominium and all three purchased their units as all three wished to
    continue living there. Ellen Jayne Abromson and one other tenant who was sharing #3,
    continued to live there briefly and rented from Ms.Thayre, who was a student at that time.
    Ms Thayre left school to work full-time to defray the costs of ownership but later
    returned to school and continued renting either one or two bedrooms in her home in order
    to pay her mortgage, real estate taxes, condo fees, building repairs, utilities and insurance.

16. Due to the greatly increased cost of living since the 1980s, which was not matched by increases in her income, renting one or two bedrooms has always been a necessity for Ms Thayre, and she has always shared her living space at #3 with others.

17. Each of the three units which are part of the 12 Euston St Condominium has been rented out by its owners, either in whole or in part, for lengthy periods of time since the creation of this condominium in 1981. The only restriction on these rentals imposed by either the Town or by the condominium documents has been the number of persons to whom they can be rented, which "may not exceed four unrelated persons."

18. Ms. Thayre's condominium has one kitchen, one full bath, a half bath, and three rooms which can be used as bedrooms, one of which is for herself.

19. The condo documents governing the 12 Euston St Condo Trust contain no prohibitions regarding short term rentals nor have they ever since their inception in 1981. Nor has Ms Thayre ever, during her 44-year residence at 12 Euston St., been aware of any restrictions on the length of a rental in her home until she received a Notice of Violation on May 10, 2019, thirty-eight years after her ownership commenced.

20. On May 10, 2019, Defendant Robert Dougan, as Building Inspector for the Brookline Building Department, issued a Notice of Violation against Ms. Thayre pursuant to "Zoning By-Law Ch. 4: Permitted Use #7, Lodging House requiring Special Permit." The Violation Notice ordered her to stop renting to "short-term renters for fewer than 30 days," unless she could secure a special permit as a lodging house. A copy of the Violation order is attached at Exhibit C.

21. A "Lodging House" in the ordinance is defined as "A dwelling structure in which sleeping accommodations without individual cooking facilities are designed to be let for

compensation to *four or more persons* not within the second degree of kinship to the owner or operator." (emphasis added)

22. Ms. Thayre has never operated a Lodging House, in that she has not rented to four or more unrelated persons or rented more than two bedrooms.

23. Defendant Dougan did not ascertain these facts or even speak to Ms. Thayre. He apparently also did not notice that Ms. Thayre's Airbnb listing, which he cited, specified that her rentals were limited to only two guests.

24. The Notice of Violation issued by Defendant Dougan included this paragraph: "A complaint was made in regard to the property you own at 12 Euston Street. It was brought to the Town's attention that you are renting your property as an Airbnb. This was verified by searching property's Airbnb.com's website and finding your property listed for short term rental. This is a violation of the Town of Brookline's Zoning By-Law."

25. Yet nowhere in the ordinance is there any reference to a 30-day limitation for rentals. Nor does the ordinance include the terms "short-term rental" or "long term rental."

26. The Notice of Violation set out what the Town of Brookline required of Ms. Thayre, stating: "REMEDY: Immediately remove your property in the listings of Airbnb.com." (Emphasis supplied.) Directly below the REMEDY portion of the Notice of Violation, the Notice of Violation stated:

Failure to comply with this notice within thirty days (30) of receipt of this notice will result in fines of $1000 per day for each day the violation exists (MGL 143 §§ 94a) as well as enforcement actions through MGL 146 §§ 6 - 12, and court action.

27. In response to the threat of a fine of $1,000 daily, Ms. Thayre did not continue Airbnb rentals and lost needed income, as a result of the Notice of Violation.

28. As soon as she read this notice, Ms. Thayre called Commissioner Bennet to ask about the Violation of Use 7 of the Zoning Bylaws, since her home did not qualify as a Lodging House. Commissioner Bennet insisted Use 7 was applicable to her, but he was unable to explain this in any way that made sense.

29. It came to Ms Thayre's attention around this time that enforcement of the town's ban against short-term rentals is entirely complaint-driven, meaning that town officials do not actively search for violations of the zoning code. She later witnessed this policy publicly stated in a visual presentation to the Town Selectmen on February 18, 2020.

30. On June 10, 2019, Ms. Thayre timely appealed the May 10, 2019 Notice of Violation to the Brookline Zoning Board of Appeals, seeking reversal of the Notice of Violation (see Exhibit D for a copy of Ms. Thayre's appeal). Ms. Thayre therein informed the Zoning Board of Appeals that rental of rooms in her home is allowed under Chapter 4, Permitted Use 51.

31. In her June 10, 2019 appeal, Ms. Thayre included reference to Table of Use Regulations, §4.07 of the Brookline zoning by-law, at Use #51, which allows for the rental of up to two rooms to up to two lodgers, as a permitted use in all zoning districts:

> "Within a dwelling unit, the renting of not more than two rooms as a lodging without separate cooking facilities and for not more than two lodgers; in the case of a dwelling unit occupied by unrelated persons, the sum of lodgers and other unrelated persons shall not exceed the limits defined for a family in §2.06, paragraph 1."

32. The Brookline Zoning Bylaw, at *Section 2.12 "L" Definitions* defines Lodger as "a person who rents for living or sleeping purposes and who is not within the second degree of kinship to the lessor." The definition of Lodger does not contain any minimum time frame for rentals.

33. Although the Brookline Zoning Bylaw includes no definition of "short-term" or "long-term" rental," and Use #51 has no time duration aspects, the Building Commissioner has interpreted the permitted accessory use allowed in Ch. 4, Sec. 4.07, Use #51 as being only for rentals of 30 days or more.

34. The hearing on Ms. Thayre's appeal went forward with Permitted Use #7 being the only violation cited to Ms. Thayre as the basis for the Notice of Violation.

35. In the six months intervening between Ms. Thayre filing her June 10, 2019 appeal of the Notice of Violation, neither the Building Department, nor the Building Commissioner, nor Building Inspector Dougan amended the Notice of Violation or issued an additional Notice of Violation citing any other portion of the Brookline Zoning Bylaw.

36. There was no evidence at the hearing before the Zoning Board of Appeals that Ms. Thayre was in violation of Brookline Zoning Bylaw Ch. 4: Permitted Use #7.

37. The Zoning Board of Appeals made no finding that Ms. Thayre was in violation of the Ch. 4: Permitted Use #7 cited in the Notice of Violation.

38. At no time did the Town of Brookline amend its Notice of Violation, or issue an additional Notice of Violation, charging Ms. Thayre with violation of Chap. 4 Use 51.

39. At the hearing before the Zoning Board of Appeals on December 19, 2019, Ms. Thayre again pointed out to the Zoning Board of Appeals that her rentals are allowed under Brookline Zoning Bylaw Chapter 4, Use 51.

40. At this hearing, the Building Commissioner, via his Deputy Building Commissioner Joseph Braga, provided the Board members with an interoffice memorandum. See attached as <u>Exhibit E.</u>

41. Nowhere in that interoffice memorandum did the Building Commissioner address the violation listed in the Notice of Complaint specifying violation of Use 7.

42. Instead, Building Commissioner Bennett asserted in the memo: "It is my position and that of my two predecessors, that Use 51 has been interpreted to permit only long-term rentals (non transient - greater than 30 days)."

43. However, the Building Commissioner, in this memo, acknowledged, "I understand that the by-law does not specifically reference the non-transient nature of the lodger."

44. Building Commissioner Bennett's Inter-office Memo suggested that the Board give deference to the non-transient "interpretation" disallowing short-term rentals.

45. At the end of the memo, Mr. Bennett stated the following: "If the Zoning Board chooses not to uphold my interpretation of Use 51 the short term use would be permitted as of right and any future by-law change would make the use pre-existing noncomforming and our ability to regulate would be greatly diminished."

46. This indicates a conscious intent to supersede the written text of Use 51 in order to prosecute an independent agenda relating to an upcoming plan of the Town to amend the zoning bylaws.

47. Building Commissioner Bennett's memorandum was not provided to Ms. Thayre, her attorney, or the members of the Zoning Board of Appeals until the hearing was underway. No opportunity was provided by the Zoning Board of Appeals to respond to this Interoffice Memorandum in writing.

48. Defendant Johanna Schneider, Chair of the Board, framed the issue before the Board as the "primary question" as being "whether this case falls under Use 7 or Use 51." (Decision, page 6) Despite posing this question, Board Chair Schneider and the Board failed to rule on the violation set out in the Notice of Complaint served on Ms. Thayre, which only cited violation of Use 7.

49. The Decision recites various testimony, various statements made by and to the members of the Board, but nowhere in the Decision are any findings of fact made at all.

50. Furthermore, Board Chair Schneider failed to recuse herself from the hearing despite her strongly-held personal views that "she is against short-term rentals being operated without the support of the neighborhood." Specifically, she stated:

> "AirBnbs are everywhere. There are many on my street. I find them to be absolutely terrible for the neighborhood...I think it's awful. And I think it is incredibly inconsiderate for a condo owner [referring to Ms. Thayre] to be invading the space of their neighbors, and the privacy of their neighbors, and the sanctity of their condo building —imposing a constant stream of transients on people in their community."[2]

This statement was very inappropriate and was prejudicial to Ms. Thayre.

51. The Decision denying Ms. Thayre's appeal of the Notice of Violation states that: "....the Board voted unanimously to reject the petitioner's Administrative Appeal (filed June 10, 2019) and uphold the Building Commissioner's Notice of Violation (dated May 19,

---

[2] This statement is a direct quote from the recording of the proceeding provided by the Town. Ms. Thayre intends to pay a third-party to transcribe the recording, at an appropriate date.

2019) which cited the Petitioner for renting their [sic "her"] property as a short term rental advertised on Airbnb.com - a use not permitted under the Town's Zoning By-law."

## LEGAL ARGUMENTS

52. The legal defects of the Board's Decision are numerous, and it should be annulled for the following list of reasons:

    a. The Violation for which Ms. Thayre was cited was inapplicable.

    b. A court owes deference to the interpretation of a zoning bylaw by local officials *only* when that interpretation is reasonable. When the plain meaning of the statute lends itself to only one reasonable interpretation, that interpretation controls.

    c. Municipal agencies have no roving license to disregard clear statutory language simply on the view that the legislature must have intended something other than what the statute actually states.

    d. An agency has no authority to tailor legislation to policy goals by rewriting unambiguous statutory terms.

    e. If an agency is dissatisfied with the clear, unambiguous language of a statute, the solution is to amend it via the legislative process. The Board's attempt to accomplish such an amendment through its Decision is unenforceable and must be reversed.

    f. The Building Commissioner's interpretation subverts legislative intent by disproportionately affecting older people on fixed incomes, who need to defray expenses for their homes in order to age in place.

g. Short-term rentals were already a common practice in Brookline when Use 51 was adopted. Hence it cannot be argued that they were not contemplated by the town legislature.

h. The legislature deliberately did not include in the definition of "lodger" any language that imposes a time restriction.

i. The Commissioner's interpretation appears to narrow the term "rent" to refer solely to long-term rentals. But the generic meaning of "rent" cannot be restricted, unless the legislative intent to do so is made clear.

j. The dictionary definition of "lodger" is not a time-restricted term. And an interpretation that limits "lodger" to specifically mean "occupancy lasting thirty days or more" is contradicted by centuries of common usage.

k. The rule of accessory uses recognizes that owners may utilize land in ways an ordinance does not expressly permit. Furthermore, short-term rentals are a customarily incidental use of a home and are an established practice in Brookline — dating back to at least the mid-nineteenth century.

l. The Court should adopt the more reasonable interpretation of the word "lodger" that more closely aligns with other sections of the ordinance.

m. Transient lodgers do not degrade the residential quality of a neighborhood. As long as the property is used for living purposes, it does not cease being "residential" simply because such use is transitory rather than permanent.

n. In so far as they derogate from the common law, restrictions on property rights must be strictly construed and never be extended to include anything not clearly expressed. And where there is doubt or ambiguity with respect to the

interpretation of a zoning regulation, it must be resolved in favor of the property owner.

o. A key member of the zoning board publicly expressed antipathy towards short-term rentals and for those who operate them. Because of these remarks, it is clear that Ms. Thayre did not receive a fair and unbiased hearing.

p. As a matter of actual practice, Commissioner Bennett did not interpret Brookline's zoning bylaws to prohibit short-term rentals until after 2013. And there is little evidence to prove that this interpretation is based on any long-standing practice.

q. Commissioner Bennett's decision to enforce a ban against short-term rentals was made without adequate public notice and appears to not have been published.

r. *Ultra vires* zoning regulations—those regulations that exceed the delegated authority of the regulating agency — constitute an unlawful deprivation of property without due process of law.

s. The right to associate closely with and live with whom one chooses in one's own home should not be subject to government intrusion.

53. The arbitrary, capricious, unlawful, and unconstitutional nature of the Decision is more than enough to warrant vacatur in full. Importantly, while the legal defects of the Board's Decision are many, Plaintiff needs only to prevail on one of her arguments to warrant vacatur in full.

### A. The Violation for which Ms. Thayre was cited was inapplicable.

54. The only portion of the Brookline Zoning Bylaw cited as the basis for the Notice of Violation against Ms. Thayre is "Zoning Bylaw Ch 4: Permitted Use #7 Lodging House requiring Special Permit." At the appeal hearing before the Board,

   a. No evidence was presented to the Board that Ms.Thayre had violated Brookline Zoning Bylaw Ch. 4, Permitted Use #7

   b. The Board made no findings of fact regarding violation of Use 7.

   c. Furthermore, the Board made no determination or ruling that Plaintiff Thayre had violated Use 7.

The Board thereby erred in denying Plaintiff's appeal of the May 10, 2019 Notice of Violation.

**B. A court owes deference to the interpretation of a zoning bylaw by local officials *only* when that interpretation is reasonable. When the plain meaning of the statute lends itself to only one reasonable interpretation, that interpretation controls.**

55. It is a basic and often-cited principle of Massachusetts zoning law that the courts give some measure of deference to the local board's decisions. This deference is due, in part, to the fact that a zoning board is presumed to have special knowledge concerning local matters which are related to a zoning ordinance, like what speed limit to set in town or where to locate a shopping center. But a court owes deference to the interpretation of a zoning bylaw by local officials only when that interpretation is *reasonable*. An incorrect interpretation is not entitled to deference. See *Britton v. Zoning Bd. of Appeals of Gloucester,* 59 Mass. App. Ct. 68, 73-74 (2003) See also *Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley*, 461 Mass. 469, 475 (2012). "[D]eference is not abdication, and it requires us to accept only those agency interpretations that are

reasonable in light of the principles of construction courts normally employ." *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 260, 111 S. Ct. 1227, 1237, 113 L. Ed. 2d 274, 290 (1991) (Scalia, J., concurring). An interpretation that is inconsistent with the design and structure of the statute as a whole, does not merit deference; and in such circumstances, the judiciary is free to ascertain the proper interpretation from the statutory language and legislative intent. Statutory interpretation begins with the language of the statute, the plain meaning of which is derived from its text and its structure. If the meaning of the ordinance is plain on its face, then that interpretation controls — and an agency need not travel further in order to do it justice.

56. A reviewing court would only be required to give deference to an agency's interpretation if the regulation contained an ambiguity.[3] And while courts generally defer to an agency's interpretations of its own ambiguous regulations, they do not do so when the interpretation is "plainly erroneous or inconsistent with the regulation," *Auer*, 519 U.S. at 461, 117 S.Ct. 905 (internal quotation marks omitted), or when such deference would impermissibly "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation,"[4] *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Furthermore, an administrative agency's construction of a statute is accorded much less weight when the only issue to be resolved by a court is a nontechnical question of law. *See* 2B Norman J. Singer, *Statutes and Statutory*

---

[3] An ambiguity does not exist unless reasonable persons can find different meanings in the same statute. If the language of an ordinance is unambiguous — that is, susceptible to only one correct interpretation — then agencies must give effect to the unambiguously expressed intent of the statute and not depart from it. The fact that parties may disagree as to the meaning of an ordinance does not necessarily mean that an ordinance is ambiguous. *Michie's Jurisprudence, Statutes*, p. 310. Likewise, a statute is not rendered ambiguous merely because it is complex and requires some analysis.

[4] This is what we contend is happening in Brookline.

*Construction* § 49:04, 24 (6th ed. 2000 Rev.) See also Matter of Dworman v. N.Y. State

Div. of Housing & Community Renewal, 94 N.Y.2d 359, 704 N.Y.S.2d 192, 725 N.E.2d

613, 619 (1999) ("[W]here, as here, the question is one of pure statutory interpretation

dependent only on accurate apprehension of legislative intent, there is little basis to rely

on any special competence or expertise of the administrative agency and its interpretive

regulations are therefore to be accorded much less weight." (citation omitted) (internal

quotation marks omitted)).

57. The language at issue here is *not* ambiguous. According to the plain language of Use 51,

Ms. Thayre can rent as many as two rooms in her home for *any* duration, so long as there

are (a) no separate cooking facilities for lodgers (b) the number of lodgers does not

exceed two persons and (c) no more than four unrelated persons dwell at one time in the

unit. Use 51 could not be more clear. The only issue in this case is whether the

Commissioner has correctly interpreted the term, "lodger." (*and he has not.*) Thus, the

issue in this case does not involve such complex and technical matters as to warrant an

appreciable level of deference to the Commissioner's interpretation.

**C.   Municipal agencies have no roving license to disregard clear statutory language**

**simply on the view that the legislature must have intended something other than**

**what the statute actually states.**

58. In his interpretation of "lodger," the Commissioner appears to be speculating as to what

he believes the legislature was trying to say (but did not actually say). He currently

interprets the word "lodger" in Use 51 to mean "lodger for thirty days or more," when

there is no textual support for the inclusion of a time restriction. The ordinance defines

"lodger" simply to mean "a person who rents space for living or sleeping purposes

without separate cooking facilities and who is not within the second degree of kinship to the lessor." This definition of lodger, in addition to being clear and unambiguous, has remained unchanged for at least 58 years. Moreover, nothing in the statute itself evinces a legislative intent to impose a time restriction. The Board and Commissioner must therefore, administer and enforce the zoning ordinance as written, without adding new criteria.

