## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **HELENI THAYRE** | )     **Civil Action No. 1:20-cv-10510** |
| **Plaintiffs,** | ) |
| **v.** | ) |
| **TOWN OF BROOKLINE and** | ) |
| **JESSE GELLER, JOHANNA SCHNEIDER** | ) |
| **MARK ZUROFF, KATE POVERMAN,** | ) **Plaintiff's** |
| **LARK PALERMO, and RANDOLPH** | ) **Memorandum in Opposition to** |
| **MEIKLEJOHN, as they are** | ) **Motions to Dismiss** |
| **members of the BROOKLINE ZONING** | ) |
| **BOARD OF APPEALS,** | ) |
| **DANIEL BENNETT as** | ) |
| **Building Commissioner for the TOWN OF** | ) |
| **BROOKLINE, JOSEPH BRAGA as** | ) |
| **Deputy Building Commissioner,** | ) |
| **and ROBERT DOUGAN  as Building Inspector** | )          ) |
| **Defendants.** | ) |

## STATEMENT OF THE CASE AND OF THE FACTS

Plaintiff Heleni Thayre files this response in opposition to Defendants' Fed. R. Civ. P. 12(b)(6) motions to dismiss Plaintiff's constitutional law claims. In responding to Defendants' motions to Dismiss, Plaintiff, for the sake of brevity, will not repeat those factual allegations and discussion, but incorporate the allegations of the Complaint (see Complaint ¶¶ 14 – 51).

## LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion is to determine whether a plaintiff's complaint adequately states a claim for relief. In assessing a motion to dismiss, a court should not inquire whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support his or her claims. See *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). Furthermore, a motion to dismiss a complaint under Rule 12 (b)(6) must be denied if the complaint contains sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal, U.S.*, 129 S. Ct. 1937, 1949 (2009).

If a complaint alleges sufficient facts that give rise to a plausible claim for the deprivation of constitutional rights, the motion must be denied, and the plaintiff must be

given the opportunity to seek and offer evidence in support of his or her claims. A court shall not grant a motion to dismiss if a reasonable fact-finder could find the plaintiff meets each element of a claim, after accepting Plaintiff's allegations and after drawing every reasonable inference in a light most favorable to Plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If one assumes that all of the allegations in Plaintiff's Complaint are true, as this Honorable Court must do, Plaintiff has stated federal constitutional claims upon which relief may be granted. Therefore, this Honorable Court should not dismiss her constitutional claims.

## ARGUMENTS

I. **There is ample evidence to suggest that the host-guest relationship is an "intimate association." And this relationship choice should be protected under the Due Process Clause.**

This is a constitutional challenge to a zoning regulation that abridges a fundamental right: the right of homeowners to enter into intimate associations with their guests. The Defendants mischaracterize Plaintiff's case as just another "routine" zoning dispute, and in their Motion to Dismiss, they focus on nine cases where federal courts rejected attempts by plaintiffs to "transform [their] zoning-related complaints into a case of… constitutional dimensions." However, it would be a grave mistake to apply those cases to Plaintiff's situation, when they bear no resemblance to the facts of her case.[1] Besides the obvious fact that they do not involve short-term rentals, none of those nine cases implicate a plaintiff's right to carry on intimate relationships within the privacy of her home.

The freedom of intimate association affirms the fundamental right of an individual to choose affirmatively the person with whom he or she will live. Intimate associations that occur within the home are especially important, because the home is a haven for fulfilling our desires and carrying on our private thoughts. A helpful starting point is *Stanley v. Georgia*, which upheld the right of an adult to possess and view

_____

[1] In most of those nine cases, the municipality simply had denied the plaintiff permits or

obscene materials in the privacy of his home. According to the Supreme Court, the Fourteenth Amendment allows individuals to satisfy their "intellectual and emotional needs in the privacy of [their] own home[s]," without state interference. *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). Courts may extend *Stanley* to the right to share the home with whom one pleases, for the home surely furthers the pleasures of intimate companionship as much as it permits the solitary viewing of obscene materials.

In his dissent in *Village of Belle Terre v. Boraas*, Justice Thurgood Marshall argued strongly for the recognition of shared living as a form of intimate association. He argued that the selection of living companions needed to be protected as diligently as one's choice of political, economic or social associates, because it involves "similar choices as to the emotional, social, or economic benefits to be derived from alternative living arrangements." Justice Marshall also noted that the right to "establish a home" was an essential part of the liberty guaranteed by the Fourteenth Amendment. He then posited:

> "The choice of one's household companions — of whether a person's intellectual and emotional needs are best met by living with family, friends, professional associates, or others — involves deeply personal considerations as to the kind and quality of intimate relationships within the home."

More recently, in *Lawrence v. Texas*, the Supreme Court expanded protection of intimate associations beyond the familial arena. The Court recognized that sexuality is only "one element in a personal bond" of intimacy; additionally, adults have the right to this bond "in the confines of their homes" and in "their own private lives." The Court thereby indicated an expanded idea of protection of associations beyond the family, beyond sex, and between those who choose to live together. Airbnb guests and hosts might not be living companions in the traditional sense, but there is no doubt that they experience intimacy while living together.

People who travel often desire to have intimate interactions and meaningful connections with other people. (Bialski, 2009; Conran, 2011). Human interaction and the interpersonal exchange are core themes related to the Airbnb brand (Yannopoulou,

Moufahim & Bian, 2013). For instance, Airbnb markets itself as a means of engendering new communities of belonging, making "one less stranger" through the incredibly personal experience of living in someone else's home. In addition to its "#OneLessStranger" campaign, Airbnb further highlights the positive effect a host can have on travelers' experiences with such catch phrases as "Belong Anywhere" and "Welcome Home" (Airbnb 2015, Homepage), all of which promote the idea of kinship and rapport with people.

Airbnb also promotes its service as a way to "creat[e] durable, lasting relationships between host and guests that continue long after a reservation has ended," *See* Laura W. Murphy, *Airbnb's Work to Fight Discrimination and Build Inclusion: A Report Submitted to Airbnb*, at 23, blog.atairbnb (Sept. 8, 2016), (explaining this as "Airbnb's overall mission") There is considerable truth to this advertisement. Research shows that Airbnb is helping create friendships that would have never existed. For instance, Lampinen and Coye Cheshire (2016) interviewed Airbnb hosts and found examples of valued social interaction extending beyond individual stays, sometimes leading to new friendships. An Airbnb host, Shirley, spoke about her luck of having hosted guests with whom she built strong bonds:

> "I have brought in people that I have made connections -- really deep friendships that otherwise it would not have happened. -- I had dinner with—one of them came into my house, the other day, who just wanted to see me and see my dog. I'm having dinner with another one on Thursday. So, yeah, the friendship is just, it's amazing."