59. When a word or phrase is defined as having a particular meaning in a statute, it is that meaning alone which must always be given to it. The Commissioner and the Board cannot ignore the statutory definition of "lodger" and try to impose what they consider to be the *true intended* meaning of the word. It is not necessary —nor should it be allowable— to go beyond the plain meaning of the text in search of such conjecture:

> "In construing a statute where the wording is plain, the [zoning board] cannot speculate upon any supposed intention not expressed....or restrict the ordinary import of the words used, in order to effectuate such supposed intent, but which the statute [itself] does not express." *Zoning Law and Practice* (3d ed), § 15-14.

The intention of every statute must be gathered from the language itself; and it is the duty of the zoning board to simply implement a law as written and not read into that law an intention that was never expressed. As Justice Homes put it: "We do not inquire what the legislature meant; we ask only what the statute means" The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 419 (1899)

**D. An agency has no authority to tailor legislation to policy goals by rewriting unambiguous statutory terms.**

60. Frequently, administrative agencies are charged, implicitly or explicitly, with the task of crafting regulations that are more detailed than statutes and tailored to more situations than the legislation specifies. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council*. Legislators can hardly be expected to illuminate every conceivable facet of a statute's application, and agencies will be compelled, at some point, to fill in the gaps in legislative meaning by assigning their own meaning to the statutory language. But although agencies have a great deal of flexibility in interpreting the statutes they administer, they do not have authority to rewrite clear statutory terms. See e.g. *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S. Ct. 1655, 1663, 146 L. Ed. 2d 621, 632 (2000). ("The administrative power to interpret a regulation does not include the power to rewrite it.") See also *Util. Air Regulatory Grp.* v. *EPA*, 134 S. Ct. 2427, 2445 (2014) ("The power of executing the laws . . . does not include a power to revise clear statutory terms," and it is thus a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). Where the legislature has defined a term in specific terms, agencies have no authority to define it differently.

**E. If an agency is dissatisfied with the clear, unambiguous language of a statute, the solution is to amend it via the legislative process. The Board's attempt to accomplish such an amendment through its Decision is unenforceable and must be reversed.**

61. If an agency is dissatisfied with the clear, unambiguous language of a statute, the solution is to amend it. However, cities and towns must follow intricate procedures when adopting or amending regulatory ordinances. Amendment of the Brookline Zoning Bylaws in

accord with Bylaw §10 and M.G.L. c. 40A §5 is a time-consuming and arduous task, involving the Town selectboard, review by the Planning Board, followed by a hearing held by the Planning Board *and* another hearing by the select board, with specified notice requirements including publication at least 14 days prior to such hearing. The process for amending zoning bylaws also includes notice of the proposed amendment to the department of housing and community development, the regional planning agency, if any, and to the planning board of each abutting city and town, *and* prohibits a vote on a proposed zoning amendment unless the Planning Board has prepared a report on the proposed amendment. Passage of a zoning bylaw amendment must almost meet the high threshold of garnering the votes of two-thirds of the Town Meeting. After approval by two-thirds vote at the Brookline Town Meeting, amendments must also be sent to the Massachusetts Attorney General, accompanied by a report of the Brookline Planning Board. Amendment of a zoning ordinance is further limited with re-submission of a zoning amendment not allowed until two years have passed.

62. The challenging requirements which must be met to accomplish amendment of a zoning bylaw in conformance with Massachusetts state law, means that such amendments are not to be taken lightly, that the property owners and homeowners are not subjected rapid zoning bylaw changes, and that there is an opportunity to notice to residents of Brookline about the nature and content of a proposed zoning amendment as well as notice that a proposed zoning amendment has been approved by the Brookline Town Meeting and the Massachusetts attorney general. Importantly, this amendment process provides protection from hasty changes to a municipal ordinance which has a huge impact on Brookline homeowners and landowners.

63. It is undisputed that the amendment procedure set forth in G. L. 40A, §5 — which, among other things, requires two-thirds vote of all the members of the town council — was not followed here. Therefore, the Board's attempt to accomplish such an amendment *sub rosa* through its Decision is unenforceable and must be reversed.

**F.   The Building Commissioner's interpretation subverts legislative intent by disproportionately affecting older people on fixed incomes, who need to defray expenses for their homes in order to age in place.**

64. In 1961, The Brookline Planning Board released a public report asserting that the town's zoning laws needed "comprehensive revision" and that many of its regulations, dating back to 1922, were "obsolete." One of the most significant proposals for changing the bylaws was the insertion of a clause that would allow residents in single-family districts to rent out additional space in their homes. As the Board realized, this was already a common practice in the town, but up to this point, it was considered illegal. Realizing the injustice this caused to a great number of people, the Planning Board stated (see Exhibit G):

> "The present By-law does not allow lodging houses in single-family districts. Nor has the Town interpreted the renting of a room or two in a single-family district as an accessory use. This is felt to be both unrealistic and unnecessary. Many home-owners in Brookline are illegally renting one or two-rooms, whether for the income or for the comfort of having someone to help shovel snow and help with maintenance, without adverse effect upon the neighborhood. The new By-law allows the renting of one room, without separate cooking facilities, as an

accessory use in any dwelling unit in any district. Depending on the size of the dwelling unit and the district, two rooms may be let to up to three persons as an accessory use."

As is indicated by this statement, the drafters of Use 51 wanted to provide homeowners with companionship, financial security and assistance with daily tasks. More importantly, the drafters wanted older persons to comfortably age-in-place. Aging in place is a term used to describe a person living in the residence of their choice for as long as they are able, as they become older. This allows seniors to maintain continuity in their relationships and their environment. The drafters of Use 51 explicitly stated that this was their goal. They wrote, "for widows or older couples on limited incomes, taking in lodgers has been the *only* way to maintain the family home." (emphasis added). But aging in place becomes significantly harder when short-term rentals are arbitrarily prohibited.

65. Airbnb was created during the Great Recession and has always been powered by everyday people who use what is typically their greatest expense – their housing – as a way to generate supplemental income. Right now, older adults — and especially women aged 60 and older like Ms. Thayre — make up the largest demographic of Airbnb hosts in Massachusetts. For these people, Airbnb is an effective means of ensuring that they are able to maintain ownership of their homes. Nearly 60 percent of older adults who host Airbnb report that income from hosting has helped them stay in their homes, 13 percent report that hosting has helped them avoid foreclosure, and as many as 35 percent said hosting helped them avoid eviction. Older residents who own their homes also have the opportunity to generate additional income through Airbnb at a time in life where many see their income declining and have been forced to draw down on their life savings. As

more and more seniors live on fixed incomes, Airbnb income is a major source — if not the only source — of adequate income being earned to supplement Social Security.

66. A ban against short-term rentals would disproportionately harm older persons on limited incomes— which was the chief demographic the drafters were concerned with. It would also undermine one of the major goals of Use 51: sharing and offsetting the cost of home ownership and maintenance.[5] The board must give the language of the ordinance a reading consonant with the logical goal of the legislative body that enacted the law. Since the record discloses a clear legislative intent to permit the accessory use of rentals which would allow seniors to supplement their incomes and age in place, and since legislation must be accorded a rational interpretation consistent with its manifest purpose, a construction should not be adopted that would deny homeowners the ability to supplement their incomes with short-term rentals.

**G. Short-term rentals were already a common practice in Brookline when Use 51 was adopted. Hence it cannot be argued that they were not contemplated by the town legislature.**

67. In the Decision, Board Chair Schneider incorrectly stated that short-term rentals were not contemplated by the town legislature; when in fact, the drafters of Use 51 were well aware of widespread availability of short-term rentals in Brookline — not just in commercial lodging houses, but also in private homes. Consider for example, the

---

[5] Some argue, therefore, that Airbnb serves to make housing more affordable by providing income to homeowners that can be used to offset mortgage and maintenance costs—in other words, alleviating the economic burden of ownership. Indeed, 60 percent of all Airbnb, many of whom are moderate- to low-income individuals, report that hosting helps them afford to stay in their homes. And in cities that have higher housing costs, this number is closer to 70 percent.

advertisements for furnished rooms in *The Boston Globe* in 1960 — two years before Use 51 was enacted. Out of approximately 1,078 total ads for furnished rooms in Brookline, 325 of those ads specified a *weekly rate* for rent. In other words, short-term rentals represented more than a third of the total ads listed for Brookline:

## January 3, 1960

BROOKLINE—At Braves Field, pleasant rm. with dinette, semi-private bath, kit. privileges, frig., parking, $7 wk. AS 7-9832.

## January 6, 1960

BROOKLINE. 55 Garrison rd., rm. with bath, $16 wk; parking; single rms., $8. LO 6-9304, before 10 a.m. and after 4 p.m.

## January 9, 1960

BROOKLINE. 7 Euston st., off St. Marys, clean, lge. rm., sgle. or dble., kit. priv. $12 wk. BE 2-6209

## January 13, 1960

COOLIDGE CORNER Area —
Beaut. rm., for student, girl or
bus. woman, in priv. fam., 2
closets and extra bathrm., kitch.
priv.; $11. Call LO 6-2503 after
5 p.m.

**January 28, 1960**

BROOKLINE'S largest rm., exc.
loc., tile bath, priv. home, sep.
entr., gent., $14 wk. BE 2-4569.

BROOKLINE—Clean, lge. warm
rm., twin beds, 2 closets, kit.
priv., $12 wk. BE 2-6209.

BRKLNE., Coolidge Cor., lge. cor.
rm., newly furn., prv. bath, prv.
entr. prkg., $16 week. AS 7-1620.

**January 31, 1960**

BROOKLINE — Spacious rm. with
fam., nr. carline, pkg., $8 wk.
AS 7-3897.

68. In contrast, there were only *nine* ads that specified a monthly rate for rent.[6] This amounts

to less than 1 percent out of the total ads for furnished rooms in Brookline. By an

---

[6] The remainder of homeowners (66 percent) did not specify a weekly or monthly rate. This can
be explained by a couple of factors. First, homeowners had to consider the per-line cost of

overwhelming margin then, Brookline homeowners preferred to advertise weekly rentals compared to monthly ones. We must conclude, based on these numbers, that there was a robust demand for short-term rentals in Brookline during the period when Use 51 was proposed and enacted in 1961-62.

69. It is beyond question that the drafters of Use 51 were aware of the widespread availability of short-term rentals. And yet they showed no interest in regulating the length or duration of rentals. Their primary focus in drafting Use 51 was not the duration of occupancy but on the number of occupants and rooms being rented out per unit. If they intended to prohibit short-term rentals, they were more than fully capable of saying so (and it would not have been left to the uncertainty of implication or inference). But we cannot read the law as embodying an intention the local lawmakers plainly did not have.

## H. The legislature deliberately did not include in the definition of "lodger" any language that imposes a time restriction.

70. It must also be noted that the drafters of the town zoning ordinance were quite familiar with the concept of time limits for the use of signs on properties.[7] They knew how to

---

advertising. When putting out ads, they would have had to include more essential details such as a phone number, the location, and amenities (e.g. laundry, kitchen privileges, room size, transportation). There was a limit to the number of details they could reasonably include in an ad. However, when Brookline homeowners did decide to specify a rate for rent, they were *far* more likely to indicate a weekly rate than a monthly one. At a minimum, this fact indicates a willingness to rent out rooms on a short-term basis. But it also suggests that Brookline homeowners were catering to a specific market. In other words, the housing they were providing was filling a short-term need.

[7] *"Non-illuminated non-commercial public message signs may be placed on private property in all zoning districts. Such signs related to a specific event shall be removed by the property owner within 7 days following the event."*

impose a duration on particular uses or types of structures. Rather than apply similar time limits on accessory rentals, they chose not to impose such restrictions.

71. The legislature deliberately did not include in the definition of "lodger" any language that imposes a time restriction. And there is nothing whatsoever to indicate that the legislature made a mistake in using this language which includes no reference to time. Indeed, from 1962 to 2018, the Brookline Zoning Bylaw was amended on approximately 45 occasions. Had the Town Meeting wanted to amend the definition of lodger to add language setting out a duration requirement in the definition of lodger, it has had ample opportunity to do so. But that did not happen.

**I. The Commissioner's interpretation appears to narrow the term "rent" to refer solely to long-term rentals. But the generic meaning of "rent" cannot be restricted, unless the legislative intent to do so is made clear.**

72. The ordinance defines "lodger" simply to mean "a person who rents space for living or sleeping purposes without separate cooking facilities and who is not within the second degree of kinship to the lessor." The word "rent," as stated within this definition of "lodger," is not defined within the bylaws. The Commissioner's interpretation requires a restricted, narrow definition of the word, "rent" that excludes short-term rentals. But a

---

*"All window signs, other than temporary identification signs regulated in subparagraph g. below and non-commercial signs regulated by §7.03, paragraph 2, shall be subject to the design review process ... Such signs may be displayed in a window for no more than 30 days."*

fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning, as customarily derived from the dictionary. A. Scalia & B.A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012).

73. *Black's Law Dictionary* 1411 (9th ed.) defines the verb "rent" only as "to pay for the use of another's property." The Oxford Dictionaries Online also defines the verb "rent," followed by an object, as "the payment of money for the use of a property or other tangible thing." Thus, according to most dictionaries, the verb "rent" is used to describe an action taken by the person who pays for the right to occupy or use someone else's property.

74. The Commissioner cannot restrict the general meaning of statutory language. Because the word "rent" is not formally defined within the bylaws, it must be understood in its general sense to include *any* duration of leasing. This rule is expressed in the maxim, *generalia verba sunt generaliter intelligenda* (Latin for "what is generally spoken shall be generally understood.") A word of general significance in a statute is to be taken in its ordinary and comprehensive sense, unless it is shown that the word is intended to be given a different or restricted meaning. For if the legislature had intended to limit the meaning of the word "rent" to exclude short-term rentals, it would have been easy for it to do so — that it did not, however, gives rise to the presumption that it did *not* intend to limit the general meaning of the word.

75. Another principle of statutory interpretation is expressed by the phrase: "*ubi lex non distinguit, nec nos distinguere debemus*," (Latin for "where the law does not distinguish, we ought not to distinguish"). Establishing distinctions where none are indicated (and

where the law is speaking in purely general terms) is simply arbitrary. Since neither long-term nor short-term rentals are expressly mentioned in the ordinance, there is no basis to exclude one in preference to the other. Unless it is expressly provided by the statute, there should be no distinction in the application of a law where none is indicated.

76. In the Decision, Board Chair Schneider also argues that short-term rentals are distinct and she does not consider them to fall under the general category of "rent" or "rental agreement." Yet M.G.L. c. 64G §1, which governs room occupancy taxes, defines the term "rent" as "the total consideration paid by or on behalf of an occupant" and defines "occupant" as "a person who uses, possesses or has a right to use or possess a room in a bed and breakfast establishment, hotel, lodging house, *short-term rental* or motel for rent under a lease, concession, permit, right of access, license, or agreement." (Emphasis added). And despite Board Chair Schneider's assertion, courts have long characterized the income paid by short-term lodgers as "rent." *See, e.g., Johnson v. Riverside Hotel, Inc.*, 399 F. Supp. 1138, 1139-41 (S.D. Fla. 1975) (obligation of transient guest characterized as "rent"); *Collins v. ViceroyHotel Corp.*, 338 F. Supp. 390, 392 & n.2 (N.D. Ill1.972) (court denominates weekly obligation of hotel guest as "rental" and "rent"); *Green v. Watson*, 36 Cal. Rptr. 362,365 (Dist. Ct. App. 1964) (characterizing both tenants and lodgers as "renting" rooms); *Sloan v. Court Hotel,* 164 P.2d 516, 520-21 (Cal. Dist. Ct. App. 1945) (hotel owner's acceptance of "rent" from plaintiff supported inference of implied contract to accept plaintiff as roomer); *Roberts v. Casey*, 93 P.2d 654, 656-60 (Cal. App. Dep't Super. Ct.1939) (characterizing obligation of apartment hotel occupier as "rent"); *Davis v. Francis Scott Key Apartments*, 140 A.2d 188, 189 (D.C. 1958) (resident of apartment hotel characterized as roomer but described as having

"rented" room); *Lindsey v. Watson*, 83 A.2d 226, 227(D.C. 1951) (stating that rooming

house owner received "rent" from plaintiff roomer); *Tamamian v. Gabbard*, 55 A.2d 513,

513-16 (D.C. 1947) (repeatedly characterizing obligation of roomer as "rent"); *Donin v.*

*Pierce*, 133 So. 178, 178-79 (La. Ct. App.1931) (same); *Trout v. Tipton*, 145 N.E.2d 478,

479-80 (Ohio Ct. App. 1956) (same).

**J. The dictionary definition of "lodger" is not a time-restricted term. And an**
**interpretation that limits "lodger" to *only* mean "occupancy lasting thirty days or**
**more" is contradicted by centuries of common usage.**

77. The term "lodger" was carefully chosen by the drafters of Use 51 because it was

expansive in its meaning and contained no innate restriction as to time. According to *The*

*United Editors Encyclopedia and Dictionary* (1907):

> "The word ["lodger"] has passed through several grades of meaning in different
>
> places and at different times, till it is now almost impossible legally to distinguish
>
> a lodger from a boarder, a hotel guest, or a transient or permanent tenant... A
>
> lodger may remain such or become a boarder...A hotel guest may be a lodger, that
>
> is a sleeper for a single night....Lodger therefore may comprise a whole furnished
>
> house or a single room with sleeping accommodations; *may be occupied one night*
>
> *or for any period*...and may be hired or rented in a hotel or on the premises of a
>
> private family." (emphasis added)

In this sense, the meaning of the word "lodger" is not so much vague as it is simply

*broad,* encompassing a multitude of different usages and customs spanning centuries.

"Where the [legislature] borrows terms of art in which are accumulated the legal tradition

and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." Morissette v. United States, 342 U.S. 246, 263 (1952).

78. According to English and American authorities through successive generations, the term "lodger" has been defined as follows:

    a. "Lodger, one who hires a room or apartment in another person's house." Nathan Bailey: *An Universal Etymological Dictionary* (1721)[8]

    b. "Lodger: One who lives in rooms hired in the house of another" *Dr. Samuel Johnson's Dictionary* (1755)[9]

    c. "Lodger. One who inhabits a portion of a house of which another has the general possession and custody." Bouvier, *Law Dictionary* (1839)[10]

    d. "Lodger: One who lodges or lives at board or in a hired room; one who stays in any place for a time" *Chambers English Dictionary* (1872)[11]

---

[8] *An Universal Etymological English Dictionary* was a dictionary compiled by Nathan Bailey (or Nathaniel Bailey) and first published in London in 1721. It was the most popular English dictionary of the eighteenth century. Bailey's dictionary was one of the first monolingual English dictionaries to focus on defining words in common usage, rather than just difficult words.