Hosts and guests have even developed romantic relationships after staying together for a few days. See Anh-Minh Le, *"When Strangers Meet" Film Contest Winners*, Airbnb Blog (Jan. 27, 2015) (holding a contest for those who "met someone special through a chance encounter on Airbnb" because "an overwhelming number of couples ... met and fell in love through the serendipitous circumstance of an Airbnb").  Of course, not all guest-host relationships become this durable. Indeed, most are quite short-lived; they form and dissolve as guests arrive and depart. Nevertheless, there is substantial evidence

that shows that hosts and guests derive significant emotional satisfaction from their interactions with each other.

Social interaction makes an Airbnb experience fundamentally different from a hotel. Rather than staying at a traditional hotel and being served by uniformed employees, travelers are often specifically seeking out the more intimate experience of staying in a person's home. Airbnb's philosophy is to make guests feel at home and connect with the local people. Accordingly, the host is encouraged to "treat guests like friends or family," "share favorite places with guests," and "teach guests something local and unforgettable" (Airbnb, 2015a). Many hosts work hard to recreate a space for guests to feel comfortable. Hosts will sometimes pick up guests from the airport, prepare meals for them, or spend time socializing with them (Schor, 2015). This special "quality of interaction" with hosts and the "homely feelings" that come with it are among Airbnb's primary success factors (Heo, 2016; Liu & Mattila, 2017)

One of the benefits that guests seek from Airbnb accommodation is social interaction (Stollery & Jun, 2017). Research has shown that many travellers use Airbnb to have meaningful interactions with hosts and create memorable experiences with them. For example, Sthapit and Jiménez-Barreto (2018) found that memorable Airbnb experiences were related to the social interactions with the host. Tussyadiah and Zach (2017) cluster analyzed Airbnb reviews and found that they focused on the importance of hosts and feeling welcomed in a home. Other studies show that guests value the distinct role of the host, the host's efforts, and the accompanying intimacy (Tussyadiah, 2016) According to Paulauskaite et al. (2017), "[T]he connection made with the host leads to a more personal and companionable experience, sparking feelings of familiarity and sociability." These feelings are expressed in Plaintiff's guestbook (see Exhibit B) and a sample of her Guest Reviews (see Exhibit C). Noteworthy adjectives (e.g., "lovely," "warm," "special," "wonderful") highlight the positive emotions expressed by Airbnb guests to describe their experience of Plaintiff and her home. These are a few examples:

"Heleni is a very warm-hearted lady…She took me to restaurants she likes as soon as we got the chance to have dinner together. She prepared fruit and milk for my breakfast. She even cooked Chinese style noodle for me at night. During my staying [sic] I got to know her friend, Chiuba, too… We talked about a lot of things, politics, law system, sports, history, and I even taught them a little Chinese." – Squall

"This is a very special [Air]bnb experience. The house has a lot of charm as well as Heleni…[T]he best part of our stay was Heleni: she is an extremely interesting person, who literally spoiled us (breakfast included)" – Alberto

"[W]e felt welcomed from the minute we entered your house. We really appreciate the attention you dedicated around the comfort of our stay in every detail: from the flexibility to accept the late arrival, the breakfast, to the winter clothes you lent us because we were not prepared for the cold weather. Thank you so much for the unequaled hospitality."  Orianne & Kevin

Airbnb guests are very often interested in developing meaningful social interactions with their hosts (Tussyadiah and Pesonen, 2015). Ludmilla Tibulschi (2017) found that many Airbnb hosts are similarly open to creating a social connection with their guests. As a result, hosts will share their time, their homes, and their communities with guests. Cohen, Brown & Vergragt's (2017) research confirms this, where more than half of the hosts tthey interviewed indicated that they had social exchanges with guests by "eating with them, taking them around town, and in a small number of cases, even creating lasting friendships" (Cohen et al., 2017).

Both guests and hosts of Airbnb often experience each other's presence in deeply personal ways, as they strive to create an "atmosphere of honest and shared hospitality" (Garibaldi 2015) Isak Ladegaard  (2018) notes that hosts and guests sometimes share moments of intimate rapport, exchanging gifts and stories.  The close proximity that is formed during an Airbnb stay, can result in warm, affectionate and emotionally intense relations between guests and hosts. For instance in a review of one guest named Christina (see Exhibit C), Plaintiff writes: "What a lively, fun-loving, generous woman. There was always something to laugh at, to talk about, to think about, [and] to share." With regards to one couple who stayed in her home, Plaintiff writes,

> "I thoroughly enjoyed Ariel and Griff's visit! They were so easy to talk to and to get along with, and comfortably shared their interesting thoughts and ideas on a variety of topics. I felt that we had a lot in common."

Then in a private comment, Plaintiff compares Ariel and Griff to "old friends":  "**I felt like you were like old friends, not people I had just met.**" (emphasis added) On another occasion, Plaintiff likened her Airbnb guests to "family". For instance, she wrote of one couple in a public review:

> "Pilar arranged for her parents to stay with me for an entire week…They are both from Peru originally. **I soon felt like Estela & Jorge were part of my own family**, since my grandfather and all his brothers and sisters were born in Mexico. It was so cozy and comfortable to be with them that it carried me back to my childhood…We shared three or four breakfasts and chatted about so many things….Jorge, with a trademark twinkle in his eye, teased me without shame." 8/3/2018 (emphasis added)

These reviews  (see Exhibit C) reflect what Paula Bialski describes as "moments of friendship" that are condensed in time and therefore lived intensely. As Bialski notes, "Friendship today is not reliant on the duration of contact between two people, but on the level of intimacy achieved." And although these friendships often form and dissolve as guests arrive and depart, they are by no means forgettable. As Bialski points out, "The memories shared between [the host and guest] and the impact they had on each other is something quite permanent, as my research revealed." This is evident in Plaintiff's guest book (see Exhibit B). As one guest writes,

> "It seems [you and I] have lots of common interests, and our conversations could continue forever. I'm glad we've crossed paths, and this memory will certainly hold a special place in my heart." – Linda

Plaintiff's documented experience with her guests shows that people who are relatively unknown to each other can still achieve intimacy in a meaningful way.

It is through intimate associations that we enjoy the company of others and fulfill a necessary psychological need to interact with others (Karst 1980, 627). For Plaintiff, genuine intimacy is experienced through the enjoyable, inspiring interactions that she has had with her guests. In her affidavit (see Exhibit A), she states that hosting Airbnb "is an exhilarating social landscape that few other situations in my life have equaled. I have

never had so many interesting conversations with so many interesting people in such a relaxed environment, in such a short time." The following excerpts from the Guestbook (see Exhibit B) suggest that there is fun, familiarity, and enjoyment in Plaintiff's conversations with her guests.