[9] Published on 1755 and written by Samuel Johnson, A Dictionary of the English Language, sometimes published as Johnson's Dictionary, is among the most influential dictionaries in the history of the English language. Until the completion of the Oxford English Dictionary 173 years later, Johnson's was viewed as the pre-eminent English dictionary.

[10] In the early United States, law dictionaries from England held the field. That changed, however, in 1839 when John Bouvier published two volumes clumsily titled *A Law Dictionary Adapted to the Constitution and Laws of the United States of America, and the Several States of the American Union.* Bouvier's dictionary went through several editions overtime, expanding in scope and coverage, and for many years was the pinnacle of American law dictionaries.

[11] First published in 1872, *The Chambers Dictionary* contains more words, phrases and meanings than any other single-volume English dictionary.

e. "Lodger: One who occupies hired apartments in another's house" Black's Law Dictionary (1891)[12]

f. " A lodger is one who has leave to inhabit another man's house; one who lives in a hired room or rooms in the house of another." 19 *The American and English Encyclopedia of Law.* (1892)

g. "A person is a lodger who has a defined portion of a house, which is in the occupancy of another person, assigned to him in consideration of a certain rent" *Pitman's Business Man's Encyclopedia and Dictionary of Commerce*, Volume 2 (1922)

As one can see from the many encyclopedias and dictionaries, the traditional definition of "lodger" was not confined to any specific time limit. The distinguishing feature of a lodger is not his or her duration of occupancy — a lodger is simply a person who pays another for the right to occupy a room, but who generally does not have exclusive possession of the premises.[13] The drafters of Use 51 understood and used the phrase in that general sense, consciously adopting it in preference to the alternative word, "tenant."

---

[12] Regarded as the definitive law dictionary in the United States, the first edition was published in 1891. *Black's Law* remains the most widely used law dictionary in the United States.

[13] Several courts have cited similar definitions. See e.g. *White v. Maynard*, 111 Mass. 250, 15 (1872) ("A mere lodger is one who occupies a room or portion of a tenement, which is under the control or in the occupancy of another.") *Thompson v. Ward*, L.R.6. C.P. 327, 360, (1882) ("A lodger is a person whose occupation is part of a house, and subordinate to and in some degree under the control of a landlord.") *Pullman Palace Car Co. v. Lowe*, 23 Nebr. 239, 44 N.W. 226 (1890)("Lodger: One who lives in a hired room or rooms in the house of another.") *Matthews v. Livingston*, 86 Conn 263 (1912) ("A lodger ... has merely a right to the use of the premises, the landlord retaining the control and being responsible for the care and attention necessary and retaining the right of access to the premises for such purpose." *Marden v. Radford*, 229 Mo. App. 789 (1935) ("A lodger lodges with someone who has control over the place where he lodges. When the owner of a house takes a person to reside in part of it.")

Compared to a tenant, a lodger has a passing interest in the use of the premises, has relatively easy access to other temporary quarters, and is free to leave at any time. It is the comparatively *transient* character of the visit, that is, its indefinite or temporary duration, which mostly distinguishes a lodger from a tenant. For example, in *Pollock v. Landis*, 36 Iowa 651, 652 (1886) we find this definition: "A lodger is one who lives at board, or in a hired room, or who has a bed in another's house *for a night*. Webster's Dictionary." (emphasis added). In *Morton v. Palmer*, 51 L. J. 307 (1882), we find this definition, "The word 'Lodger' implies residence or control by the landlord . . . a lodger may be described as one who has a *temporary residence*." Morton v. Palmer, App. (1882). (emphasis added) And to this day, the word "lodger" still carries with it connotations of transience. For instance, in *Chambers Concise Dictionary* (2004) the word lodger is defined as "someone who rents accommodation in someone else's home, *often temporarily*." (emphasis added)

**K. The rule of accessory uses recognizes that owners may utilize land in ways an ordinance does not expressly permit. Furthermore, short-term rentals are a customarily incidental use of a home and are an established practice in Brookline — dating back to at least the mid-nineteenth century.**

79. The Commissioner contends that, because the zoning code does not specifically permit occupancy by lodgers for less than thirty days, short-term rentals are proscribed by the ordinance. Essentially, he takes the position that every use of property is prohibited unless the use is specifically permitted by ordinance. Granted, Brookline's zoning regulations are permissive in nature, meaning that those matters not specifically permitted

are forbidden.[14] It states that no building shall be erected or land shall be used "except for the purposes permitted in the district in the section of this Article applicable thereto." But as a matter of law, this principle only applies to primary use classifications; it does not apply to *accessory uses.*[15]

80. Accessory use provisions permit minor uses of property that owners naturally expect to engage in when they purchase their property for its primary use. The rule of accessory uses recognizes that because general types of real estate have a natural and reasonable tendency to lead to more specific uses, owners may utilize that property in ways an ordinance does not expressly permit. Treisman v. Town of Bedford, 132 N.H. 54, 59, 563 A.2d 786, 789 (1989). Even under a permissive ordinance, a given use may be allowed even if it is not explicitly permitted, so long as it can be deemed an accessory use. *Town of Salem v. Durrett*, 125 N.H. 29, 32, 480 A.2d 9, 10 (1984).

81. Accessory use provisions in zoning laws allow for a range of incidental uses of property too numerous to mention. The drafters of early zoning codes found it more practical to enumerate and separate primary uses into districts than to specify among the countless uses that were customarily associated with each primary use. See 125 N.H. 29, 32, 480 A.2d 9, 10 (1984). ("The rule of accessory use is a response to the impossibility of providing expressly by zoning ordinance for every possible lawful use.") In other words, their approach was to permit *all* accessory uses that were customary in nature.

---

[14] As compared to prohibitive zoning ordinances, where all uses are allowed except those expressly prohibited, permissive zoning regulations are the preference of the majority of the municipalities in Massachusetts.

[15] Accessory uses are activities which, while distinct from the primary or principal use of property, are generally allowed because of their close relationship with the primary use. Tool-sheds, garages, patios, and small decks might be typical examples of an accessory use in a residential use district.

82. Board Member Meiklejohn suggested that since short-term rentals are not listed in the Use Table, the By-law is effectively saying that short-term rentals fit within none of the uses currently documented in the use table and are therefore prohibited. Yet this argument overlooks the definition of "accessory use" in the ordinance. The pertinent section of the zoning ordinance defines accessory use as follows: "a use incident to, and on the same lot as, a principal use." It must be presumed that the Legislature intended each and every word or phrase to have some meaning and serve some useful purpose. If, as Board Member Meiklejohn claims, the only permitted accessory uses are those specifically listed, then the ordinance's general definition of accessory use would be rendered superfluous.[16] See State v. P.T. & L. Const. Co., Inc., 77 N.J. 20, 389 A.2d 448, 451 (1978) (holding that introductory definition of accessory use would be rendered "mere surplusage" if list of accessory uses were deemed exclusive); see also Merrill v. Great Bay Disposal Serv., 125 N.H. 540, 543, 484 A.2d 1101, 1103 (1984) (legislature presumed not to have used superfluous or redundant words). The enumerated permitted accessory uses set forth for a particular zoning district are only intended to provide examples of valid accessory uses; they are not meant to be exhaustive. Nor are they intended to exclude accessory uses implied as a matter of law. As stated in one well-known treatise:

> "In situations where there is no . . . specific provision in the ordinance, the question is the extent to which the principal use as a matter of custom, carries with it an incidental use so that as a matter of law . . . it will be deemed that the

---

[16] "A basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." State v. Goode, 830 So.2d 817, 824 (Fla. 2002)).

legislative intent was to include it." 1 Rathkopf, Zoning Planning (3d Ed.), p. 23-4.

In other words, this standard requires a finding of commonality, meaning a determination of whether the use is so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it. For instance, in *Pratt v. Building Inspector,* the zoning ordinance was silent as to accessory uses; but the court held that an accessory use customarily incident to a residential district was *impliedly* permitted. 330 Mass. 344, 113 N.E.2d 816 (1953).

83. "Customarily incidental" requires that the accessory use be scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use.[17] Numerous court decisions from the early- and mid-20th century have recognized the right of individuals to take in boarders or lodgers as long as the activity was "merely incidental and accessory to the principal use of the house as a home." See 2 ARDEN H. RATHKOPF ET AL., RATHKOPF'S THE LAW OF ZONING AND PLANNING § 33:35 (discussing several cases from the early-20th century illustrating the "general rule . . . that a limited number of boarders is a customarily accessory use of residential property but that where the number of boarders is disproportionate to the primary residential use by the principal occupant it becomes a business") And it has been stated many times in court opinions that the use of a home

---

[17] For example, the kinds of uses that are commonly, habitually and by long practice established as uses that are reasonably associated with a residential use include garages, swimming pools, decks, gazebos, small sheds and small-scale gardening; the kinds of uses that are commonly, habitually and by long practice established as uses that are reasonably associated with an agricultural use include barns, sheds, silos, the storage of farm equipment and machinery, and the raising of crops and livestock.

with incidental renting of a room does not constitute the operation of a commercial lodging house. See e.g. *Carey v. Lauhoff,* 301 Mich 168, 3 N.W.2d 67; *Singelakis v. Davidson*, 117 N.J. L. 332, 188 A. 443; *Rosenblatt v. Levin*, 127 N.J.Eq. 207, 12 A.2d 627.

84. Accessory rentals have long been customarily incidental to private homes. For instance, in 1906, sociologist Albert Wolfe, in describing the prevalence of lodgers in Massachusetts, noted that "[l]odgers in apartment suites and in private families where only a room or two is rented are to be found in considerable numbers."[18] Historically, the home has not merely been a private refuge: it is an economic resource that can be used for generating extra income, for staying out of poverty and for maintaining autonomy at old age.[19] Indeed, whenever a family had space which they could possibly spare, it was often converted into a sleeping place for lodgers. Taking in lodgers also stabilized the family income over periods of unemployment and sickness; it equalized income over the life cycle as lodgers were moved into rooms vacated by children; it also gave widows and single women in middle and old age an opportunity to maintain their own independent household.[20] In fact, taking in lodgers was one of the most common ways in which women earned income up until at least the 1920s.[21]

---

[18] Albert B. Wolfe, *The Lodging House Problem in Boston* (Cambridge: Harvard University Press, 1913)

[19] Hareven, T. K. (2000). Families, History, and Social Change, Oxford: Westview Press.

[20] Daunton, M. J. *Housing the workers, 1850-1914 : a comparative perspective* / edited by M.J. Daunton  Leicester University Press London ; New York  1990

[21] Carswell, A. T. (Ed.) (2012). *The encyclopedia of housing* (Vols. 1-2). Thousand Oaks, CA: SAGE Publications, Inc. doi: 10.4135/9781452218380

85. With regards to short-term rentals in particular, there is a long and established history of individuals in Brookline renting space in their homes to transients (see Exhibit B for comprehensive historical overview). For instance in 1842, Abraham Kohn, a peddler from Bavaria, arrived in Brookline, where for the charge of twenty-five cents he could obtain supper, lodging for the night, and breakfast.[22] During the late nineteenth century, virtually every major town and city offered itinerant workers short-term lodging options, and there were doubtless many migrants who stayed in Brookline. Short-term rentals in private homes made particular sense to this population. The majority of migrants were young, single, and disproportionately male. Since their work was often temporary, seasonal, or otherwise discontinuous, they tended to move in and out of households without staying long. Uncertain of employment from one week to the next, and often paid by the day, they were simply too poor to pay out large sums of money, such as monthly rent. Most migrants had little in the way of personal property, and as the work was often casual or for a fixed period, the best solution was to lodge in a person's home, often for the small sum of ten or fifteen cents a night.

86. Furthermore, throughout the mid-to-late nineteenth century, scores of building tradesmen migrated to Brookline for short periods of time. These tradesmen were particularly drawn to Brookline because of the employment opportunities provided by the construction of new roads, railways, and trolleys. Yet many of the men who worked on these construction projects did so for less than six months at a time, and a significant number

---

[22] Abraham Vossen Goodman, "A Jewish Peddler's Diary," in *Critical Studies in American Jewish History*, 3 vols., ed. Jacob Rader Marcus (Cincinnati: American Jewish Archives, 1971), 1:

spent less than a month at these jobs.[23] Since employment was limited to the length of time needed to complete a project, building tradesmen rarely rented rooms for more than a week at a time.

87. In the early twentieth century, a significant number of middle class households in Brookline contained short-term boarders and lodgers. For instance, in 1917, a 34-year old woman who was a stenographer and proofreader, cited her preference for private homes as opposed to commercial lodging houses. For two dollars per week, this woman rented a room in a private home in Brookline. Like many of her peers, she was charged rent on a weekly basis. Indeed, a simple review of *The Boston Globe* of the period reveals multiple listings for furnished rooms in private homes in Brookline available for rent on a weekly basis:

## September 3, 1916 Sunday (Boston Globe)

> BROOKLINE—Would like to let 1 or 2 rooms in my private home, which is a large detached house in most desirable part of Brookline; beautiful rooms, with unexcelled view of Boston and suburbs; prices $3 and $4. Telephone Brookline 4646-W.

## September 27 1914 (Boston Globe)

---

[23] Webb, W. Loring. (1922). *Railroad construction: theory and practice; a text-book for the use of students in colleges and technical schools, and a hand-book for the use of engineers in field and office.* 7th ed., rev. and enl., New York: John Wiley & sons, inc. [etc., etc.]. *See also* Gabaccia, Donna R. 2004. "Constructing North America: Railroad Building and the Rise of Continental Migrations, 1850 - 1914." In Marc C. Rodriguez (ed.), *Repositioning North American Migration History.* University of Rochester Press

ROOM in private family, attractive, nicely furnished, all modern improvements, $2.50 per week. Apply G. D. N., 104 Franklin st, Brookline, suite 3.                    SSu*

### June, 15 1919 (Boston Globe)

BUNGALOW, living room, kitchenette, furnished, heated, telephone; $4 per week; 40 Atherton road, Brookline. Tel. 5806-W Brookline.                    *

**BROOKLINE**
COOLIDGE COR.—Room in first-class apartment, 1 flight up, $5. Phone Brookline 3788-W.

### November 20 1921(Boston Globe)

**BROOKLINE**
COOLIDGE COR.—Room in first-class apartment, 1 flight up, $5. Phone Brookline 3788-W.

BROOKLINE, Park St.—Warm, sunny room, in modern apartment; steam, electricity, near bath; $5 per week for one, $7.50 for two. Call Brookline 6795-M.

### June 17, 1923 Sun (Boston Globe)

BROOKLINE—Front room, large balcony, $3.50 per week. 40 Atherton road; tel. 1739-W Brookline.

### October 7 1923 (Boston Globe)

> BROOKLINE—To let, in private family, me-
> dium-sized pleasant room with couch instead of
> bed, new house with all improvements; fine
> neighborhood, and convenient to everything; $5
> per week. Tel. Brookline 8676-W or call at 10
> Searle av., near Public Library.

> BROOKLINE—Coolidge Corner, large room
> with private bath, in well-heated apartment,
> $12 per week. Aspinwall 2066.

88. As indicated from the evidence outlined above, short-term rentals existed and were

advertised on a regular basis in the *Boston Globe*. Therefore, it is clear that the

accommodation of short-term lodgers *is in fact* a customarily incidental use of a home—

dating back to at least the nineteenth century and continuing throughout the twentieth

century.

89. Despite what the Board has argued, customarily incidental uses do not need to be

explicitly mentioned in order to be lawful. Otherwise, taken to its logical conclusion, this

would mean that the Board could restrict *any* accessory use without limitation by simply

arguing that the use was one not specifically mentioned. "[A]ny number of other uses,

unquestionably incident to the main use as a matter of custom or convenience, would

automatically be disqualified." P.T. & L. Const. Co., Inc., 389 A.2d at 451.

### L. The Court should adopt the more reasonable interpretation of the word "lodger" that most closely aligns with other sections of the ordinance.

90. In viewing an entire statute, courts start with the proposition that they will not interpret

different statutory provisions as contradicting or undermining one another. *Publishers*

*Forest Prods. Co. v. State*, 81 Wn.2d 814, 816, 505 P.2d 453 (1973) The presumption is

that the legislature intended consistent usage of the same or similar words found in different portions of the statute. See Booma v. Bigelow-Sanford Carpet Co.., 330 Mass. 79, 82, 111 N.E.2d 742 ("It is a familiar canon of construction, that when similar words are used in different parts of a statute, the meaning is presumed to be the same throughout.")

91. The words "lodger" and "lodging house" obviously share the same terminology. But in addition, the statutory definitions of "lodger" and "lodging house" in the town zoning bylaws share nearly identical language and appear to be modeled after each other:

> Lodger: a person who rents space for living or *sleeping purposes without separate cooking facilities* and who is *not within the second degree of kinship to the lessor.* (emphasis added)

> Lodging House: "A dwelling structure in which *sleeping accommodations without individual cooking facilities* are designed to be *let for compensation* to four or more persons *not within the second degree of kinship to the owner or operator,* but not including dormitories, fraternities, or sororities." (emphasis added)

92. As expressed in the bylaws, the words "lodger" and "lodging house" relate to the same subject matter: the leasing of rooms (either in a commercial establishment or a residence) with no separate cooking facilities, to persons unrelated to the lesser or owner. Because these terms closely align with each other, they must be read in *pari materia* ("of the same manner") and given a uniform reading. See Cowles Pub'g Co. v. State Patrol, 109 Wn.2d

712, 722, 748 P.2d 597 (1988) (similar words used in different parts of the same statute are presumed to have the same meaning throughout).

93. Once "lodger" is defined in the ordinance, we must hold that the definition therein provided applies equally to Use 7 (which permits lodging houses to operate in certain districts) as it does to Use 51. However, if we accept the Commissioner's interpretation of "lodger" requiring occupancy of thirty days or more, and apply the same word to Use 7, it results in an absurd outcome: compliance with the thirty-day minimim requirement would prevent lodgers from making short-term use of inns and bed and breakfast establishments in Brookline (!) — an interpretation that no one would reasonably support. If statutory provisions using the same terminology are to be construed in *pari materia*, then we must dispense with the Commissioner's interpretation to avoid this absurd result. The Commissioner cannot avoid this absurdity by simply erecting a wall between the two provisions. He should not be allowed to enforce a different meaning of "lodger" for Use 51 and not apply that same meaning to Use 7. Both provisions pertain equally to the same class of occupants ("lodgers") and must be construed harmoniously, as the *pari materia* rule prescribes.