> "We really enjoyed our stay with you and the stories you told." – Vijaya and Chandra
> .
> "Thank you for the welcoming atmosphere and for the nice conversations!" – Andreas and Victor
> .
> "I really enjoyed our discussion about art" – Chloe
> .
> "Thanks…for sharing your interesting family history with us." – Isabella
> .
> "I enjoyed talking to you about almost every subject!" – Steve
> .
> "Thanks you so much for the hospitality and the great discussions." – Beck

The Supreme Court has articulated the basis for the right of intimate association in terms of the psychological and emotional sustenance derived from the relationship. *See e.g.*, *Roberts*, 468 U.S. at 619 ("the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others.") Airbnb has certainly enriched the emotional life of many hosts. This is especially true for women over age 60, such as Plaintiff. As many as 82 percent of senior women hosts reported that hosting on Airbnb has helped them stay more socially and emotionally connected. As one blogger write:

> "My 86 year old mom, who is battling Stage 4 lung cancer, is at her best when she is socially engaged. She literally morphs from a sullen and sickly person into a completely different and more energized person when she socializes. Her eyes sparkle, her energy increases, and her beautiful smile lights up the room when she engages with her many different guests. She often offers some small cakes or cookies from the Asian market as she invites her guest to sit down and watch an

episode of America's Got Talent with her. Her laughter and her smile is her best medicine and I have so much gratitude for all those "strangers-turned-friends" who have come through Airbnb.  It has come to the point that the extra income they get from hosting is really a secondary benefit. (Cindy Kang, 2020)

However, the Defendants assert that, "On its face, Plaintiff's AirBNB business hosting short-term stays by strangers every 3 or so days is not the type of 'intimate' personal relationship…. encompassed by the state or federal constitutional right to association." There are multiple problems with this characterization. To start with, the guest, although in many ways unknown to the host, is not a complete "stranger." Because the hosts and guests get acquainted with each other online, there already exists some kind of relationship between the host and the guest prior to their actual arrival. Hosts and guests can both consult each other's profile pages for more information. It is also common for the traveller and the host to exchange several messages, and even phone calls.  In other words, they use the platform to initiate introductions and to create trust. As one hosts states,

> "What I've found neat is how quickly a stranger, no longer seems like a stranger when you exchange messages back and forth…It's interesting to me the high level of comfort I get as soon as I look at someone's pictures of themselves and they tell me their reason for visiting and we exchange some notes back and forth about the place…Then it's like not a stranger, it's like this girl and her boyfriend from Italy who are coming to New York for the first time and are excited about having a barbecue in the backyard, you know.

Secondly, for Defendants to suggest that Airbnb is merely a "business" is to speak without knowledge. Many Airbnb hosts enjoy sharing their homes with guests for reasons that go far beyond making money, such as making new friends, sharing personal stories, or learning about different cultures and languages. Indeed, enhanced social interaction— meeting people and making new friends—is a frequently mentioned aspect of hosting Several studies have underscored the role of social interactions in motivating hosts to engage in sharing accommodations. For instance, Lampinen and Ikkala (2014) interviewed several Airbnb hosts and found that while earning money was important, the opportunities to meet people and have enjoyable company was important motivation for hosting.  For example, Alfonso, a 53-year-old, stressed the importance of the social

nature of Airbnb hosting. For him, renting out a private room in his two-room apartment was, in essence, a way to meet new people, since his social circle in Helsinki was relatively small and at times felt insufficient to him:

> "For me, it's not that easy to meet people … Of course, I could go to a bar or something, but it's not that easy for people of my age to meet people like that. But sometimes I have really nice conversations and moments with my guests, people who are total strangers to me. I think it's similar to what happens when you are traveling. You meet people on trains and airplanes, and it's just easy to connect with them. "

Among the Airbnb hosts who were interviewed, some claimed that that the social aspects of Airbnb were so beneficial, that they would continue to host even if they had all the money they could want. These findings are corroborated by Juliet Schor (2015) who found that sociability was an important motive for at least half of all Airbnb hosts:

> "They [the hosts] socialized with their guests, ate with them, took them out, and in some cases became friends with them. A few of our respondents said they would continue hosting even if their financial situations improved markedly, and others said that the social aspect was as important as the financial."

In some cases, hosts will even sacrifice money and lower the price of their properties beneath market price, in order to increase the probability of zeroing in on their preferred guests. (Ikkala and Lampinen, 2014). This research suggests that many of the benefits of hosting an Airbnb are rooted in something more meaningful than money.

According to Malazizi et al. (2018), the Airbnb hosting experience can lead to social connectedness and thus less loneliness. The study by Farmarki and Stergiou (2019) *"Escaping loneliness through Airbnb host-guest interactions"* supports not only that hosts are motivated by social and psychological factors, but also argues that these factors are increasingly important in a time when loneliness troubles more and more people. Many people, particularly those who have lost a spouse, can feel quite lonely and isolated in their home. And for these people, Airbnb is a much-needed platform to socialize and meet new interesting people. As one blogger writes, "It was 8 months after my husband's death that I decided to share my home with Airbnb guests.…I've had some wonderful guests, some I'd even consider friends because we shared so many wonderful stories." (Elene Marsden).

It boils down to this: It should not be made a crime to rent to people whose company one enjoys simply because it is for a short time. Zoning authorities should not prevent homeowners from deciding whom they can share their homes with. They should allow people to structure their intimate relationships as they see fit – especially when those relationships bring personal joy and fulfillment. "Taking a person into one's home because he…brings happiness to the household is of the same dignity" as the marital right to privacy or other rights of intimate association that the Supreme Court has recognized. U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 531–32 (1973)  (Douglas, J., concurring) The "right to invite the stranger into one's home" is deserving of constitutional protection. Id. *see also* Vill. of Belle Terre v. Boraas, 416 U.S. 1, 18 (1974) (Marshall, J., dissenting) (stating that the freedom of association is broad enough to encompass the "'right to invite the stranger into one's home' not only for 'entertainment' but to join the household as well" (quoting *Moreno*, 413 U.S. at 438–45))

## II.   Plaintiff seeks to exercise a historically established right to lease property for any duration of time – a right that is permitted under existing law. Where a municipal entity attempts to deprive citizens from a use of their own property that is permitted under existing law, substantive due process is violated.