**M. Transient lodgers do not necessarily degrade the residential quality of a neighborhood. As long as the property is used for living purposes, it does not cease being "residential" simply because such use is transitory rather than permanent.**

94. To accomodate people in your home on a regular basis is a normal residential use of land. A place used for "residential purposes" is, according to its plain and ordinary meaning, "one in which people reside or dwell, or which they make their homes, as distinguished from one which is used for commercial or business purposes." (*Blevins v. Barry-*

*Lawrence Cnty. Ass'n for Retarded Citizens*, 707 S.W.2d 407, 408 (Mo. 1986). Importantly, there is nothing inherent in the concept of "residence" or "dwelling" that includes time. Thus, if an AirBnB guest uses a home for the purposes of eating, sleeping, and other residential purposes, this use is residential, not commercial, no matter how short the rental duration. *See Slaby v. Mountain River Estates Residential Ass'n*, 100 So. 3d 569, 579 (Ala. Civ. App. 2012) ("[P]roperty is used for 'residential purposes' when those occupying it do so for ordinary living purposes. Thus, so long as the renters continue to relax, eat, sleep, bathe, and engage in other incidental activities . . . they are using the [property] for residential purposes.")

95. By not explicitly prohibiting short-term rentals, the local legislature of Brookline has implicitly determined that such practices are in fact, compatible with a residential environment. The owner's receipt of rental income either from short- or long-term rentals in no way detracts or changes the residential characteristics of the use by the tenant. Nor does the payment of business and occupation taxes or lodging taxes detract from the residential character of such use to make the use commercial in character. Even if the property is rented to different people every night, there is no allegation that the tenants are using the property for anything other than ordinary living purposes. And as long as the owner of the property is still using the property as their residence, short-term-rental activity does not rise to the level of a business.[24]

---

[24] The mere presence of short-term rental *activity* does not necessarily create a commercial *use*. A "use" suggests something far more permanent: "[A] long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional . . . ." Black's Law Dictionary (10th ed. 2014). In other words, conducting commercial activity in the home does not create a non-residential, commercial use of property until that activity becomes the primary purpose of the property. See e.g. Houston v. Wilson Mesa Ranch Homeowners' Ass'n, 360 P.3d 255, 260

**N. In so far as they derogate from the common law, restrictions on property rights must be strictly construed and never be extended to include anything not clearly expressed. And where there is doubt or ambiguity with respect to the interpretation of a zoning regulation, it must be resolved in favor of the property owner.**

96. There is one compelling reason for not interpreting the zoning ordinance as *impliedly* prohibiting short-term rentals as an accessory use: it would infringe upon the common rights of the citizen heretofore long recognized. From the outset of this country's founding, private property rights have been a foundational tenet of public policy—indeed, many of the leading political philosophers of the time held that pre-existing property rights were the primary purpose for which people associated into governments. Property rights are also among the oldest protected by common law.[25] Zoning laws are

---

(Colo. App. 2015) ("[R]eceipt of income does not transform residential use of property into commercial use."); O'Connor v. Resort Custom Builders, Inc., 591 N.W.2d 216, 218 (Mich. 1999) (quoting Beverly Island Ass'n v. Zinger, 317 N.W.2d 611, 613 (Mich. 1982) ("A business use 'may not violate a residential use covenant so long as the nonresidential use was casual, infrequent or unobtrusive . . . .'")); Jackson v. Williams, 714 P.2d 1017, 1022 (Okla. 1985) ("Although the commercial nature of a group may have some relevance, that characteristic is not determinative in this case. It is the purpose and method of operation which serves to distinguish the proposed residential use of the home from that normally incident to a purely commercial operation.") Courts should determine whether, under the totality of the circumstances, the primary purpose of a property is to conduct a short-term-rental *business* rather than be a residence. In some cases, it is relatively easy to conclude that rental activity is of a great enough frequency and intensity to cross the line between commercial activity and commercial use: For example, a full-time rental property listed 360 or more days out of the year and never occupied by an owner or tenant is being used to make a profit nearly 100% of the time and is being used as a residence none of the time.

[25] The common law "comprises the body of those principles and rules of action, relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts." Weaver v. Commonwealth, 25 Va. App. 486 (1997). Generally, when one refers to the common law, he or she is referring to laws derived from judicial opinions, and the common law may extend back to the English common law that existed before the United States was established. Prior to the

said to be in derogation of the common law and operate to deprive an owner of a use which otherwise would be lawful. Therefore, to legitimately operate in derogation of the common law, the provisions of a zoning ordinance must be crystal clear and unambiguous, and never extended by implication to include anything not clearly expressed. *HEEF Realty and Investments, LLP v. City of Cedarburg Board of Appeals*, 2015 WI App 23, 361 Wis. 2d 185, 861 N.W.2d 797, 14-0062. See also 8 Eugene McQuillin, The Law of Municipal Corporations, § 25.71 (3d ed.1991) ("[Z]oning regulations should not be extended by construction beyond the fair import of their language and they cannot be construed to include by implication that which is not clearly within their express terms.").

97. Courts in Massachusetts have historically held that laws in derogation of the liberty of property owners are to be strictly construed and given effect only to the extent clearly expressed by their terms. *Gibson v. Jenney*, 15 Mass. 205. *Gagnon v. Ainsworth*, 283 Mass. 488, 490. *Melody v. Real*, 4 Mass. 471. To construe a zoning ordinance "strictly" is to refrain from drawing inferences that do not arise from the text's necessary implications. "The prevailing rule in most jurisdictions ... is that zoning laws should be strictly construed in favor of the property owner or to favor the free use of property." 83 Am. Jur. 2d *Zoning and Planning* § 595 (2017)

98. This Complaint asserts that there are no ambiguities in Use 51. Hence, there is no need to divine or speculate about hidden meanings or unclear intentions — because there are none. Yet even assuming, *arguendo*, the statute was ambiguous with regards to undefined words like "rent," where doubt exists as to the intended meaning of words in a statute,

---

enactment of zoning laws, questions concerning an individual's right to peacefully use his or her own property were governed exclusively by the common law.

that doubt must be resolved in favor of Ms. Thayre, so that she is afforded the broadest possible use and peaceful enjoyment of her property. See Rathkopf, *The Law of Zoning and Planning* (1960), ch 8, p 8-1 ("The language [of a statute] must be interpreted, where doubt exists as to the intention of the legislative body, in favor of the property owner, and against any implied extension of the restriction.") See also *Anderson v. Shackelford*, 76 So. 343, 345 (Fla. 1917), citing 1 *Dillon on Municipal Corp.* (4th Ed.) § 91 ("It is a *fundamental and universal* rule that any ambiguity or doubt … which may affect the common-law right of a citizen or inhabitant, should be resolved against the municipality.") (emphasis in original)

99. To summarize:

    a. As it currently stands, nothing in the language of bylaws prohibits the renting of rooms based on any duration or time

    b. Because the word "rent" is not formally defined within the bylaws, it must be understood in its general sense to include *any* duration of leasing.

    c. The plain language of Use 51 makes no distinction between short- and long-term rentals.

    d. If the language of the statute is clear and unequivocal, then the legislative intent must be derived from the words used without engaging in speculation as to what the the legislators intended or should have intended.

    e. Neither courts nor local agencies can rewrite a statute's plain text to correspond to its supposed purposes. See Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 462 (2002) ("We will not alter the text in order to satisfy the policy preferences of" an agency).

f.  Even under a permissive ordinance, a given use may be allowed even if it
    is not explicitly mentioned, so long as it can be deemed an accessory use
    that is customarily incidental. *Town of Salem v. Durrett*, 125 N.H. 29, 32,
    480 A.2d 9, 10 (1984).

g.  Because zoning laws operate in derogation of the common law, care must
    be taken to not extend the scope of an ordinance beyond the point where
    the town legislature intended for it to stop. So if the Brookline Building
    Department or local zoning board wants to qualify an accessory use so as
    to exclude some forms of it, then it must do so *only* by express provisions
    in a zoning ordinance.

h.  In the absence of an express provision limiting the accessory use of short-
    term rentals, Ms. Thayre should be allowed to rent out her space for *any*
    duration of time, so long as she does not violate any of the requirements
    specified in Use 51, which limit the number of lodgers and rooms rented
    out.

**O.  A key member of the Brookline zoning board publicly expressed her antipathy
towards short-term rentals and for those who operate them. Given her remark, it is
clear that Ms. Thayre Ms. Thayre did not receive a fair and unbiased hearing.**

100.    The avoidance of bias[26] is much more than a mere nicety; the avoidance of bias is
        a prerequisite to procedural due process. A zoning board and all of its members must

---

[26] "Bias" means personal antipathies that might underlie a tendency or inclination to treat a
particular litigant more or less generously. For example, financial bias may exist if a member of
the board has a financial interest in a party or the outcome of a claim. Relationship bias may
exist if a member of the board is related to, or is friends with, someone involved in the lawsuit.

comply with due process and other legal requirements that ensure a fair decision. Care must always be taken to evaluate each project on its merits and not make biased remarks. And when a person on a zoning board has, by her own conduct, shown that she is biased, she must recuse herself. To do otherwise is a violation of procedural due process.

101.     At the hearing that took place on December 19, 2019, Board Chair Johnna Schneider, publicly expressed her antipathy towards short-term rentals (particularly in condominiums) and for those who operate them. She stated:

> "AirBnbs are everywhere. There are many on my street. I find them to be
> absolutely terrible for the neighborhood...I think it's awful. And I think it is
> incredibly inconsiderate for a condo owner [referring to Ms. Thayre] to be
> invading the space of their neighbors, and the privacy of their neighbors, and the
> sanctity of their condo building — imposing a constant stream of transients on
> people in their community."

Such comments from a municipal official have no place during the proceedings. Board Chair Schneider made it clear that she was biased against Ms. Thayre and unable to act impartially. Her statements — effectively impugning the character of Ms. Thayre — were sufficiently grave to taint the entire Zoning Board proceeding. If her bias against operators of AirBnBs was such that she could not contain prejudicial remarks about them, then it was incumbent upon her to recuse herself. Having not done so, it puts in question the decision-making process of the entire Board.

---

Personal bias may exist if a member of the board personally favors or disfavors someone involved in a claim. All of these types of bias have the potential to impair the board's impartiality.

102.     In addition, and possibly connected to the above, Board Chair Schneider created spurious roadblocks such as questioning the common usage of the word "rent" which is undefined in the ByLaws, without making any proper investigation of the matter (e.g., by consulting the dictionary) either prior to the hearing or by virtue of a fact-finding continuance, before calling for a vote. She also summarily closed the hearing over the protests of the Plaintiff.

103.     Also of concern is that the other members of the Zoning Board of Appeals, upon hearing Chair Schneider's statements, did not raise the issue of Chair Schneider recusing herself from the hearing.

**P.   As a matter of actual practice, Commissioner Bennett did not interpret Brookline's zoning bylaws to prohibit short-term rentals until after 2013. And there is little evidence to prove that this interpretation is based on any long-standing practice.**

104.     While long standing interpretations of zoning bylaws are sometimes afforded deference by courts, such interpretations cannot be used to dispute unambiguous statutory language. 2 Am.Jur.2d Administrative Law, Section 307. Long continued practice may be persuasive in the interpretation of doubtful provisions of a statute, but it cannot alter provisions that are clear and explicit. *Louisville & Nashville R.R. v. U.S.*, 282 U.S. 740, 759 (1931).

105.     Granted, some might argue that an agency's long-standing interpretation is particularly worthy of deference, because if the legislature disagreed with the interpretation, it could have amended the statute appropriately. But as the U.S. Supreme Court reminds us, "Legislative silence is a poor beacon to follow in discerning the proper

statutory route," (Zuber v. Allen (1969) 396 U.S. 168, 185, 90 S.Ct. 314, 24 L.Ed.2d

345.) The town legislature of Brookline can hardly be said to have "adopted" any

interpretation of Use 51 through its inaction, since legislative inaction frequently

betokens "unawareness, preoccupation, or paralysis." Id. at p. 185, fn. 21, 90 S.Ct. 314.

Even if the legislature was somehow aware of the construction placed upon Use 51 by the

Building Department, its inaction in the face of that construction is an unsatisfactory

basis to accord deference. See, e.g., Aaron v. SEC, 446 U.S. 680, 694, n. 11

(1980)("[F]ailure of Congress to overturn the Commission's interpretation falls far short

of providing a basis to support a construction of § 10(b) so clearly at odds with its plain

meaning and legislative history.") More importantly, a long-standing interpretation that

has survived the re-enactment of a statute must give way if the regulation is found to be

plainly contrary to the statute. See also *Biddle v. Commissioner*, 302 U.S. 573; 82 L. Ed.

431 (1938) *See Northern X-Ray*, 542 N.W.2d at 738 ("[W]e will not defer to even a long-

standing agency interpretation that is contrary to the intent of the legislature.")

106.     Furthermore, there is evidence that indicates that the Building Department has *not*

followed a consistent and long-standing interpretation of Use 51. Commissioner Bennett

was interviewed in an article published in the *Brookline Tab* on September 19, 2013 (see

Exhibit F). The article featured a story about a Brookline resident who operated an

AirBnb that was shut down by the town. Yet when questioned, the Commissioner

indicated that the violation occurred not because of the existence of a short-term rental

*per se*, but because the number of lodgers that were accommodated by this particular

resident exceeded that permitted by Use 51. As stated in the article: "According to

Building Commissioner Dan Bennett, an owner may rent up to two rooms to two lodgers

as of right, as long as there are no separate cooking facilities" *Significantly, at no point in the article does Commissioner Bennett ever state that short-rentals are themselves illegal.* Thus, the Commissioner's current construction of Use 51 appears not to be of long standing.

107.     As far as we know, the only evidence of the Building Department's interpretation being long-standing is a memorandum issued by Commissioner Bennett on December 19, 2019 (see Exhibit D). The memo states: "It is my position, and that of my two predecessors, that Use #51 has been interpreted to permit only long-term rentals... [T]his has been the practice since 1988." But this memorandum is contradicted by Commissioner Bennett's own statement published in the *Brookline Tab*. In order to corroborate this claim, Commissioner Bennett should —at the very least — be expected to produce records of enforcement action against short-term rentals dating back to at least 1988. Ms. Thayre has since submitted a records request pursuant to G. L. ch. 66, Section 10, asking the Town of Brookline to share any documents to substantiate Commissioner Bennett's claim that the ban against short-term rentals has been in effect since the 1980s. Thus far, Commissioner Bennett has not produced this evidence.

**Q.   Commissioner Bennett's decision to enforce a ban against short-term rentals was made without adequate public notice and appears to not have been published.**

108.     The Brookline Building Department is attempting to impose restrictions that are not expressed in the ordinance itself. And as far as we know, this policy was not codified in writing or made available to the residents of Brookline before it was officially implemented. This is a clear violation of procedural due process. Procedural due process

restricts the government's ability to deprive individuals of their property and liberty interests without affording them notice.[27] The Constitution recognizes that property owners must have adequate notice of the requirements of the law before it becomes enforceable, so that they might adjust their affairs or take any other action which the issuance of new rules may prompt (such as requesting an injunction to prevent the enforcement of such laws).

109.     Procedural Due Process requires a minimum standard of fairness during the process of making public decisions that impact private rights. This means at a minimum that the government "promulgate" the law by making it publicly available and announcing its existence before it can take effect. See Texaco, Inc. v. Short, 454at 531-33, 102 S. Ct. 781 (noting that, "[g]enerally, a legislature [must] enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply"). Indeed, "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted). *See also Chris- topher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) ("[A]gencies should provide regulated parties 'fair warning' of the conduct [a regulation] prohibits or require.") (quotation marks and citation omitted). It should also be pointed out that when regulations are not made public, they can be much more easily manipulated.[28]

---

[27] Notice is the legal concept describing a requirement that a party be aware of legal process affecting their rights, obligations or duties.

[28] This is a maxim that dates back to Ancient Rome. According to Roman lore, the plebeians — the common people of Rome — were at a great disadvantage, because the law was administered solely by the patricians, who kept the knowledge of it to themselves, and who regarded it as a precious legacy from their ancestors, too sacred to be shared with the lowborn plebeians. The laws themselves had never been written down or published. Thus, the patricians could therefore

110.    In an article published in 2013 (see Exhibit F), Commissioner Bennett was

questioned about the legality of short-term rentals in Brookline. Not knowing the answer,

he replied that he would "look at it." Having "looked" into the matter, Commissioner

Bennet subsequently went on to enforce a ban against short-term rentals. But it is unclear

whether he gave the public any notice regarding his intention to enforce such a ban.

111.    Agencies should always provide clear advance notice before new burdens are

imposed on property owners. Even if Commissioner Bennet's predecessors enforced a

ban against short-term rentals (and he was simply unfamiliar with this policy), this

apparent lapse in enforcement would require that the Town of Brookline issue public

notice before re-implementing the ban. See *National Conservative Political Action*

*Committee v. Federal Election Commission*, (D.C. Cir. 1980) 626 F2d. 953, 950 ("[P]rior

notice is required where a private party justifiably relies upon an agency's past practice

and is substantially affected by a change in that practice."). Ms. Thayre has since

submitted a records request pursuant to G. L. ch. 66, Section 10, asking the Town of

Brookline to disclose any public notices regarding its ban against short-term rentals. If it

turns out that this regulation was not properly promulgated or published, it should

become void and ineffective. There can be no basis to demand compliance with secret

regulations. A secret law is no law at all.

---

administer them as they saw fit. This was a great injustice to the lower classes. And it was
important to the plebeians to have the laws written down so the patricians would not be able to
change them. This resulted in the creation of written laws (*legibus scribundis*) presented on
twelve tables that were placed on display in the center of the city, so everyone could view them.
As a consequence, laws became statutes and were no longer based on mere custom and tradition.

**R.** *Ultra vires* **zoning regulations—those regulations that exceed the delegated authority of the regulating agency — constitute an unlawful deprivation of property without due process of law.**

112.  The Commissioner has infringed upon Ms. Thayre's property rights without regard for substantive due process. In situations where an agency impinges upon a landowner's use and enjoyment of property, substantive due process prevents that agency from limiting the intended land use on arbitrary grounds. [29] See *Dent v. West Virginia*, 129 U.S.114, 123-24 (1889) (noting that the purpose of due process is to "secure the citizen against any arbitrary deprivation of... rights").