It is beyond question that the right to use property in a lawful manner and for a lawful purpose is one of the most significant rights protected by our Constitution. Indeed, the Supreme Court has recognized property rights as "basic civil rights," *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972) and has listed among the recognized rights of land ownership "the right to unrestricted use and enjoyment, and the right to receive rents." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53–54, 114 S.Ct. 492, 126 L.Ed.2d 490(1993) The Defendants argue that "The Town's prohibition of a short-term rental business use in [Plaintiff's] Unit. . . is hardly a constitutionally cognizable property interest." We disagree. A ban on short-term rentals results in the loss of potential rental income. The loss of this rental income is not

"insignificant or unworthy of due process protection. This rent represents a significant portion of the exploitable economic value of [the owner's] home." *James Daniel Good Real Prop.*, 510 U.S. at 54–55, 114 S.Ct. 492. There can be no dispute that Plaintiff has a substantial economic interest in the short-term renting of her property

Short-term renting has been in practice for hundreds of years in this country. For instance, most of the delegates to the Constitutional Convention were taken into private residences during their time in Philadelphia. Ellis Paxson Oberholtzer, *The Literary History of Philadelphia* 105 (1906). At multiple points in his career, Abraham Lincoln was a transient occupant, such as when he was elected to Congress and moved to Washington. Chris Derose, *Congressman Lincoln* 9- 10 (2013); David Herbert Donald, *Lincoln* 119-120 (1995). The practice of taking in short-term lodgers was so common during the nineteenth century that one in three to one in five households contained transients. Jamilia Jefferson-Jones, *Airbnb and the Housing Segment of the Modern "Sharing Economy": Are Short-Term Rental Restrictions an Unconstitutional Taking?*, 42 Hastings Const. L.Q. 557, 563 (2015).

In Brookline, there is a long and established history of individuals renting space in their homes to transients (see Exhibit B of Plaintiff's Complaint for comprehensive historical overview). For instance in 1842, Abraham Kohn, a peddler from Bavaria, arrived in Brookline, where for the charge of twenty-five cents he could obtain supper, lodging for the night, and breakfast. And by the early twentieth century, a significant number of middle class households in Brookline contained short-term boarders and lodgers. Indeed, a simple review of *The Boston Globe* of the period reveals multiple listings for furnished rooms in private homes in Brookline, available for rent on a *weekly* basis. Websites such as Airbnb.com have undoubtedly reinvigorated this old phenomenon, yet they have not fundamentally altered the nature of home-sharing and short-term renting. The only difference now is that the practice has become more efficient: Property owners can market their homes more widely and readily than in the past, giving owners extraordinary flexibility in how they use, swap, lease, and share their

homes. This new freedom has enabled homeowners and transients to connect better than ever before.

Defendant Daniel Bennett, acting as Building Commissioner for the Town of Brookline, is now seeking to deprive Brookline residents of a right that they have enjoyed for well over a century: the right to rent rooms in the confines of their own homes to persons of their own choosing, for any length of time. Based on his interpretation of the zoning ordinance, Commissioner Bennett has decided to impose a ban on all short-term rentals, by requiring lodgers to occupy units for a minimum of thirty days. Yet nowhere in the ordinance is there any reference to a 30-day limitation for rentals. Nor does the ordinance include the terms "short-term rental" or "long term rental." Indeed, the ordinance does not attempt to distinguish or otherwise prohibit classes of rentals based on any duration of use whatsoever. On the contrary, the ordinance allows Plaintiff to operate a short-term rental in her home, provided that (a) she does not exceed the accommodation limits specified in Permitted Accessory Use #51 (b) she meets the elements of the definition of "accessory use" and (c) she adheres to the restrictions specified under §4.05.

### a) A short-term rental is a lawful accessory use in Brookline if it adheres to the accommodation limits specified in Permitted Accessory Use #51

The specific provision at issue in Plaintiff's case, Permitted Accessory Use #51, is one that applies to every homeowner in Brookline "*by-right*" or "*as of right.*"[2]  Under the plain language of Use #51,[3] a homeowner in Brookline can rent as many as two rooms for an unspecified duration of time, provided that (1) there are no separate cooking facilities for lodgers (2) the number of lodgers does not exceed two persons and (3) no more than four unrelated persons dwell at one time in the unit. Because nothing in the

---

[2] A "use by right" is a use permitted in a zoning district and is therefore not subject to special review and approval by a local government.

[3] Use #51 states: "Within a dwelling unit, the renting of not more than two rooms as a lodging without separate cooking facilities and for not more than two lodgers; in the case of a dwelling unit occupied by unrelated persons, the sum of lodgers and other unrelated  persons shall not exceed the limits defined for a family in §2.06, paragraph 1."

provision prohibits the renting of rooms based on duration of time (and the provision makes no distinction whatsoever between short- and long-term rentals), it is irrelevant whether the occupying lodgers stay for one year or ten days. The foregoing statutory language should end any debate about whether short-term rentals are allowed in Brookline. Use #51 at least authorizes short-term rentals that operate as an accessory use in an owner-occupied home.

**b)   A short-term rental is a lawful accessory use in Brookline if it meets the definition of "accessory use" in the ordinance and adheres to the restrictions specified under §4.05.**

The pertinent section of the zoning ordinance defines accessory use as follows: "a use incident to, and on the same lot as, a principal use." According to 2 E. C. YOKLEY, ZONING LAW AND PRACTICE § 8.2 (4th ed. 1978), a use is incidental if the use is not "the primary use of the property," is "minor in significance," and has a "reasonable relationship with the primary use." The term "accessory use" recognizes that the primary purpose of the dwelling is to serve as a residence for the owner, and only a part of the dwelling unit can be used for short-term rental purposes. Under the existing zoning code in Brookline, a short-term rental cannot be a stand-alone use on a property; it can exist only with an accompanying primary use to which it is subordinate and incidental. To be subordinate and incidental to the primary use, the short-term rental accessory use cannot be larger in size, scale, or scope and impact of daily operations than the primary use. Furthermore, a short-term rental must not occupy 25% or more of the total floor area to be considered a lawful accessory use. See §4.05. Yet so long as the owners legitimately occupy the house as their primary residence and merely rent one or two rooms on a short-term basis, there is no violation of the zoning ordinance.

**c)   Assuming, *arguendo*, that short-term rentals were not expressly permitted by the ordinance, the doctrine of accessory uses contemplates that property may be used in ways not expressly permitted under an ordinance.**

Commissioner Bennett's ban on short-term rentals does not flow logically and definitively from anything written in the ordinance, and there is nothing in the ordinance

that provides a basis for drawing a distinction between long-term rentals and short-term rental. Interestingly enough, the ordinance contains a significant number of restrictions on accessory uses in §4.05. Although some accessory uses are prohibited outright in certain districts, short-term rentals are not listed among these prohibited accessory uses. Nonetheless, Commissioner Bennett contends that, because the zoning code does not specifically permit rentals for less than thirty days, short-term rentals are proscribed by the ordinance. Essentially, he takes the position that every use of property is prohibited unless the use is specifically permitted by the ordinance. Granted, the Brookline zoning ordinance states that no building shall be erected or land shall be used "except for the purposes permitted in the district in the section of this Article applicable thereto." But this applies only to *primary or principal uses*. The ordinance does not use this same language to permit or otherwise prohibit accessory uses.