113.  It is a basic rule that an administrative regulation may not exceed statutory authority or supersede a statute.  Commissioner Bennett clearly ventured beyond the limits of his authority when he rewrote the definition of "Lodger" to exclude short-term rentals. Indeed, it is such a drastic rewrite of the statute that it amounts to an *ultra vires* action. Whenever an agency interprets a law in a manner that is beyond the scope of its authority, this act is known as "*ultra vires*" (Latin for "beyond the powers"). An agency has a legal obligation to interpret and discharge its mandate in good faith. And when an agency does not seek to discern and apply a statute's correct interpretation — and choses instead to pursue its own policy preferences — its interpretations are *ultra vires* and illegitimate. Because zoning authority is a police power and interferes with individual

---

[29] Substantive Due Process is a principle used to protect fundamental rights from government interference under the authority of the due process clauses of the Fifth and Fourteenth Amendments, which prohibit the federal and state governments from depriving any person of life, liberty, or property, without due process of law. By contrast, *procedural* due process is intended to determine whether a person had sufficient notice and the opportunity for a fair and impartial hearing.

rights, any use of that power must advance legitimate governmental interests that serve the public health, safety, morals, and general welfare. However, the Commissioner cannot advance a legitimate governmental purpose when he acts outside the scope of his delegated authority.

### S. The right to associate closely with and live with whom one chooses in one's own home should not be subject to government intrusion.

114.     There is another constitutional reason to invalidate the Commissioner's ban against short-term rentals: the choice of whom to share a home with is such a personal and significant part of one's everyday life, that it should not be subject to government intrusion. Indeed, "[t]he right to intimate association guarantees an individual the choice of entering an intimate relationship free from undue intrusion by the government." Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).[30]  Sharing a dwelling with another person is by definition an intimate association worthy of constitutional protection. As one court explains, "[A]side from immediate family or a romantic partner, it's hard to imagine a relationship more intimate than that between roommates, who share living rooms, dining rooms, kitchens, bathrooms, and even bedrooms." Fair Housing Council of San Fernando Valley v. Roomatemate.com, 66 F. 3d 1216 (9th Cir. 2012).

115.     The constitutional right to freedom of intimate association protects roommate choice. And the Commissioner's ban against short-term rentals deprives Ms. Thayre of

---

[30] Although the archetype of "intimate association" is the bond represented by family and marriage, the Supreme Court has "not held that constitutional protection is restricted to relationships among family members." Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987). Rather, the Supreme Court recognizes a "spectrum from the most intimate to the most attenuated of personal attachments." Id. As a result, other relationships with similar qualities could also be considered sufficiently intimate to warrant constitutional protection.

her constitutional right to intimate associations of her choice. Living in the same quarters is an inherently intimate act, and it should not be made a crime to rent to people whose company one enjoys, simply because it is for a short time. Granted, for some hosts, Airbnb hosting is like a business: they rent out empty rooms and apartments primarily for the expectation of profit. However, many hosts enjoy sharing their homes with guests for reasons that go far beyond making profits, such as making new friends and learning about different cultures. Others are rewarded by showing off their home and city to a newcomer or by offering a traveler who could not otherwise afford to stay in a downtown hotel.

116.        Additionally, Airbnb has publicly invited its hosts to open their homes to guests affected by natural disasters or to political refugees at heavily discounted or subsidized rates. These are but some of the myriad of ways that Airbnb is used as a platform to connect hosts with out-of-state or international guests of their choosing, in order to interact, engage in high-level discourse and make new friends or connections in one of the most intimate settings imaginable: sitting around a dinner table and having a guest sleep over in one's own home. Such living situations are sufficiently personal and intimate to implicate constitutional protection.

## FIRST CAUSE OF ACTION

### APPEALING ZONING BOARD DECISION AND VIOLATION ORDER

## COUNT I

in violation of G.L. c. 40A, §17

(Against all Defendants)

## COUNT II

in violation of G.L. c. 240, §14A

(Against all Defendants)

117.     Plaintiff Thayre repeats and re-alleges the allegations set forth above as if fully restated herein.

118.     The Defendant Board failed to render its Decision in accordance with the law, and failed to make the findings required to support the Decision, and its Decision is not supported by the facts or the law, and is therefore beyond its jurisdiction, arbitrary and capricious.

119.     Plaintiff Thayre is aggrieved and injured by the Decision, which purports to preclude Plaintiff Thayer from using her spare bedroom for short-term rentals and upholds the Brookline Building Department's May 10, 2019 Notice of Violation.

120.     As a direct and proximate result of the Board's unlawful actions, Plaintiff Thayre has been damaged.

121.     Based on the foregoing, and other arguments presented before the Board, the "interpretation" of Use # 51 in the Brookline zoning by-law, as set for in its decision, is invalid.

## SECOND CAUSE OF ACTION:

PROCEDURAL  DUE PROCESS

## COUNT III

in violation of 42 U.S.C. §1983

(Against all Defendants)

# COUNT IV

## in violation of art. 29 of the Mass. Decl. of Rights

## (Against all Defendants)

122.    Plaintiff Thayre repeats and re-alleges the allegations set forth above as if fully restated herein.

123.    The Due Process Clause embodies one of the American judiciary's most cherished values: the right to an impartial and disinterested tribunal. See U.S. Const. amend. XIV, § 1; Marshall v. Jerrico Inc., 446 U.S. 238, 242 (1980)(stating that —"[t]he neutrality requirement [of the Due Process Clause] helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law"). This fundamental principle of a neutral adjudicator has been applied to zoning boards, which are vested with a substantial measure of quasi-judicial power under the local law regulating the use of land within their jurisdiction. Barbara Realty Co. v. Zoning Bd. of Review of Cranston, 85 R.I. 152, 156, 128 A.2d 342, 344 (1957)

124.    Likewise Article 29 of the Massachusetts Declaration of Rights states:

"[i]t is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit."

"Article 29 extends beyond judges 'to all persons authorized to decide the rights of litigants.' " Police Commr. of Boston v. Municipal Ct. of the W. Roxbury Dist., 368 Mass. 501, 507 (1975), quoting from Beauregard v. Dailey, 294 Mass. 315, 324 (1936).

Art. 29 extends to the appeal process under the Brookline zoning code because it is essentially adjudicatory in nature.

125.    Chair Schneider's predisposition to rule against anyone who offers rentals in their home via Airbnb.com and her participation in the Decisions against Ms. Thayre are in violation of the Fourteenth Amendment of the United States Constitution and Article 29 of the Massachusetts Declaration of Rights.

126.    In addition, the Constitution recognizes that property owners must have adequate notice of the requirements of the law before it becomes enforceable, so that they might adjust their affairs or take any other action which the issuance of new rules may prompt (such as requesting an injunction to prevent the enforcement of such laws).

127.    Procedural Due Process requires a minimum standard of fairness during the process of making public decisions that impact private rights. This means at a minimum that the government "promulgate" the law by making it publicly available and announcing its existence before it can take effect. See Texaco, Inc. v. Short, 454at 531-33, 102 S. Ct. 781 (noting that, "[g]enerally, a legislature [must] enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply").

128.    As far as we know, the Commissioner's decision to enforce a ban against short-term rentals was made without public notice and appears to not have been published.

129.    In this case, the individual Defendants are state actors subject to the Fourteenth Amendment, and were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Ms. Thayre's constitutional rights.

130.     At the final vote, the Defendant Board all agreed to, approved, and ratified this unconstitutional conduct as described above. Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment.

131.     There is a substantial and continuing controversy between plaintiff Ms. Thayre and the Defendants as to the constitutionality and thus enforceability of the Decision. This injury can be redressed by the requested relief of a declaratory judgment.

## THIRD CAUSE OF ACTION

### UNCONSTITUTIONAL INVASION OF PROPERTY RIGHTS UNDER SUBSTANTIVE DUE PROCESS

### Count V

#### (in violation of 42 U.S.C. §1983)

#### (against all Defendants)

### Count VI

#### (in violation of art. 12 of the Massachusetts Declaration of Rights)

#### (against all Defendants)

132.     Plaintiff Thayre repeats and re-alleges the allegations set forth above as if fully restated herein.

133.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

134.    Article 12 has always been considered as embodying due process protections at least parallel to those granted by the Fourteenth Amendment. See Commonwealth v. Alvarez, 413 Mass. 224 , 228 n.4 (1992), citing Commonwealth v. Jackson, 369 Mass. 904 , 916 (1976).

135.    In situations where an agency impinges upon a landowner's use and enjoyment of property, substantive due process prevents that agency from limiting the intended land use on arbitrary grounds. [31] See *Dent v. West Virginia*, 129 U.S.114, 123-24 (1889) (noting that the purpose of due process is to "secure the citizen against any arbitrary deprivation of... rights").

136.    Whenever an agency interprets a law in a manner that is beyond the scope of its authority, this act is known as "*ultra vires*" (Latin phrase meaning "beyond the powers"). *Ultra vires* zoning regulations—those regulations that exceed the delegated authority of the regulating agency — constitutes an unlawful deprivation of property without due process of law. See *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 779 (2d Cir. 2007). ( "[I]f the Town Board did not have authority for the actions it took regarding Fun Quest's permit—as it appears it did not—the Board's actions were ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation.")

137.    This Court has the inherent power to review alleged *ultra vires* agency action when an agency patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute. See, e.g., Aid Ass'n for

---

[31] Substantive Due Process is a principle used to protect fundamental rights from government interference under the authority of the due process clauses of the Fifth and Fourteenth Amendments, which prohibit the federal and state governments from depriving any person of life, liberty, or property, without due process of law. By contrast, *procedural* due process is intended to determine whether a person had sufficient notice and the opportunity for a fair and impartial hearing.

Lutherans v. U.S. Postal Serv., 321 F.3d 1166, 1168 (D.C. Cir. 2003) (agency action is ultra vires when it "exceed[s] the agency's delegated authority under the statute."); Dart v. United States, 848 F.2d 217, 224 (D.C. Cir. 1988) (agency violation of "clear and mandatory" statutory provision is ultra vires).

138.     The Building Commissioner clearly ventured beyond the limits of his authority when he rewrote the definition of "Lodger" to exclude short-term rentals.

139.     In this case, the individual Defendants are state actors subject to the Fourteenth Amendment, and were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Ms. Thayre's constitutional rights.

140.     At the final vote, the Defendant Board all agreed to, approved, and ratified this unconstitutional conduct as described above. Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment.

141.     There is a substantial and continuing controversy between plaintiff Ms. Thayre and the Defendants as to the constitutionality and thus enforceability of the Decision. This injury can be redressed by the requested relief of a declaratory judgment.

## FOURTH CAUSE OF ACTION:

## RIGHT TO INTIMATE ASSOCIATION

## COUNT VII

in violation of 42 U.S.C. §1983

(against all Defendants)

**Count VIII**

(in violation of Mass. Const., Pt. 1, Article 16)

(against all Defendants)

142.     Plaintiff Thayre repeats and re-alleges the allegations set forth above as if fully

restated herein.

143.     As the Supreme Court held in *Roberts v. United States Jaycees*, 468 U.S. 609

(1984), "because the Bill of Rights is designed to secure individual liberty, it must afford

the formation and preservation of certain kinds of highly personal relationships a

substantial measure of sanctuary from unjustified interference by the State...." *Id.* at 618.

144.     The freedom of association is thus a fundamental liberty protected by the

Constitution. This associational freedom is understood in two distinct senses: intimate

and expressive association.

145.     Intimate association refers to those "choices to enter into and maintain certain

intimate human relationships" and are afforded protection "because the role of such

relationships in safeguarding the individual freedom that is central to our constitutional

scheme." *Id.* at 618.

146.     The Plaintiff also raise intimate association claims under Article XVI which

guarantees that "The right of free speech shall not be abridged." Mass. Const., Pt. 1,

Article XVI.

147.     The right to intimate association is a fundamental liberty interest protected under

the "liberty" portion of the substantive due process clause of the Fourteenth Amendment,

meaning that any infringements of this right must be evaluated under the strict scrutiny test.

148. Although the archetype of an "intimate associational relationship" involves traditional relationships involving marriage and the family, *id.* at 619, the relationships protected under the rubric of "intimate association" are not limited to traditional nuclear relationships. *See Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987) ("Of course, we have not held that constitutional protection is restricted to relationships among family members.")

149. The bonds of personal friendship that naturally arise between an Airbnb host and guest falls within the constitutional protected freedom of intimate association.

150. The TOWN OF BROOKLINE lacks a compelling or substantial state interest in infringing upon these freedoms of association.

151. The ban against short-term rentals does not directly advance the TOWN OF BROOKLINE's governmental interest, and is not narrowly tailored or the least restrictive method of achieving that interest.

152. There is a substantial and continuing controversy between plaintiff Ms. Thayre and the Defendants as to the constitutionality and thus enforceability of the Decision. This injury can be redressed by the requested relief of a declaratory judgment.

## FIFTH CAUSE OF ACTION:

## FAILURE TO ADHERE TO AMENDMENT PROCEDURE REQUIRED BY LAW

### Count IX

### (in violation of G. L. 40A, §5)

(against all Defendants))

153.     Plaintiff Thayre repeats and re-alleges the allegations set forth above as if fully

restated herein.

154.     Ms. Thayre has the right to only be regulated according to ordinances and

standards adopted through the mandated processes, with the mandatory safeguards

related to public notice.

155.     The law imposes special requirements to assure the opportunity for full and open

discussion of proposed zoning decisions. Cities and towns must follow intricate

procedures when adopting or amending regulatory ordinances.

156.     G. L. 40A, §5 specifies the actions that municipalities must take in order to adopt

or amend land use regulations, including public notices and hearings.

157.     It is undisputed that the amendment procedure set forth in G. L. 40A, §5 —

which, among other things,  two-thirds vote of all the members of the town council —

was not followed here.

158.     Therefore, the Board's attempt to accomplish such an amendment through its

Decision is unenforceable and must be reversed.


### JURY DEMAND

1.  Pursuant to Rule 38 of Civil Procedure, plaintiff demands a jury trial on all issues so

triable.


### PRAYER FOR RELIEF

1.  WHEREFORE, Plaintiff respectfully request that the Court:

A. Enter a judgment in favor of Plaintiff, finding that Defendant violated Ms. Thayre's constitutional rights

B. Enter a declaratory judgment that the Defendants violated Plaintiffs' constitutional rights and that the ban against short-term rentals be stricken as unconstitutional, unenforceable and void *ab initio*

C. Determine that the Decision be declared to be unreasonable, arbitrary and capricious, erroneous and in excess of the Board's authority.

D. Annul the decision

E. Award the Plaintiff costs and expenses as are associated with these proceedings

F. Declare such other and further rights of the parties and grant such other and further relief as this court shall consider necessary; and

G. Provide such other relief as justice may require.

Heleni Thayre
12 Euston St, #3
Brookline, MA 02446

Heleni Thayre

617-232-8180
617-232-8180
heleni22@verizon.net

I ATTEST THAT THIS DOCUMENT IS A
CERTIFIED PHOTOCOPY OF AN ORIGINAL
ON FILE.
_____
Deputy Assistant Clerk
2/25/00

# EXHIBIT A

# ZBA Decision

# Filed February 5, 2020



*Town of Brookline*
*Massachusetts*

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2020 FEB -5 P 12: 51

**BOARD OF APPEALS**
Jesse Geller, Chairman
Mark Zuroff
Johanna Schneider

Town Hall, 1st Floor
333 Washington Street
Brookline, MA 02445-6899
(617) 730-2010 Fax (617) 730-2043

**Patrick J. Ward, Clerk**

TOWN OF BROOKLINE
BOARD OF APPEALS
CASE NO. 2019-0042
12 EUSTON STREET, BROOKLINE, MA

Petitioner, Heleni Thayre, filed an administrative appeal of a Building Department Notice of Violation, dated May 10, 2019, which cited the Petitioner for renting their property as a short term rental advertised on Airbnb.com which was considered a violation of the Town of Brookline Zoning By-Law. The administrative appeal was filed on June 10, 2019.

The Board administratively determined that the properties affected were those shown on a schedule certified by the Board of Assessors of the Town of Brookline and fixed August 29, 2019 at 7:00 PM, in the Select Board's Hearing Room as the date, time and place for the public hearing. Notice of the hearing was mailed to the Petitioners, to their attorney, Scott Gladstone, to the owners of the properties deemed by the Board to be affected as they appeared on the most recent local tax list, to the Planning Board and to all others required by law. Notice of the hearing was published on August 15, 2019 and August 22, 2019 in the Brookline Tab, a newspaper published in Brookline. A copy of said notice is as follows:

### Notice of Hearing

Pursuant to M.G.L., C. 40A, the Board of Appeals will conduct a public hearing at Town Hall, 333 Washington Street, Brookline, on a proposal at:

1

12 EUSTON STREET, #3, BROOKLINE, MA 02446 - Appeal of Notice of Violation against AirBnB unit, in a(n) M-2.0 APARTMENT HOUSE on 08/29/2019 at 19:00 in the 6th Floor Select Board's Hearing Room (Petitioner/Owner: THAYRE, HELENI K ) Precinct 1

Hearings may be continued by the Chair to a date/time certain, with no further notice to abutters or in the TAB. Questions about hearing schedules may be directed to the Planning and Community Development Department at 617-730-2130, or by checking the Town meeting calendar at: www.brooklinema.gov.

The Town of Brookline does not discriminate in its programs or activities on the basis of disability or handicap or any other characteristic protected under applicable federal, state or local law. Individuals who are in need of auxiliary aids for effective communication in Town programs or activities may make their needs known by contacting the Town's ADA Compliance Officer. Assistive Listening Devices are available at the Public Safety Building for public use at Town of Brookline meetings and events. Those who need effective communication services should dial 711 and ask the operator to dial the Town's ADA Compliance Officer.

If you have any questions regarding this Notice or the Assistive Listening Device, please contact Caitlin Haynes at 617-730-2345 or at chaynes@brooklinema.gov.