As construed by the courts, an accessory use may be predicated upon a specific provision found in the local zoning ordinance, or it may be based upon the fact that the use is so customarily incidental to the principal use that it may be deemed as a matter of law, to be impliedly part and parcel of the permitted use. 2 Arden H. and Daren A. Rathkopf, *The Law of Zoning and Planning*, sec. 23.01 at 23-6 (4th Ed. 1985). For instance, there are a myriad of activities intimately associated with maintaining a home, such as the cultivation of a lawn or garden, the maintenance of a swimming pool, or the storing of the family automobile, that are not always expressly permitted in a zoning ordinance. Nonetheless, such activities are easily deemed to come within the general definition of accessory use.

Because it is impossible for a zoning ordinance to express every possible lawful use of property, the drafters of zoning codes found it much more practical to enumerate and separate primary uses into districts rather than to specify all the countless accessory uses that were customarily associated with each primary use. See 125 N.H. 29, 32, 480 A.2d 9, 10 (1984). ("The rule of accessory use is a response to the impossibility of providing expressly by zoning ordinance for every possible lawful use.")  Their approach

was to permit all accessory uses that were customarily incidental in nature.[4]  While a local bylaw or ordinance may list some allowed accessory uses, the enumerated list is not to be regarded as exhaustive. Salah v. Board of Appeals of Canton, 2 Mass. App. Ct. 488, 496 (1974) ("The four uses listed obviously could not have been intended to exhaust the multifarious possibilities inherent in the broad definition of 'accessory use.'").

Enumerated permitted accessory uses are only intended to provide examples of valid accessory uses; they are not meant to be exhaustive. Nor are they intended to exclude accessory uses implied as a matter of law.[5] Otherwise, taken to its logical conclusion, this would mean that Commissioner Bennett could restrict *any* accessory use without limitation (such as the keeping of a dog as a household pet) by simply arguing that the use was one not specifically mentioned. "[A]ny number of other uses, unquestionably incident to the main use as a matter of custom or convenience, would automatically be disqualified." *P.T. & L. Const. Co., Inc.*, 389 A.2d at 451. Such an interpretation conflicts with the purpose and policy of accessory uses built into the ordinance.

---

[4] "Customarily incidental" requires that the accessory use be scrutinized to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use. This standard requires a finding of commonality, meaning a determination of whether the accessory use is so necessary or commonly to be expected that it cannot be supposed that the ordinance was intended to prevent it. Numerous court decisions from the early- and mid-20th century have recognized the right of individuals to take in boarders or lodgers as long as the activity was "merely incidental and accessory to the principal use of the house as a home." See 2 ARDEN H. RATHKOPF ET AL., RATHKOPF'S THE LAW OF ZONING AND PLANNING § 33:35 (discussing several cases from the early-20th century illustrating the "general rule . . . that a limited number of boarders is a customarily accessory use of residential property but that where the number of boarders is disproportionate to the primary residential use by the principal occupant it becomes a business") The accommodation of short-term lodgers is, in fact, a customarily incidental use of a home — dating back to at least the nineteenth century and continuing throughout the twentieth century. (see Exhibit B of Complaint for comprehensive historical overview of short-term rentals in Brookline).

[5] Customarily incidental uses do not need to be explicitly mentioned in order to be lawful. As stated in one well-known treatise: "In situations where there is no . . . specific provision in the ordinance [permitting the accessory use], the question is the extent to which the principal use as a matter of custom, carries with it an incidental use so that as a matter of law . . . it will be deemed that the legislative intent was to include it." 1 Rathkopf, Zoning Planning (3d Ed.), p. 23-4.

Furthermore, the Commissioner's argument also overlooks the definition of "accessory use" in the ordinance. The Commissioner's reading of the ordinance would deny effect to these essential words. If, as the Commissioner claims, the only permitted accessory uses are those specifically listed, then the ordinance's general definition of accessory use would be rendered superfluous. See State v. P.T. & L. Const. Co., Inc., 77 N.J. 20, 389 A.2d 448, 451 (1978) (holding that introductory definition of accessory use would be rendered "mere surplusage" if list of accessory uses were deemed exclusive). Thus, the Commissioner's reading is at odds with the basic interpretive canon that "'[a] statute should be construed [to give effect] to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"  Hibbs v. Winn, 542 U. S. 88.

### III.   Furthermore, Plaintiff had no fair warning that her actions could be considered unlawful.  And contrary to Defendant's claims, there is ample evidence that short term rentals are a residential and not a business use.

Our legal system is based on the premise that citizens have the ability "to steer between lawful and unlawful conduct. " *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972). But no such capacity exists when citizens are not given fair notice of what the government considers to be unlawful. *Connally* v. *Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Contrary to Defendants' claim that Plaintiff's "violation" should have been obvious to her, Plaintiff contends that no reasonable person could infer from the ordinance that short-term rentals were prohibited. This is due to this one simple fact: *nothing in the ordinance explicitly prohibits the renting of rooms based on time restrictions.* It fundamentally violates Due Process norms to cite individuals and threaten them with harsh fines for violating regulations, when those prohibitions are not discernible from the text of the statute. The lack of a direct punishment is immaterial.[6]

---

[6] In *FCC v. Fox Television Stations*, *Inc.* 567 U.S, 132 S. Ct. 2307 (2012), the Supreme Court squarely addressed the issue of whether direct punishment was required in order to assert a cognizable void-for-vagueness claim. In that case, Fox Broadcasting was not fined at all. Despite this lack of direct punishment, the Court held the FCC's decision of finding even isolated vulgarities was unconstitutionally vague. The mere possibility that this finding of indecency could be used by the FCC to justify "increas[ing] any future penalties" for future violations was

Defendants also state that, based solely on the language of the ordinance, "Plaintiff was on fair notice that her AirBNB business was not a permitted use in the Unit. This is apparent from the Unit's location in a "Residence District" with a principal use as a dwelling, the strict controls placed on other accessory uses included in the Use Tables that are in the nature of a business use, and the inconsistency with those controls that Plaintiff's proposed liberal interpretation would create." In making this statement, Defendants seem to suggest that it should have been apparent to a reasonable person that operating a short-term rental is a "business use" inconsistent with a residential zone.[7]  But in at least nineteen states,[8] short-term rentals are a recognized residential use, appropriate for residential areas. See e.g. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 291-92 (Tex. 2018) (declining to interpret "residential" as prohibiting short-term

---

enough to raise Due Process concerns. Moreover, whenever there is any legal effect -- even a modest one that falls far short of criminal punishment -- the "reputational injury" created by a finding of liability may suffice to trigger the void-for-vagueness doctrine.