Jesse Geller, Chair
Christopher Hussey
Mark Zuroff

Publish: 08/15/2019 & 08/22/2019

On August 29, 2019 at the time and place specified in the notice, this Board held a public hearing. At the August 29th hearing, the Petitioner requested that the public hearing be continued to December 5, 2019. The Board agreed and continued the case to December 5, 2019. The Board was unable to schedule a meeting for December 5, 2019, so the public hearing was rescheduled for December 19, 2019. Notice of the hearing was mailed to the Petitioners, to their attorney, Scott Gladstone, to the owners of the properties deemed by the Board to be affected as they appeared on the most recent local tax list, to the Planning Board and to all others required by law. Notice of the hearing was published on December 5, 2019 and December 12, 2019 in the Brookline Tab, a newspaper published in Brookline. A copy of said notice is as follows:

2

## Notice of Hearing

Pursuant to M.G.L., C. 40A, the Board of Appeals will conduct a public hearing on **12/19/2019** at **7:30 PM** in the **6th Floor Select Board's Hearing Room, Town Hall**, 333 Washington Street, Brookline, on the following:

**12 EUSTON STREET, #3, BROOKLINE, MA 02446.** *Petitioner – Heleni Thayre.* Administrative Appeal of Notice of Violation against AirBnB unit. M-2.0 APARTMENT HOUSE Zone. Precinct 1.

*Hearings may be continued by the Chair to a date/time certain, with no further notice to abutters or in the TAB. Questions about hearing schedules may be directed to the **Planning and Community Development Department at 617-730-2130**, or by checking the Town meeting calendar at: www.brooklinema.gov.*

*The Town of Brookline does not discriminate in its programs or activities on the basis of disability or handicap or any other characteristic protected under applicable federal, state or local law. Individuals who are in need of auxiliary aids for effective communication in Town programs or activities may make their needs known by contacting the Town's ADA Compliance Officer. Assistive Listening Devices are available at the Public Safety Building for public use at Town of Brookline meetings and events. Those who need effective communication services should dial 711 and ask the operator to dial the Town's ADA Compliance Officer. If you have any questions regarding this Notice or the Assistive Listening Device, please contact Caitlin Haynes at 617-730-2345 or at chaynes@brooklinema.gov.*

*Jesse Geller, Chair*
*Mark Zuroff*
*Johanna Schneider*

**Publish: 12/05/2019 & 12/12/2019**

Present at the continued hearing on December 19th were Chair Johanna Schneider and Board Members Kate Poverman and Randolph Meiklejohn. Also present at the hearing were Charlotte Leis, Zoning Coordinator & Planner, and Joe Braga, Deputy Building Commissioner.

The case was presented by Scott Gladstone, Attorney at Law. Also in attendance was the Petitioner and owner of the property, Heleni Thayre.

Attorney Scott Gladstone waived the public reading of notice.

Mr. Gladstone stated that the case is an administrative appeal of a notice of violation. Mr. Gladstone opined that the Petitioner's use of her property for the purposes of short-term rentals falls under Use #51, (which states in part "within a dwelling unit, the renting of not more than two rooms as a lodging without separate cooking facilities and for not more than two lodgers") and relies on the definition of a

"lodger" (defined in By-law Section 2.12 as "a person who rents space for living or sleeping purposes and who is not within the second degree of kinship to the lessor"). Mr. Gladstone explained that the Building Department has read into that definition the idea that "lodger" applies only to people staying more than 30 days. Mr. Gladstone contended that the definition of "lodger" does not explicitly indicate a time limit and therefore short-term lodgers should be allowed.

Petitioner Heleni Thayre explained her history with the apartment and why she wants to be able to use it as a short-term rental rather than for long-term rentals. She has had bad experiences with long-term rentals, but has only had good experiences with short-term rentals. She has never had a restriction on how long her tenants could rent for. She believes it is not safe for her to be renting out to long term rentals due to her age.

Board Chair Johanna Schneider asked whether Use 51 is permitted in the district by Special Permit. Mr. Gladstone responded that it was a by-right use. Board Chair Schneider asked if the Petitioner's short-term rental would be prohibited or allowed by Special Permit if it were categorized under Use 7 (Lodging House, defined in Section 12.2 of the By-law as a dwelling structure in which sleeping accommodations without individual cooking facilities are designed to be let for compensation to four or more persons not within the second degree of kinship to the owner or operator."). Mr. Gladstone stated that it would be allowed by Special Permit, but since Use 7 is for four (4) or more lodgers, it doesn't apply in this case. Board Chair Schneider asked for more information on the configuration of the apartment. Mr. Gladstone stated that it has 1.5 baths, three (3) bedrooms, and one (1) kitchen. He further noted that Use 51 allows for renting of spare bedroom. Board Chair Schneider asked how many rooms were available for short-term rental tenants. Petitioner Thayer said one (1) room. Mr. Gladstone added that the room doesn't have separate kitchen facilities.

Board Member Kate Poverman asked if the Petitioner had registered with the Commonwealth as a Short-Term Rental Operator. Petitioner Thayre said that she had to close down her operation before she could register, but will register with the Commonwealth if allowed to reopen. Board Member Poverman disclosed that she has a short-term rental on Cape Cod in Truro. She stated that the Commonwealth permits short-term rentals to operate, and allows communities to decide whether or not to allow them. Mr. Gladstone added that the Town is collecting taxes on short-term rental uses collected by the Commonwealth, despite the Building Department considering them to be an illegal use.

Deputy Building Commissioner Joe Braga circulated a December 19, 2019 memorandum of the Building Commissioner regarding his interpretation of whether "lodger" refers to short or long term lodgers. According to the memorandum, the Building Department has long interpreted Use 51 as allowing only long term rentals (non-transient/greater than 30 days). The memorandum further states that the By-law is one of inclusion such that if a use is not permitted in the Table of Use Regulations, it is not permitted and, because short term rentals are not listed on the Table of Use Regulations, it is the position of the Building Commissioner that the use is not allowed. Mr. Braga in his testimony noted that various Town departments have been working on addressing this issue for months so that the Town can regulate them properly. Mr. Braga explained that the Building Department deals with illegal short-term rentals all the time, including clear and flagrant violations of the zoning code and life safety regulations. Board Member Randolph Meiklejohn asked for a brief recess so that Board members could review the Building Commissioner's memo in more detail.

The Board entered into a 5-minute recess.

Mr. Gladstone requested to address the memorandum. Board Chair Schneider permitted him to do so. According to Mr. Gladstone, in the memorandum, the Building Commissioner acknowledges that by-law does not explicitly address the time frame of a lodger's stay, and that he requests deference to the

Building Department's interpretation. Mr. Gladstone asserted that the plain reading of the By-law should allow for both short term and long term lodgers. Mr. Gladstone stated that he had been talking with the Building Commissioner for two years about short-term rentals, and that he finally wrote his own proposal for a zoning change to address this issue since he felt there was no movement by the Town on the issue. Town Meeting did not act on Mr. Gladstone's article in part because the Planning Department said they would bring a proposed amendment to the next Town Meeting. Mr. Gladstone conceded that if the Board were to approve this request it would create a new non-conformity for this unit, but not generally. Mr. Gladstone insisted that the Petitioner's use clearly falls within Use 51 when read in plain English, as there is nothing in the By-law that distinguishes between a short-term and a long-term lodger.

Board Chair Schneider asked whether the agreements that Airbnb users enter into are technically a lease - and therefore are they are renting – or are they something else. Mr. Gladstone explained that there is a contract, in some ways even more comprehensive than with a hotel. Mr. Gladstone argued that renting is that act of trading money for the right to occupy a living space so Airbnb users are indeed renters. Board Chair Schneider asked about the standard duration of Airbnb durations. Petitioner Thayre said that she rents for a maximum of eight (8) days and minimum of two (2) days, but that the average is probably about three (3) days.

Board Member Meiklejohn asked why there was so much focus on the 30-day threshold. Mr. Braga explained that the Building Code is clear on the issue, but it's not referenced in the Zoning By-law.

Board Chair Schneider asked whether there were any members of the public in attendance who wished to speak on the matter.

Marsha Lapson (resident of Stearns Road) asked where the Airbnb guests park. Petitioner Thayre explained that she used to offer her parking space to guests but it was used so infrequently that she no

longer offers parking and tells prospective guests that if they need parking they should seek other accommodations.

Carole Capper (12 Euston Street, #2) stated she lives directly under the subject short-term rental unit. She had talked to Mr. Braga a lot about this issue and reported the violation. She doesn't want the business operating in her building. She stated that the average stay as she has experienced it is two (2) days and she can clearly hear when people come in and out. She said that she bought her condominium with the expectation that the building wouldn't be operated as a business. The operation of the short-term rental has created an unnecessary burden on the condominium in general relating to insurance, water, noise, and wear and tear on the building. Such activity had not been considered when writing condominium documents. Ms. Capper said that it's one thing in a house, but different in a shared living space. She was not consulted when unit started getting rented on AirBnb. She has been to meetings by Planning Department regarding short-term rentals. She concluded by saying that she was fine with the long term rentals Petitioner Thayre has had over the years, but not the transient renters.

Ana Albuquerque (24 Euston St, #2, Pct 1 Town Meeting Member) stated that she doesn't want her neighbors using condos as short-term rentals. Heating and water are shared expenses, so she doesn't want neighbors using more heating/water without her having a say but forcing her to subsidize it.

Board Chair Schneider asked if members of the public had any issues relating to this specific enforcement request.

Paul Warren (71 Carlton St, Town Meeting Member) said he is concerned about the decision tonight because he thinks it is very important. He stated that he is intimately familiar with issue of transient vs. long-term rentals. He added that zoning is about expectations, and the Town is not currently expecting to deal with short-term rentals. Mr. Warren stated that he wants this issue to be decided by Town Meeting, not by the Zoning Board of Appeals.

Board Chair Schneider clarified that the primary question is whether this case falls under Use 7 or Use 51 – operation issues are not really relevant. Mr. Gladstone argued that short-term rentals could fall under Use 7 or Use 51 depending on whether they rent to four (4) or more people (Use 7) or two (2) or fewer people (Use 51).

Board Chair Schneider asked if Town Counsel has provided an opinion. Zoning Coordinator Charlotte Leis stated that Counsel had worked on the memo with the Building Commissioner, so Counsel has endorsed the Building Commissioner's interpretation.

Board Member Meiklejohn suggested that since short-term rentals are not listed in the Use Table, the By-law is effectively saying that short-term rentals fit within none of the uses currently documented in the use table and are therefore prohibited.

Board Chair Schneider said that she is very uncomfortable making a decision about something that is the subject of pending legislation within the town. Clearly the issue of short-term rentals is not dealt with in the By-law, and clearly it needs to be. Board Chair Schneider said that she is personally against short-term rentals being operated without the support of the neighborhood, but that that is a separate issue from whether or not it's permitted by the Zoning By-law. Ms. Schneider wasn't confident that short-term rentals count as rentals at all but was certain that the By-law did not contemplate the use. She felt that short-term rentals fell into a class of their own and therefore should be listed as an allowed use within the use table.

Board Members Poverman added that the Town would not be in violation of state law if the Town forbade short-term rentals. She stated that she was hesitant to go against the interpretation of the Building Commissioner.

Board Chair Schneider summarized that the main issue is whether the short-term rental use was contemplated in the definitions and use table of the By-law. She stated that she doesn't think it was and

added that there is a good case to be made that short-term rentals are a separate use. She chided the Town for not having passed regulations relating to this use previously. She opined that this is a use that is different in kind than either of the two uses this could be shoehorned into (Use 7 or Use 51). In her opinion, until the Town passes a short-term rental by-law, this is not a permitted use under the By-law.

Board Member Poverman stated that because the use is not specifically allowed and because it is not a state-given right, it is not allowed by the Zoning By-law.

Board Member Meiklejohn agreed with Board Member Poverman and Board Chair Schneider.

**Accordingly, the Board voted unanimously to reject the Petitioner's Administrative Appeal (filed June 10, 2019) and uphold the Building Department's Notice of Violation (dated May 10, 2019) which cited the Petitioner for renting their property as a short term rental advertised on Airbnb.com – a use not allowed under the Town's Zoning By-law.**

Unanimous Decision of
The Board of Appeals

Filing Date: Feb 02/05/2020

Johanna Schneider, Chair

A True Copy
ATTEST:

Patrick J. Ward
Clerk, Board of Appeals

# EXIBIT B

# Historical Overview

# Short Term Rentals

# In Brookline

**There is a long tradition in American history of individuals renting space in their homes to transients seeking short-term accommodations. This include peddlers who arrived in Brookline.**

There is a long tradition in American history of individuals renting space in their homes to transients seeking short-term accommodations. The custom of opening one's home to travellers dates back to the earliest days of Colonial America. See David Faflik, *Boarding Out: Inhabiting the American Literary Imagination*, 1804–1860 39–41 (2012) (noting that "Dutch merchants [in the New World] enjoyed the temporary shelter afforded them by boarding as early as the seventeenth century," acknowledging the long-standing existence of such arrangement in Europe, and charting its development in America). The nineteenth-century United States was abuzz with commercial travelers. At every level of commerce and in every line of business— wholesale and retail, durables and consumables — the work of buying and selling required people to go from place to place.

Peddlers, in particular, were a familiar sight on the roads of America. Peddlers frequently roamed the countryside selling foodstuffs and households goods from hand-held baskets, horse-drawn wagons, and two-wheeled carts.[1] The peddler would buy up cheap, portable

---

[1] Itinerant salesmen from other industries joined these petty-goods sellers on the road. Salesmen went by a variety of names in the years following the Civil War. Canvasser and agent, the most common terms, usually signified a salesman working on commission. Whereas peddlers carried trunks filled with goods, a canvasser typically represented one product and would develop techniques to best sell that one product to as many people as possible. After mid-century, canvasser became the term of choice for salesmen carrying petty goods door-to-door. These terms were applied loosely; peddler, canvasser, or agent could refer to any type of itinerant salesman. The overlapping of terms is understandable, for they all had a common goal: selling inexpensive goods directly to consumers.

manufactured goods, pack them in a wagon or peddler's pack, and set off for villages and towns,

selling his or her wares at a good profit.[2]  Peddlers combed the countryside, often traveling in

regular circuits to reach their customers. By 1860, there were 1,648 peddlers in Massachusetts,

totalling 5 percent of the overall commercial population of 35,937.[3]

What was perhaps most notable about the peddler was his or her transience. He or she

was constantly on the move. When Americans in the nineteenth century and early twentieth

century encountered peddlers and canvassers, the experience in most instances involved either a

stranger or a person who traveled a regular circuit but who nevertheless came and was soon off

again. In towns like Brookline, peddlers sought food and lodging with families along their

routes. For instance, in 1842, Abraham Kohn, a peddler from Bavaria, arrived in Brookline,

where for the charge of twenty-five cents he could obtain supper, lodging for the night, and

breakfast.

By the 1880s and 1890s, although department stores, chain stores, and catalogue

companies offered a wide array of goods to more and more Americans, itinerant merchants

continued to find a niche. Even as railroads connected the region to national markets and the

region crawled with traveling salesmen who sold wholesale to storekeepers, peddlers and other

sales agents continued to bring their wares right to the homes of customers. According to the

---

[2] General peddlers carried an assortment of items: pins, needles, scissors, razors, combs, buttons, spoons, small hardware, books, paper, cotton goods, lace, and perfume. More specialized peddlers dealt mainly in such items as: tin, clocks, chairs, spices, essences, dyes, woodenware, pottery, brushes, brooms, religious books, and even wagons and carriages.

[3] Jaffee, David. "Peddlers of Progress and the Transformation of the Rural North, 1760-1860." *The Journal of American History*, vol. 78, no. 2, 1991, pp. 511–535. *JSTOR*, www.jstor.org/stable/2079532

census, which tends to undercount itinerant salespeople, the number of "hucksters and peddlers" increased from 59,083 in 1890 to 80,415 in 1910.[4] By 1905, peddlers visited Brookline in sufficient numbers that the town legislature passed an ordinance prohibiting "peddlers and hawkers" from disturbing "the peace and comfort of the inhabitants of the town" and requiring a peddler to register his or her name and residence with the Chief of Police.

**Many lodgers were young men in search of employment. Lodgers who arrived in Brookline seeking work depended on short-term rentals.**

In nineteenth century America, renting a room in a private house was more common than staying at an inn or bed and breakfast.[5] According to census rolls, in 1850, a lodger or roomer or boarder was present in 35 percent of all households in the central cities of metropolitan areas with fifty thousand or more people.[6] Few Americans lived only with relatives. Nearly all working-class people lived with non-relatives at some stage in their lives, either in their youth, when they boarded, or in their later years, when they took others in.[7] Taking in a lodger, sharing a family dwelling with a migrant worker or running a private boarding house were all normal occurrences.

[4] Susan J. Matt; Walter A. Friedman. Birth of a Salesman: The Transformation of Selling in America. Cambridge: Harvard University Press. 2004

[5] Ruth Graham, *Boardinghouses: Where the City Was Born*, BOS. GLOBE (Jan. 13, 2013), (noting that some social historians estimate that up to one-half of all urbanities either rented space to boarders or were boarders themselves).

[6] BEITO, DAVID T., and LINDA ROYSTER BEITO. 2016. *"The "Lodger Evil" and the Transformation of Progressive Housing Reform, 1890–1930."* Independent Review 20, no. 4: 485-508. Political Science Complete

[7] My Own Dear Mother: the Correspondence of Julia Stone Towne and. Mary Julia Towne, 1868-1882. Page 27

Nineteenth-century Americans traveled for many reasons, the most important of which was to make a living. During this period, the jobless and the poor frequently moved from place to place in search of employment.[8] Existing transportation in the nineteenth century was too limited and too costly for working people to live far from their place of employment. Walking was the primary form of everyday transportation, so switching jobs usually meant changing residence too.[9] Indeed, workers moved around at an astonishing rate during these years. For instance, in Boston between 1830 and 1860, as much as 20 percent of the population turned over on an annual basis.[10] Almost 800,000 people moved into and out of Boston between 1880 and 1890 alone.[11] A newspaper noted in 1859 that "the immense majority [of immigrants] are as yet but a mere floating population migrating from place to place whereever they may find a market for their labor."[12] The state's immigration commission would make a similar observation, stating "everywhere in Massachusetts" there is "restless movement of the immigrant from place to place and from mill to mill."[13]

---

[8] Alexander Keyssar, *Out of Work: The First Century of Unemployment in Massachusetts*. New York: Cambridge University Press, 1986.