[7] Zoning, by its very nature, segregates incompatible land uses. Each land use is assigned to a district in the community reserved exclusively for residential, commercial, or industrial purposes. Plaintiff's home is located in a "Residence District" (specifically, a district designated "M-2.0", referring to it being zoned to allow principally multifamily residences at a certain density). Within the "M-2.0" District, the "principal use" of buildings is as dwellings for single or multi-family occupancy.

[8] *Santa Monica Beach Prop. Owners Ass'n, Inc. v. Acord*, 1D16-4782, 2017 WL 1534769, at *2 (Fla. Dist. Ct. App. Apr. 28, 2017); *Gadd v. Hensley*, 2015-CA-001948-MR, 2017 WL 1102982, at *6 (Ky. Ct. App. Mar. 24, 2017); *Houston v. Wilson Mesa Ranch Homeowners Ass'n, Inc.*, 2015 COA 113, ¶ 18, 2015 WL 4760331 (Colo. App. Aug. 13, 2015); *Wilkinson v. Chiwawa Communities Ass'n*, 86870-1, 2014 WL 1509945 (Wash. Apr. 17, 2014); *Roaring Lion, LLC v. v. Exclusive Resorts PBL 1, LLC*, CAAP-11-0001072, 2013 WL 1759002 (Haw. Ct. App. Apr. 24, 2013); *Estates at Desert Ridge Trails Homeowners' Ass'n v. Vazquez,* 2013-NMCA- 051, 300 P.3d 736, 743 (N.M. App. Feb. 8, 2013); *Slaby v. Mtn. River Est. Resid'l Assoc., Inc.*, 2012 WL 1071634 (Ala. Ct. Civ. App. March 30, 2012) *Dunn v. Aamodt*, 2012 WL 137463 (W.D. Ark. Jan. 18, 2012) *Mason Family Trust v. DeVaney*, 146 N.M. 199 (2009); *Ross v. Bennett*, 148 Wash. App. 40 (Wash. Ct. App. – Div. 1 2009); *Applegate v. Colucci*, 908 N.E.2d 1214 (Ind. Ct. App. 2009) *Scott v. Walker*, 274 Va. 209 (2007) *Lowden v. Bosley*, 395 Md. 58 (2006); *Mullin v. Silvercreek Condo. Owners Assoc., Inc.*, 195 S.W.3d 484 (Missouri Ct. App. 2006); *Pinehaven Planning Bd. v. Brooks*, 138 Idaho 826 (2003) *Yogman v. Parrott*, 325 Or. 358 (1997); *Forshee v. Neuschwander*, 2017 WI App 43, ¶ 22, 377 Wis. 2d 162, 176, 900 N.W.2d 100, 107, *review granted,* 2017 WI 94, ¶ 2; *Vera Lee Angel Revocable Trust v. Jim O'Bryant And Kay O'Bryant Joint Revocable Trust*, 2018 Ark. 38 (2018); *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 291-92 (Tex. 2018)

rentals where tenants engage in the ordinary incidents of living in a home); Lowden v. Bosley, 395 Md. 58, 909 A.2d 261, 267 (2006) (holding that as long as the property is used for living purposes, it does not cease being "residential" simply because such use is transitory rather than permanent); see also Mullin v. Silvercreek Condo. Owner's Ass'n, 195 S.W.3d 484, 490 (Mo. Ct. App. 2006); Pinehaven Planning Board v. Brooks, 138 Idaho 826, 70 P.3d 664, 667–68 (2003) (renting a property to people who used it for residential purposes, whether short or long-term does not change the nature of the use); Slaby v. Mountain River Estates Residential Ass'n, 100 So.3d 569, 579 (Ala. Civ. App. 2012) ("[P]roperty is used for 'residential purposes' when those occupying it do so for ordinary living purposes. Thus, so long as the renters continue to relax, eat, sleep, bathe, and engage in other incidental activities ... they are using the [property] for residential purposes."); and Houston v. Wilson Mesa Ranch Homeowners Ass'n, Inc., 2015 COA 113, ¶ 18, 360 P.3d 255, 259 (2015) (using residence for ordinary living purposes does not change its function whether rented on a short-term or long-term basis.)

Contrary to Defendants' claims, Plaintiff does not operate a "business" on her property. Renting out a room for short terms does not render the home itself a "business," any more than renting out a room for long terms does. The fact that a lease is for a short duration does not mean that the use of the property is commercial in nature. What determines whether a use is residential or commercial is what the occupants are doing on the land. A place used for "residential purposes" is, according to its plain and ordinary meaning, "one in which people reside or dwell, or which they make their homes, as distinguished from one which is used for commercial or business purposes." *Blevins v. Barry- Lawrence Cnty. Ass'n for Retarded Citizens*, 707 S.W.2d 407, 408 (Mo. 1986). Thus, so long as an Airbnb guest uses a home for the purposes of eating, sleeping, and other living purposes, this use is residential. The owner's receipt of rental income either from short- or long-term rentals in no way detracts or changes the residential characteristics of the use by the tenant. Character of use is determined by what human beings actually do upon the land, and if all they do is engage in the ordinary incidents of

residing in a place, then any governmental determination that they are engaging in a trade or business has no foundation in reason and is arbitrary and irrational.

IV.    **Plaintiff has sufficiently pled facts that establish that Commissioner Bennett acted *ultra vires* in violation of substantive due process. This is a plausible claim for relief sufficient to overcome a Rule 12(b)(6) motion to dismiss.**

In certain situations, an *ultra vires*[9] claim may be styled as a Substantive Due Process violation.[10] Substantive Due Process seeks to prevent governmental action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests. The question of whether an agency action substantially advances a legitimate state interest asks in essence, whether it is effective in achieving some legitimate public purpose. An *ultra vires* act, however, cannot advance a legitimate governmental purpose, because the government's purposes are *per se* illegitimate whenever it acts outside the bounds of its

---

[9] An ultra vires act is an action that goes beyond the scope of authority provided under the law. According to the U.S. Supreme Court, government action is *ultra vires* if an agency or other government entity "is not doing the business which the sovereign has empowered [it] to do or [it] is doing it in a way which the sovereign has forbidden." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). The underlying principle behind the *ultra vires* doctrine is that an agency must have an affirmative legal basis for its actions. Indeed, this principle—that only authorized action is valid—is a cornerstone of administrative law.