[9] Id. See also Rempe, Gary, *"Denizens of the road: An examination of America's itinerant laborers 1870-1920"* (1990). Graduate Student Theses, Dissertations, & Professional Papers. 5377. https://scholarworks.umt.edu/etd/5377

[10] Stephan Thernstrom and Peter Knights, "Men in Motion: Some Data and Speculations about Urban Population Mobility in Nineteenth-Century America", *Anonymous Americans: Explorations in Nineteenth-Century Social History* (Englewood Cliff, N.J.; Prentice-Hall, 1971), 17-47

[11] Id. See also Peter Knights, *The Plain People of Boston, 1830-1860: A Study of City Growth* (NewYork: Oxford University Press, 1971), 58, 63; for a summary of persistence data, see Stephan Therstrom, *The Other Bostonians: Poverty and Progress in the American Metropolis, 1880 - 1960* (Cambridge: Harvard University Press, 1973), 222-23

[12] Miller, K. A. (1985). *Emigrants and exiles: Ireland and the Irish exodus to North America*. New York: Oxford University Press. Page 318

[13] Keyssar, page 123

Circular and seasonal migration rose to unprecedented levels in the last quarter of the nineteenth century as masses of jobless men sought work. According to one estimate, each year between 1885 and 1895, about one-third of Massachusetts workers were out of work for an average of three to four months.[14] More than one hundred thousand male workers were unemployed for weeks or months at a time and were obliged to hunt for new jobs.[15] Most had little choice but to take whatever employment was available, at whatever wages could be garnered: hauling lumber to construction sites, working the fields of farms, building new subdivision roads, digging trenches and foundations for new houses and stores, shoveling snow and ice, and performing other available chores. However, the availability of work was never guaranteed, since weather and market conditions were always in play: laborers were hired in times of need, and laid off in slack periods, with underemployment usually often occurring in the winter months. Absent public aid for the able-bodied, these workers were totally dependent on their own wages and frequently had to roam in search of employment

Peter Boag calls this period the heyday of the casual laborer due to the "abundance of low skill, seasonal, and labor-intensive jobs."[16] Much employment was based in 'part-year' operations and production, as it was called at the time. This stemmed from the fact that even beyond those pursuits normally seen as seasonal in nature, such as construction and farm labour, many industries in the late nineteenth century did not operate on a year-round basis.[17] As a result,

---

[14] Fischer, C. S., & Fischer, C. S. (2010). *Made in America: A social history of American culture and character*. Chicago: The University of Chicago Press. Page 46

[15] Keyssar, page 124

[16] Peter Boag, "Sex & Politics in Progressive-Era Portland & Eugene: The 1912 Same-Sex Vice Scandal," Oregon Historical Quarterly 100, no. 2 (July 1, 1999) page 42

[17] In their study of 'part-year' operation, Jeremy Atack, Fred Bateman and Robert Margo state, 'Substantial numbers of establishments (for example, nearly 40 percent in 1880) were "part-year", most of

workers in late nineteenth century America were likely to seek serial employment, often by travelling. At work in the field, on the railroads, or in mining and lumbering sites, these unmarried, unskilled hired men, day laborers, and migrant workers spilled back into cities during the winter months in search of temporary work.

According to historians Peter Knights and Stephan Thernstrom, the typical urban migrant "went not to one city but to three or four (or perhaps a dozen) in the course of his wanderings."[18] Evidence on job duration amongst these migrants is far from complete, but one researcher notes that the average job duration among itinerant laborers in 1914 was "fifteen to thirty days in lumber camps, sixty days in mining, thirty days in canning, ten days in construction work, and seven days in harvesting. In extreme cases, an itinerant laborer might remain on the job for as few as three hours before walking off."[19] During this period, virtually every major town and city in Massachusetts offered itinerant workers short-term lodging options, and there were doubtless many migrants who stayed in Brookline. The lodging options available in Brookline included a temporary respite at an inn or a common boarding house. In 1870, eight such boarding houses existed in Brookline, accommodating a total of 142 lodgers.[20] Even the Brookline police department offered temporary lodgings to transients.[21]

---

it due to 'differences in months of operation, not hours per day or days per month.' In fact, as they point out using census data, part-year operations increased from 26-29% in 1870 to 38-40% in 1880

[18] Thernstrom and Knights, page 186

[19] Schwantes, Carlos A. "Images of the Wageworkers' Frontier." *Montana: The Magazine of Western History*, vol. 38, no. 4, 1988, pp. 38–49. *JSTOR*, www.jstor.org/stable/4519172. Accessed 26 Jan. 2020.
[20] U. S. Census, 1870, Population Schedule, Brookline; Brookline, Tax List for the Year 1870 (Boston, 1871) 2-67; Brookline, Tax List for the Year 1873, 2- 76.

[21] Emergency shelter may seem an odd mission for a police force, but in the latter half of the nineteenth century, the police spent as much time on "social welfare" responsibilities — dispensing food and lodging — as they did on crime control.

Short-term rentals in private homes also made particular sense to this population of migrants. The majority were young, single, and disproportionately male. Since their work was often temporary, seasonal, or otherwise discontinuous, they tended to move in and out of households without staying long. Uncertain of employment from one week to the next, and often paid by the day, they were simply too poor to pay out such large sums of money, such as a monthly rent. Nor could they afford furniture. Most migrants had little in the way of personal property, and as the work was often casual or for a fixed period, the best solution was to lodge in a person's home, often for the small sum of ten or fifteen cents a night.

Boarding with families was particularly common in Brookline's poor tenement neighborhoods. In 1870, perhaps as many as a third of immigrant households in Brookline accepted boarders and lodgers.[22] Indeed, much of the overcrowding in these tenement apartments resulted from the practice of accepting lodgers to supplement family incomes. In the mid-nineteenth century, scores of poor Irish immigrants moved to Brookline, and the work involved in hosting lodgers largely fell to the women of these households.

Nearly 16 percent of Brookline's Irish-born household heads were female.[23] Whether single, widowed, or married with an absent husband, these women faced a particularly daunting task. There were very few other ways for a woman to support herself financially, aside from taking in boarders. In fact, taking in lodgers and boarders was one of the most common ways in which women earned income up until at least the 1920s.[24] The home became their workplace as they cooked meals, did laundry, kept records of expenses, and calculated each lodger's bill.

[22] KARR, RONALD DALE. *Between City and Country: Brookline, Massachusetts, and the Origins of Suburbia*. University of Massachusetts Press, 2018.

[23] Dale

[24] Carswell, A. T. (Ed.) (2012). *The encyclopedia of housing* (Vols. 1-2). Thousand Oaks, CA: SAGE Publications, Inc. doi: 10.4135/9781452218380

Despite crowded conditions and the inconvenience, accepting lodgers benefited both the migrants and the settled families. For migrants, a private home offered overnight accommodation within their limited financial means, while women who accepted lodgers were able to support themselves and their families.

**Historical arguments regarding itinerant builders travelling to Brookline and becoming short-term residents.**

During the nineteenth and early twentieth centuries, skilled workers had a tradition of itinerancy. Masons, joiners, carpenters, and other artisans in construction or related crafts typically developed their skills by traveling the country over a period of several years to acquire a thorough knowledge of regional specialties and trade secrets. Employers often approved of this type of mobility. The labor supervisor at National Cash Register wrote in 1907 that for a skilled worker, "it is of value, not a detriment, if he has had several employers-he is learning the trade."[25] Craft unions also facilitated the skilled worker's propensity to move. The constitutions of the early national unions required local secretaries to furnish reports on the conditions of the trade in their area and assist travelling members in finding jobs.[26] Some unions even had travelling loan systems, which gave members money to finance a search for work if none was to be found near home.[27] A formal tramping system, complete with trade tickets and labor exchanges, aided journeymen carpenters. Throughout the country, boardinghouses and rooming houses catered to the needs of journeymen on the move with short-term leases and inexpensive

---

[25] Jacoby, S. M. (1985). *Employing bureaucracy: Managers, unions, and the transformation of work in American industry, 1900-1945*. New York: Columbia University Press. Page 25

[26] Id. at 25

[27] Id. at 26

lodging.[28] Journeymen changed their addresses constantly, either to avoid payment on their short-term leases or to search for cheaper lodgings.[29]

Building tradesmen, particularly carpenters, often led a peripatetic existence as they finished jobs in one community and moved on to new construction sites. Throughout the mid-to-late nineteenth century, scores of building tradesmen migrated to Brookline for short periods of time. These tradesmen were particularly drawn to Brookline because of the employment opportunities provided by the construction of new roads and railways. For instance, four new facilities were added to Brookline's transportation network in a twelve year span:[30] (1) the Brookline Branch Railroad, linking Brookline Village to Boston, was built in 1848; (2) The Charles River Railroad, an extension of the Brookline Branch across Chestnut Hill, was constructed in 1852 (3) Beacon Street, a major new thoroughfare which ran through the center of town, was constructed in 1851 (4) and a horse-car line was established in 1859, running from Brookline Village to Boston via Lower Roxbury and the South End. Brookline also expanded its road system to accommodate its growing commuter population. By 1861, Brookline's road system had developed into a thirty-six mile network, purportedly the finest anywhere near Boston. And by 1868, that network included as many as 101 streets, places, and avenues.[31]

During this period of extensive construction in Brookline, there was a large number of available construction jobs. Railroad construction, in particular, mobilized hundreds of men — to

---

[28] Wilentz, S. (1984). *Chants democratic: New York City & the rise of the American working class, 1788-1850.* New York: Oxford University Press. Page 52-53

[29] Id at Page 53

[30] William P. Marchione, "Uncommon Suburbs: Suburbanization at the Western Edge of Boston, 1820 -1873" (Ph.D. diss, Boston College, 1994) at page 105

[31] Marchione at 106

excavate roadbeds in the countryside and city, surface roadbeds, and lay rails. Yet many of the men who worked on these construction projects did so for less than six months at a time, and a significant number spent less than a month at these jobs.[32] Since employment was limited to the length of time needed to complete a project, building tradesmen rarely rented rooms for more than a week at a time. Most had no intention of remaining in Brookline for any prolonged length of time. Construction workers of this period moved into towns and cities to supplement the local labor supply during the peak of construction operations, but when a project was completed, they had to move on to different cities and towns.

Moreover, because much of the labor was performed outdoors, construction work was highly seasonal and job opportunities diminished with shorter days and poor weather conditions.[33] For instance, excavations and tills had to be made before the rainy season, cement had to be poured before cold weather began, and grading finished before snowfall. Skilled jobs in the building industry were as much hit by bad weather conditions as were those of unskilled laborers. Carpenters, masons, painters, glaziers, plumbers, slaters, and bricklayers were regularly laid off during markedly severe winters of the mid-to-late nineteenth century.

In the 1880s and 1890s, itinerant workers continued to migrate to Brookline to avail themselves of the employment opportunities afforded by the rapid redevelopment of Beacon Street into a Parisian-style boulevard. In 1889, after Beacon Street was extended and widened

---

[32] Webb, W. Loring. (1922). Railroad construction: theory and practice; a text-book for the use of students in colleges and technical schools, and a hand-book for the use of engineers in field and office. 7th ed., rev. and enl., New York: John Wiley & sons, inc. [etc., etc.]. See also Gabaccia, Donna R. 2004. "Constructing North America: Railroad Building and the Rise of Continental Migrations, 1850 - 1914." In Marc C. Rodriguez (ed.), Repositioning North American Migration History. University of Rochester Press

[33] Conference on Unemployment. Seasonal operation in the construction industries, the facts and remedies / report and recommendations of a committee of the President's conference on unemployment ; foreword by Herbert Hoover McGraw-Hill New York 1924

with separate lanes for different kinds of traffic, it supported one of the world's first successful electric street railway systems. The electric car moved at least twice as fast as the horse drawn one and was soon perfected to carry three times the number of passengers. These dramatic additions touched off a building boom that rapidly transformed Brookline into a built-up suburb of nearly 20,000 persons.[34] In northern Brookline, newly built subdivisions arose, with blocks of expensive apartments along the Beacon Street boulevard and adjacent streets of detached homes. By 1900, 160 new houses had been erected off Harvard Street alone.[35] There was so much building in Brookline between 1890 and 1910, that it required scores of stonemasons, bricklayers, teamsters, carpenters, craftsmen, and painters. During this period, there were a large number of contractors involved in the building trade in Boston and its suburbs — all of whom would have required access to temporary lodgings.

**Lodgers in Brookline during the early twentieth century.**

As late as 1885, the Town of Brookline consisted primarily of the heavily populated core of Brookline Village, surrounded by upper-middle class housing, with farms and estates occupying the rest of the town. All this began to change rapidly in the mid-1880s. The year 1886 was seminal in the development of north Brookline as it was then that the plans were accepted for the widening of Beacon Street and the construction of an electric streetcar line from Boston to Brighton, via Beacon and Harvard Streets. Shortly after that, plans were also developed to build Commonwealth Avenue. With the construction of two grand boulevards and a trolley line running up Harvard Street, it was not long before the farmland would be subdivided for building

---

[34] Dale

[35] Id.

lots. Between 1890 and 1930, Beacon Street became an urbane, elegant, Parisian-style boulevard, lined with fashionable buildings. Apartments and townhouses, rarely seen before, now proliferated.

Brookline soon experienced a tremendous increase in population. In the fifteen years from 1885 to 1900, its population rose from 9,196 to 19,935.[36] The growing demand for housing soon led to the construction of less expensive homes and apartment blocks. The majority of houses built in north Brookline during this period were generally middle-class dwellings. However, when many families moved into their new housing in north Brookline, the increased costs frequently forced them to sacrifice the extra living accommodations they had gained. Whenever a family had space which they could possibly spare, it was often converted into a sleeping place for lodgers.

Throughout the early twentieth century, a significant proportion of middle class households in Brookline contained boarders and lodgers. For instance, they frequently took in newly arrived immigrants and, at least temporarily, shared housing with them. Sociologist Albert Wolfe, in describing the prevalence of lodgers in Massachusetts, noted in 1906, "Lodgers in apartment suites and in private families where only a room or two is rented are to be found in considerable numbers."[37] The presence of boarders and lodgers in middle-class households was crucial at times in enabling families to pay for a mortgage and fulfill the dream of owning their

---

[36] Dale

[37] Albert B. Wolfe, *The Lodging House Problem in Boston* (Cambridge: Harvard University Press, 1913)

homes.[38]  For many families in Brookline, the home was not merely a private refuge: it was an economic resource that could be used for generating extra income, for staying out of poverty and for maintaining autonomy at old age.[39] Sometimes the extra income enabled a young family to meet mortgage payments on a house. One widowed mother was even able to send her only daughter to high school after eight years in which she had kept lodgers in her home. Another major incentive in taking in lodgers was to raise the family income in a way that allowed the wife to stay at home and the children to stay in school.[40] Taking in lodgers also stabilized the family income over periods of unemployment and sickness; it equalized income over the life cycle as lodgers were moved into rooms vacated by children; it also gave widows and single women in middle and old age an opportunity to maintain their independent household.[41]

During this period, lodging in private homes was becoming common among the growing ranks of white collar workers. In occupational terms, the lodging population became increasingly diverse between 1860 and 1900. By 1906, the sociologist Albert Wolfe characterized the rooming house residents of Boston's South End as a "great army of clerks, salesmen, bookkeepers, shop girls, stenographers, dress-makers, milliners, barbers, restaurant keepers, black railroad porters and stewards, policemen, nurses.... journeymen carpenters, painters, machinists, and electricians."[42] Indeed, relative to the total workforce, the lodger population was

---

[38] ARIEN, M. (ed.) (1993). *Home: A place in the world.* New York and London: New York University Press.

[39] Hareven, T. K. (2000). Families, History, and Social Change, Oxford: Westview Press.
[40] Hareven, T. K

[41] Daunton, M. J. *Housing the workers, 1850-1914 : a comparative perspective /* edited by M.J. Daunton Leicester University Press London ; New York  1990

[42] Wolfe

dis-proportionately made up of a semi-professional, white-collar, and skilled workers in the lower middle ranks of the occupational hierarchy.

In the late nineteenth century, there were around two or three male lodgers for every female lodger, but by the early twentieth century women also came to make up a substantial proportion of the lodging population.[43] The changing labour market resulted in an influx of single women into the cities such as Boston, to take up employment opportunities as secretaries, clerical workers, and sales assistants. In novels and the press, commercial lodging houses were popularly assumed to be dirty, and their communal facilities to foster immorality.[44] For those who could afford to avoid commercial lodging houses, renting a room in a private house was considered the more "respectable" option, and it was the most commonly chosen lifestyle for young single women.[45] In 1917, a 34-year old woman who was a stenographer and proofreader, cited her preference for private homes. She lived as a lodger in a home in Brookline.[46] She stated:

"I have been a participant in five different co-operative schemes and do not recommend them. The place for a girl who has come away from home is another home. There are many women in the suburbs who are glad to rent rooms to just such a girl, and for but $2 or $3 a week will give her a 'homey' room, well cared for and heated, and with the

[43] Groth, Paul. Living Downtown: The History of Residential Hotels in the United States. Berkeley: University of California Press, c1994 1994

[44] Id.

[45] Id.

[46] Department of Health *The food of working women in Boston: An investigation by the Department of Research."* Women's Educational and Industrial Union. Boston 1917

privileges of doing some washing, ironing and cooking, using the sewing machine, piano, etc. Usually, these women have been working girls themselves and know just how to treat one. They are glad to earn a little extra money for themselves."[47]

For two dollars per week, this woman rented a room in a private home in Brookline. Like many of her peers, she was charged rent on a weekly basis. Indeed, the newspapers from the early twentieth century are replete with advertisements for short-term rentals in private homes in Brookline:

## Sept 3, 1916 Sunday (Boston Globe)

BROOKLINE—Would like to let 1 or 2 rooms in my private home, which is a large detached house in most desirable part of Brookline; beautiful rooms, with unexcelled view of Boston and suburbs; prices $3 and $4. Telephone Brookline 4646-W.

## 25 Nov 1923 Sunday (Boston Globe)

BROOKLINE—In private home, near Coolidge Corner; large sunny room, next to bath, attractively furnished for one or two business people. 87 Thorndike st., Brookline; telephone after 5 or Sunday; Brookline 6376-M.

## 22 September 1918 (Boston Globe)

BROOKLINE—Room, well-furnished, heated, nice location; private family. Call 49 Harris st. or phone 6252-W.          SuTTh o22

[47] Department of Health

## October 07, 1923 Boston Globe

FURNISHED ROOM in small private family on Francis street. Brookline 4106-J. SSu*

## September 27 1914 (Boston Globe)

ROOM in private family, attractive, nicely furnished, all modern improvements, $2.50 per week. Apply G. D. N., 104 Franklin st, Brookline, suite 3. SSu*

## June, 15 1919 (Boston Globe)

BUNGALOW, living room, kitchenette, furnished, heated, telephone; $4 per week; 40 Atherton road, Brookline. Tel. 5805-W Brookline.