[10] For instance, the Second Circuit has observed that a local land use decision may be sufficiently "arbitrary, conscience-shocking, or oppressive in the constitutional sense" if it is taken without authority under state law and is tainted with "procedural irregularity." Cine SK8, Inc. v. Town of Henrietta , 507 F.3d 778, 785 (2d Cir. 2007) ("Cine SK8 "). ("[I]f the Town Board did not have authority for the actions it took regarding Fun Quest's permit -- as it appears it did not -- the Board's actions were ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation."); *TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 745 (S.D.N.Y. Sept. 27, 2011) ("Cine SK8 can be read broadly to stand for the proposition that any governmental action taken outside the scope of the defendant's authority, i.e., an 'ultra vires' act, is 'sufficiently arbitrary to amount to a substantive due process violation.'") (quoting Cine SK8, 507 F.3d at 789).Another example of an application of *Cine SK8* is *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208 (E.D.N.Y. Aug. 21, 2008), where municipal defendants sought to regulate fishing equipment that the plaintiff fisherman had placed in the town harbor. 2008 WL 3978208, at *13. The court denied the defendants' motion for summary judgment on the substantive due process claim in part because the town was "not legally authorized to regulate fishing" in the harbor and there was a question of fact regarding whether the items "pos[ed] a hazard to navigation," the only basis on which the town could regulate them. *Id.* at *14. If the town lacked authority to regulate, its actions could constitute a substantive due process violation. *Id.* (citing *Cine SK8*, 507 F.3d at 789).

delegated authority. *Ultra vires* acts, properly speaking, are not lawful acts. And if an agency enacts a regulation that it lacks the authority to make, that regulation has no standing as law, and enforcing it would violate the citizen's right not to be deprived of life, liberty, or property except by due process *of law.*

### a) The Commissioner has no authority to rewrite clear statutory language

Even if he does have authority to interpret the law, the Commissioner cannot interpret the ordinance in a manner that amounts to a rewrite. No interpretation can add or subtract from the actual scope of the statute itself. And an agency interpretation that adds to the statute "something which is not there" cannot stand. *United States v. Calamaro*, 354 U.S. 351, 359 (1957). An agency may clarify and explain statutory terms through regulation, but it does not have authority to rewrite clear statutory language. See e.g. *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S. Ct. 1655, 1663, 146 L. Ed. 2d 621, 632 (2000). ("The administrative power to interpret a regulation does not include the power to rewrite it.") See also *Util. Air Regulatory Grp.* v. *EPA*, 134 S. Ct. 2427, 2445 (2014) ("The power of executing the laws . . . does not include a power to revise clear statutory terms," and it is thus a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.")

As to its statutory definitions, the zoning ordinance defines "lodger" simply to mean "a person who rents space for living or sleeping purposes without separate cooking facilities and who is not within the second degree of kinship to the lessor."[11] However, the Commissioner interprets the word "lodger" to mean "a person who rents space for living or sleeping purposes…**for thirty days or more**." This is textbook *ultra vires*

---

[11] Although the verb  "rent" in "Lodger" is not formally defined within the bylaws, it must be understood in its general sense to include *any* duration of leasing. A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning, as customarily derived from the dictionary. A. Scalia & B.A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012).  *Black's Law Dictionary* 1411 (9th ed.) defines the verb "rent" as "to pay for the use of another's property." The Oxford Dictionaries Online also defines the verb "rent," followed by an object, as "the payment of money for the use of a property or other tangible thing." Thus, according to most dictionaries, the verb "rent" is used to describe an action taken by the person who pays for the right to occupy or use someone else's property.

action. There is simply no authority, statutory or otherwise, to justify this kind of rewriting of the text. It violates the cardinal rule that a "regulation may not serve to amend a statute," *Koshland v. Helvering*, 298 U.S. 441, 447(1936)

The Legislature, which chose not to include in the ordinance any language imposing a time restriction, did not authorize that language to be added by administrative fiat. If the drafters of the ordinance wanted to exclude short-term rentals by erecting time restrictions, they were more than capable of doing so. In fact, the drafters of the ordinance were quite familiar with the concept of time limits. For instance, they knew how to impose a duration for the use of signs on properties.[12] Rather than apply similar time limits to rentals, they chose not to impose such restrictions. Commissioner Bennett has therefore, effectively rewritten the ordinance by "putting into the body of the statute a limitation which [the legislature] did not think it necessary to prescribe." *Morrill v. Jones*, 106 U.S. 466 (1883).

When the Legislature defines a word in a statute, it requires that word to be understood in particular ways. Once defined, the term cannot be interpreted to mean something that lies outside the scope of the definition. And so the dispositive question facing this Honorable Court is whether the act of altering a clear and unambiguous definition set forth by statute exceeds the Commissioner's authority. The answer is "*yes*": Where the Legislature has defined a word in clear and specific terms, the Commissioner has no authority to define it differently. In this case, the Legislature clearly defined the term "lodger" and left no room nor delegated any authority to the Commissioner to amend that definition.

Insofar as the he is called upon to administer a zoning ordinance, the Commissioner must engage only in *bona fide* interpretation, respecting the Legislature's

---

[12] *"Non-illuminated non-commercial public message signs may be placed on private property in all zoning districts. Such signs related to a specific event shall be removed by the property owner within 7 days following the event."*

*"All window signs, other than temporary identification signs regulated in subparagraph g. below and non-commercial signs regulated by §7.03, paragraph 2, shall be subject to the design review process … Such signs may be displayed in a window for no more than 30 days."*

original policy judgment. He cannot rewrite the language of a statute to reach a policy goal he wishes had been included. 1 N. Singer, Sutherland Statutory Construction § 3.06, at 55 (5th ed. 1992-94)  ("[N]either the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy where the legislature has clearly and unambiguously spoken."). See also *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 462 (2002) ("We will not alter the text in order to satisfy the policy preferences of" an agency). On its face then, the Commissioner's rewrite is impermissible and a clear overreach of his authority. See *UARG* , 134 S.Ct. at 2446 n.8 ("We are aware of no principle of administrative law that would allow an agency to rewrite such a clear statutory term, and we shudder to contemplate the effect that such a principle would have on democratic governance")

**V.     A land use regulation violates Substantive Due Process if it does not substantially advance legitimate governmental interests.  The 'shocks the conscience' standard is not applicable.**

Defendants cite *Mongeau v. City of Marlborough*, 492 F.3d 14 (1st Cir. 2007) for the proposition that to state a substantive due process claim, a plaintiff must allege governmental action that can be said to "shock the conscience."[13] In *Mongeau*, the plaintiff alleged that the respondent Commissioner of Inspectional Services for the City of Marlborough, was biased against the plaintiff for refusing to make a voluntary payment in exchange for permission to build and treated the plaintiff's building permit application and site permit review in a hostile manner, leading to excessive delays and a predetermined outcome. Yet unlike *Mongeau*, the challenged state actions in Plaintiff's case are broad legislative regulations. Indeed, courts often distinguish legislative and executive action based on whether the action applies to a broad group of persons or a single individual. *Nicholas v Pennsylvania State Univ,* 227 F3d 133, 139, n1 (CA 3, 2000) ("[E]xecutive acts...typically apply to one person or to a limited number of persons,

---

[13]   Conduct "shocks the conscience" when it demonstrates such "a degree of outrageousness and a magnitude of potential or actual harm" that it "'shocks the conscience of federal judges.'" *Uhlrig v. Harder*, 64 F.3d 567, 573–74 (10th Cir. 1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)).

while legislative acts, generally laws and broad executive regulations, apply to large segments of society.") (citations omitted). This distinction is significant because it determines the appropriate standard for substantive due process challenges.