**BROOKLINE**
COOLIDGE COR.—Room in first-class apartment, 1 flight up, $5. Phone Brookline 3788-W.

## November 20 1921(Boston Globe)

**BROOKLINE**
COOLIDGE COR.—Room in first-class apartment, 1 flight up, $5. Phone Brookline 3788-W.

BROOKLINE, Park St.—Warm, sunny room, in modern apartment; steam, electricity, near bath; $5 per week for one, $7.50 for two. Call Brookline 6795-M.

## Jun 17, 1923 Sun (Boston Globe)

> BROOKLINE—Front room, large balcony, $3.50 per week. 40 Atherton road; tel. 1739-W Brookline.

## 07 October 1923 (Boston Globe)

> BROOKLINE—To let, in private family, medium-sized pleasant room with couch instead of bed, new house with all improvements; fine neighborhood, and convenient to everything; $5 per week. Tel. Brookline 8676-W or call at 10 Searle av., near Public Library.

> BROOKLINE—Coolidge Corner, large room with private bath, in well-heated apartment, $12 per week. Aspinwall 2066.

There could be several reasons why short-term rentals were common. One historian offers this explanation:

"For both men and women in rooming houses, frequent moves were common...At least half of lodgers moved within a typical year. Frequent moves were part of the work life for machinists, cigar workers, and people in construction trades. Layoffs were another major factor in this rooming house mobility. Jobs at this income level were often erratic and seasonal. Particularly in the slow summer months, roomers were forced to desert the city and live elsewhere -- often with their rural families."[48]

---

[48] Groth

Frequent moves were easily accomplished because lodgers owned few personal possessions and could pack them into one or two bags or at most a trunk. Two female lodgers even joked that the word "home" for them meant "a place where we can unpack our trunk, anchor our electric iron, and hang our other blouse over the chair."[49] Unlike long-term tenants, these transient lodgers had little opportunity to establish continuity of possession. Nonetheless, short-term lodging served a multiplicity of different needs. It gave lodgers the ability to rent rooms already furnished, thus negating their need to purchase expensive household items, such as bedding and linens. Unlike setting up an apartment, lodgers did not have to buy linens, dishes, furniture, or cleaning equipment. Moreover, short-term lodging offered lower entry costs, such as not having to pay four weeks' rent in advance as a bond.

---

[49] Id.

# EXHIBIT C

# Violation Notice

# Issued
# May 10, 2019



# TOWN of BROOKLINE
*Massachusetts*

## BUILDING DEPARTMENT

Heleni Thayre
12 Euston #3
Brookline, MA   02445

May 10, 2019

RE: 12 Euston St. #3

## <u>NOTICE OF VIOLATION</u>

Dear Owner,

A complaint was made in regard to the premises you own at **12 Euston St**. It was brought to the Town's attention that you are renting your property as an Airbnb. This was verified by searching properties on Airbnb.com's website and finding your property listed for short term rental. This is a violation of the Town of Brookline's Zoning By-Law and is not permitted.

**Zoning By-Law Ch 4:**
Permitted Use #7 Lodging House requiring Special Permit.

**REMEDY:**
Immediately remove your property in the listings of Airbnb.com

**Failure to comply with this notice within thirty days (30) of receipt of this notice will result in fines of $1000.00 per day for each day the violation exists (MGL 143 §§ 94a) as well enforcement actions through MGL 146 §§ 6 through 12, and court action.**

Your immediate attention to this matter is appreciated.
Respectfully,

*Robert Dougan*
Building Inspector

CC: Dan Bennett. Building Commissioner , Joseph E. Braga. Deputy Building Commissioner

# EXHIBIT    D

## Appeal to ZBA

## Application
## Jun 10, 2019

# EXHIBIT B

## TOWN OF BROOKLINE BOARD OF APPEALS
## APPLICATION FOR APPEAL OF ADMINISTRATIVE DECISION
(See M.G.L. c. 40A §8, BOA Rules and Regulations, and Zoning By-laws §7.03.2.e)

**Date:** 6 / 10 / 19

**Applicant(s):** HELENI THAYRE    **Address:** 12 Euston St. Unit #3
                                                 Brookline, MA  02446

**Owner(s) of Record:** HELENI THAYRE    **Address:** 12 Euston St. Unit #3
                                                        Brookline, MA 02446

**Address of Premises:** 12 Euston St.                          Brookline, MA

**Deed recorded in Registry of Deeds, Book** 1039 **Page** 50

**or registered in the Land Registration Office under Certificate No.** _____

**Tax Assessor's Property ID No.:**    **Map:** 2015 **Block:** 001 **Lot:** 13

1. What are you appealing and why? Is it an inability to obtain a building permit, enforcement action, order or decision of the Building Commissioner/Building Official? (Please attach copy)

   Appealing the attached Notice of Violation

2. Are you within the 30-day appeal period (M.G.L. c. 40A, §15)? Yes ✓ No ___
   Notice of Violation extended to June 29, 2019 (see attached)

3. Provide the grounds for the appeal and legal reasons why you assert that the order or decision is legally not valid. (Please attach copy)

   Air B&B of a bedroom in an owner-occupied unit is not governed by Use #7 (lodging house) but by Use #51 (renting of not more than two rooms to a lodger within a dwelling unit). The definition of "lodger" in §2.12.3 does not include a minimum stay requirement.

4. What outcome do you request if your appeal is upheld?

   That applicant be allowed to re-list her extra bedroom on Air B and B for short-term rentals. The current order is depriving applicant from such rental income over the summer high season for tourists to the Boston area.

## Certification and Signatures

*(Signatures of Appellant(s) and Owner(s) of Record (if different than the appellant) are required.)*

*The original Application with ten (10) complete copies of the application and supporting documentation to include: a copy of correspondence requesting action by the Building Commissioner/Building Official, his response (if applicable) and copies of all other pertinent information must be filed with the Zoning Coordinator in the Planning and Community Development Department. Once the application is deemed complete and the appropriate fee is paid, the Zoning Coordinator will transmit to and file with the Office of the Town Clerk four (4) copies of said complete application. Note: You are encouraged to discuss your application with Building Department Staff and thoroughly familiarize yourself with the Board of Appeals Rules and Regulations before submittal to insure the thoroughness of your application. Copies of the Rules and Regulations are available at the Office of the Town Clerk and also on-line at both the Town Clerk and Board of Appeals links on the town website. After the Board of Appeals hearing is set, the Planning Board (if applicable) may hold a meeting prior to the Board of Appeals hearing to consider the case and make a recommendation to the Board of Appeals. Contact the Building Department (617-730-2100) with any questions about the appeal process and/or meeting schedules. Also see meeting calendar on Town website at: www.brooklinema.gov.*

**I (We) hereby certify that I (we) have read the Board of Appeals Rules and Regulations and that the statements within my (our) Appeal and attachments are true and accurate to the best of my (our) knowledge and belief.**

X _Helen Thorpe_ 6/7/19      617-232-8180
Signature(s) of Appellant      Date      Daytime Telephone Number and/or Cell

_____      heleni22 @ verizon.net
Fax Number      E-Mail Address

X _Helen Thorpe_ 6/7/19      617-232-8180
Signature(s) of Owner of Record      Date      Daytime Telephone Number and/or Cell

_____      heleni22@ verizon.net
Fax Number      E-Mail Address

`If Applicable:

_Scott Gladstone_      _822 Boylston St. #300, Chestnut Hill, MA 02467_
Name of Attorney for Applicant      Address of Attorney

_617-730-4525_      _sg@ sgladstonelaw.com_
Phone Number of Attorney      E-Mail Address and Fax # of Attorney

***SUBMIT THIS FORM (original) WITH TEN (10) COPIES OF THE APPLICATION, FILING FEE AND SUPPORTING DOCUMENTATION TO THE ZONING COORDINATOR***

# EXHIBIT E

# Building Dept Memorandum

# December 19, 2019



# TOWN of BROOKLINE
*Massachusetts*

## BUILDING DEPARTMENT

Daniel F. Bennett
Building Commissioner

## INTEROFFICE MEMORANDUM

**Date:** December 19, 2019

**To:** Members of the Zoning Board of Appeals

**From:** Daniel F. Bennett
Building Commissioner

**Re:** 12 Euston Street – Appeal of Airbnb violation

The appeal in front of this Board has to do with use and whether or not Use #51 that states in part; "Within a dwelling unit, the renting of not more than two rooms as a lodging without separate cooking facilities and for not more than two lodgers…" allows for short term (transient - less than 30 days) rentals similar to Airbnb.

It is my position, and that of my two predecessors, that Use #51 has been interpreted to permit only long term rentals (non-transient - greater than 30 days). I understand the by law does not specifically reference the non-transient nature of the lodger. I would suggest the Board give deference, as the Courts do, to the Town on the non-transient interpretation since this has been the practice since at least 1988. The purpose of this use was to allow residents living in a dwelling, in any district in Town, to rent two rooms to two lodgers – a long-term use. The most common types of long term tenants would be college students and young professionals. The more recent short term rental use, such as Airbnb, was never anticipated when this provision was adopted as part of the by law (sometime prior to 1969).

In addition the Brookline Zoning by Law is one of inclusion. If the use is listed (included) in the Table of Use Regulations it is permitted, if it is not listed it is not permitted. The use of a dwelling unit for short term rentals (transient - less than 30 days) is not permitted in Brookline because it is not listed in the Use Table. Use #51, as interpreted by me and previous Building Commissioners, does not constitute a customary home occupation or home office. It is simply a property owner acting as a landlord to rent out a room. This happens all over town and is an accepted practice.

By overturning the current interpretation to include short term rentals with nonresident employees and client/customers visiting the dwelling, the new Use #51 would conflict with other provisions of the by law regulating accessory uses, home occupations and office within a residence.

Town staff, including Planning, Building, Health, and Fire Departments, the Select Board and Town Counsel's office have been working on a comprehensive set of short-term rental regulations (Zoning and General by laws). If the Zoning Board chooses not uphold my interpretation of Use #51, the short term use would be permitted as of right and any future by law change would make the use preexisting nonconforming and our ability to regulate would be greatly diminished.

# EXHIBIT F

# TAB Interview

# Bldg Commissioner

# Sept 19, 2013

This is Google's cache of https://www.wickedlocal.com/article/20130919/News/309199731 (https://www.wickedlocal.com/article/20130919/News/309199731). It is a snapshot of the page as it appeared on Feb 18, 2020 18:35:02 GMT. The current page (https://www.wickedlocal.com/article/20130919/News/309199731) could have changed in the meantime. Learn more. (http://support.google.com/websearch/bin/answer.py?hl=en&p=cached&answer=1687222)

**Full version**    Text-only version (http://webcache.googleusercontent.com/search?q=cache:UD1ZX4a24kMJ:https://www.wickedlocal.com/article/20130919/News/309199731&hl=en&gl=us&strip

Tip: To quickly find your search term on this page, press **Ctrl+F** or **⌘-F** (Mac) and use the find bar.



# North Brookline neighbors irked by informal B&B

**By Ignacio Laguarda/ilaguarda@wickedlocal.com**
Posted Sep 19, 2013 at 12:01 AM
Updated Sep 19, 2013 at 7:13 PM

It all started when residents in the North Brookline neighborhood just beyond where Pleasant Street meets Crowninshield Road began to notice strangers with luggage frequently walking up to a house.

It all started when residents in the North Brookline neighborhood just beyond where Pleasant Street meets Crowninshield Road began to notice strangers with luggage frequently walking up to a house.

Before long, it became apparent to residents that the home was being rented out for short-term stays to visitors. But it wasn't until one of them found the home listed on a website called airbnb.com that it was confirmed.

Residents reported the activity to the town, and soon after, the Building, Health and Fire departments descended upon the home.

They found three lodgers, all female, staying at the house. Two of them are exchange students who will be attending Boston University for a semester.

Sites like airbnb.com, which offers travelers rooms in privately owned homes, often present great deals in notoriously pricey cities. A studio apartment in New York City's Hell's Kitchen neighborhood can go for $119 per night, plus a $150 security deposit. One mid-week September night in a Holiday Inn Express in the same general area was going for $436 on hotels.com.

According to Building Commissioner Dan Bennett, an owner may rent up to two rooms to two lodgers as of right, as long as there are no separate cooking facilities. If an owner wants to have another lodger, they would require relief from the Zoning Board of Appeals.

The Elba Street home is owned by Bihua Zhan, who purchased the home this year, or late last year. Zhan's daughter also lives in the home, and was scheduled to meet with Bennett on Wednesday.

Neither Zhan nor Zhan's daughter could be reached prior to the TAB's deadline.

Although Zhan has already taken the listing off the Internet, Bennett said he was unaware of that, and that he is unsure if the listings go against any town bylaws.

A quick search on airbnb.com finds roughly 60 listings in Brookline for places to rent, either entire apartments or single rooms. Bennett said he was unsure about the legality of such postings.

"I'll look at it," he said.

Evelyn Roll, a Town Meeting member resident on nearby Adams Street, was one of the residents who contacted the town about the infraction.

She said the Elba Street home has six bedrooms and was purchased for roughly $1.6 million.

When people started streaming into the apartment, residents were suspicious.

"We were wondering, 'What's going on here?' There were a lot of cars coming and going, a lot of people," she said.

Once they discovered it was being used as a rooming house, many residents were upset.

"That's not what the neighborhood is about," she said.

Residents in the area have often clashed with BU students because of loud parties and disrespectful behavior. Also, a rash of armed robberies in North Brookline late last year and early this year put many residents on high alert. Roll and others have taken it upon themselves to preserve the neighborhood.

"We don't want to be Allston, with the wild student parties," said Roll, who has lived in North Brookline since the 1950s. "I love living near a university. It's a little bit more activity, but it has its problems, and one of them, of course, [is] the students."

# EXHIBIT G

# New Zoning –
# Report to Citizens

# Oct 1, 1961

# N E W   Z O N I N G   F O R   B R O O K L I N E

Report to the Citizens of Brookline

and

Study Draft of the New Zoning By-Law

October 1, 1961

Brookline Planning Board

Russell Hastings, Chairman
Francis W. Capper
F. Stanton DeLand, Jr.
William J. Geddis
William D. Mehegan

Adams, Howard & Greeley, Planning Consultants
Paul C. Zucker, Resident Planner

and better protection of values and amenity.

C. Accommodating the Automobile

Coping with the automobile is a serious problem in a place like Brookline, so much of which was built up before its extensive use.

The new By-law sets forth regulations pertaining to all land uses that have to do primarily with the automobile: parking lots, loading areas, gas stations, garages, automobile sales rooms and lots, and open air and drive-in uses. Explicit standards for the design of driveways, parking stalls, drainage, curbing, and screening of headlights are included to protect nearby property and to assure proper layout.

The new By-law also regulates the parking and loading space requirements for each type of land use in much more detail than the old By-law. The parking requirements have, in general, been raised for nonresidential land uses, and the exemption of property that fronts on wide streets is abolished. The amendment to the present By-law controlling parking requirements for converted dwellings is included.

Many of the automotive uses allowed in various districts require a Special Permit. With the addition of explicit design standards to the By-law, the Board of Appeals will be substantially relieved of the burden of setting them in each individual case, as the present By-law has made necessary.

D. Controlling Lodging Houses

The aging of the Town's older single-family areas has brought the lodging house, often considered a blighting influence. In some respects, however, this form of residence may be an asset as well as, or rather than, a liability. For widows

or older couples on limited incomes, taking in lodgers has been the only way to maintain the family home. Citizens who live as lodgers have specialized housing needs fulfilled by the lodging house operator under the high standards of the State and Town licensing regulations. The Planning Board has carefully studied the many facets of the lodging house problem, and the draft By-law includes new provisions for coping with the problem at three levels: lodgers, unlicensed lodging house, and licensed lodging house.

1. Lodgers (1, 2, or 3)

The present By-law does not allow lodging houses in single-family districts. Nor has the Town interpreted the renting of a room or two in a single-family district as an accessory use. This is felt to be both unrealistic and unnecessary. Many homeowners in Brookline are illegally renting one or two rooms, whether for the income or for the comfort of having someone to help shovel snow and help with maintenance, without adverse effect upon the neighborhood. The new By-law allows the renting of one room, without separate cooking facilities, as an accessory use in any dwelling unit in any district. Depending on the size of the dwelling unit and the district, two rooms may be let to up to three persons as an accessory use.

2. Unlicensed Lodging House (Up to 4 persons)

The present By-law allows lodging houses for not more than 4 lodgers in Two-Family districts and for any number of lodgers in General Residence districts. State law requires a lodging house to be licensed when 5 or more lodgers are accommodated. Therefore, any lodging house accommodating up to and including 4 persons need not be licensed. Brookline has many single-family houses that undoubtedly owe their good upkeep to the owner's freedom to rent rooms.

| | Residence | | | | | Business | | Industry |
|---|---|---|---|---|---|---|---|---|
| | S | SC | T | M | L | G | O | I |

apparatus or other protective services.

49. Open-lot storage or sale, as a main use, of building material, coal, or other similar materials or junk or salvaged materials.

| | No | No | No | No | No | No | No | No |

### Accessory Uses

50. The renting of not more than one room to not more than one person not within the second degree of kinship and without separate cooking facilities. In dwelling units of more than 1,000 square feet of gross floor area in S and SC Districts not more than two rooms to not more than two persons; in other districts not more than two rooms to not more than three persons.

| | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

51. Dormitory, fraternity or sorority, but only accessory to and located upon the campus of a permitted educational, religious or charitable institution, and provided no building shall be located nearer to the lot line of any lot in a residence district than twice the required front yard depth for that residence district.

| | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

52. A private garage or parking area for not more than three non-commercial motor vehicles, other than Item 53 in residence districts, or for not more than ten vehicles in other districts.

| | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

53. Private garage or parking area for not more than one and one-half non-commercial motor vehicle for each dwelling unit provided for on the lot.

| | No | No | No | Yes | Yes | Yes | Yes | Yes |

54. Other private garage or parking area for more than three non-commercial motor vehicles belonging either to occupants of the lot or residents in the vicinity in residence districts, or more than ten vehicles in other districts.

| | SP | SP | SP | Yes | Yes | Yes | Yes | Yes |