In *Lewis v. County of Sacramento*, 523 U.S. 833 (1998)*,* the Supreme Court held for the first time that the "criteria to identify what is fatally arbitrary" differ depending on whether it is legislation or a specific act of a governmental officer is at issue." Legislation (or a regulation interpreting legislation) is arbitrary if it lacks a legitimate purpose or uses unreasonable means to achieve a legitimate end. *See, e.g., Lingle v Chevron USA, Inc,* 544 US 528, 542 (2005). By contrast, the *Lewis* Court held, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Lewis,* 523 US at 846. See also *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010) ("*Lewis* clarified that the shocks-the-conscience test...governs all substantive due process claims based on executive, as opposed to legislative, action.") (italics omitted).

In short, the "shocks-the-conscience" standard of conduct only applies to determine whether individual executive action violates due process. The "shocks-the-conscience" test is not applicable, however, to cases in which plaintiffs advance a substantive due process claim to challenge broad legislative enactments. *Dias v. City and County of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009) "Instead, it is an inquiry reserved for cases challenging executive action. " Id. (citing, Lewis, 523 U.S. at 847-47 & n. 8).  *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1788 (2012) (explaining *Lewis*'s holding "that substantive due process claims against the executive—usually law enforcement officers—are governed by a 'shocks the conscience' test"). Furthermore, the "shocks the conscience" test is, by nature, ill-suited for determining whether land use regulations violate substantive due process.[14] And rightfully so, the Supreme Court has never applied the "shock the conscience" standard in land use cases.

---

[14]  One conceptual difficulty with applying the "shocks the conscience" standard in land use cases is that the basis for its application simply does not exist. The issue in *Lewis* was whether the defendant had a due process right to be free from reckless police chases that are likely to cause fatal injuries. The basic premise for applying the "shocks the conscience" standard, therefore,

**VI.    Lack of impartiality in the form of personal bias undermines the basic Due Process right to a fair hearing. For this reason, plaintiff properly raises a procedural due process claim cognizable under the Fourteenth Amendment.**

Procedural Due Process entitles a person to an impartial and disinterested tribunal. Not only is a biased decision-maker constitutionally unacceptable, but our system of law has always endeavored to prevent even the "probability of unfairness." *In re Murchison,* 349 U.S. 133, 136 (1955). In order to overcome the presumption of honesty and integrity in those serving as adjudicators, a Plaintiff must show that "the probability of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable." *Withrow v. Larkin,* 421 U.S. 35, 47 (1975). However, a showing of actual bias is not necessary in order to assert a cognizable due process claim; the potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation of that right i.e., "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 99 L. Ed. 11, 75 S. Ct. 11 (1954). See also D.C. Fed'n of Civic Ass'ns v. Volpe, 459 F.2d 1231, 1246-47 (D.C. Cir. 1971), *cert. denied,* 405 U.S. 1030 (1972)( [T]he appearance of bias or pressure may be no less objectionable than the reality.")

At the appeal hearing that took place on December 19, 2019, the risk of bias became unacceptably high when Defendant Johanna Schneider made inflammatory remarks based on her strongly-held personal belief that short-term rentals are "terrible for the neighborhood." She also obliquely impugned the character of Plaintiff, stating that condo owners (such as the Plaintiff) were "incredibly inconsiderate" for operating an Airbnb inside a condominium. She stated specifically:

---

does not even exist in a zoning case. See *United Artists,* 316 F.3d at 407 (Cowen, J., dissenting) ("'Shocks the conscience' is a useful standard in high speed police misconduct cases which tend to stir our emotions and yield immediate reaction. But it is less appropriate, and does not translate well, to the more mundane world of local land use decisions, where lifeless property interests (as opposed to bodily invasions) are involved."). In short, the "shock the conscience" test is a poor fit for land use cases.

"Airbnbs are everywhere. There are many on my street. I find them to be
absolutely terrible for the neighborhood...I think it's awful. And I think it is
incredibly inconsiderate for a condo owner to be invading the space of their
neighbors, and the privacy of their neighbors, and the sanctity of their condo
building —imposing a constant stream of transients on people in their
community."[15]

This is a troubling remark to make. In its motion for dismissal, Defendants attempt to
downplay these remarks, by stating, "Defendant Schneider's comment immediately
following it was to state that her personal views were irrelevant." Yet mere professions of
a pure heart and an open mind cannot cleanse bias or prejudice, so to speak. Indeed, the
Due Process Clause requires that a judge should disqualify himself or herself in any
proceeding in which his or her impartiality might reasonably be questioned. As the Sixth
Circuit Court of Appeals has stated: "It is fundamental that both unfairness and the
appearance of unfairness should be avoided. Wherever there may be a reasonable
suspicion of unfairness, it is best to disqualify." *American Cyanamid Co. v. Federal
Trade Commission* 363 F.2d 757 (6th Cir. 1966)

### CONCLUSION

As discussed above, Plaintiff's Complaint contains cognizable legal theories and
sufficient facts to support a cognizable legal claim. For that reason alone, Defendant's
motion to dismiss under Rule 12(b)(6) should be denied.

Respectfully re-submitted,
DATE: Thursday, May 14, 2020

/s/ Heleni Thayre
Heleni Thayre, Plaintiff *Pro Se*
12 Euston Street, #3
Brookline, MA 02446
617-232-8180
heleni22@verizon.net

---

[15] Of note, the condo documents at 12 Euston Street, where Plaintiffs lives, contain no
prohibitions regarding short term rentals nor have they ever since their inception in 1981.

## CERTIFICATE OF SERVICE

I certify that on this day I caused a true copy of the above document to be served upon the attorney of record for all parties via CM/ECF. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

DATE: Thursday, May 14, 2020

*/s/ Heleni Thayre*
Heleni Thayre, Plaintiff *Pro Se*
12  Euston Street,  #3
Brookline, MA 02446
617-232-8180
heleni22@verizon.net